OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS - # 271253
County Counsel
james.williams@cco.sccgov.org
GRETA S. HANSEN - # 251471
DANIELLE L. GOLDSTEIN - # 257486
KAVITA NARAYAN - # 264191
JAVIER SERRANO - # 252266
JULIA B. SPIEGEL - # 292469
ADRIANA L. BENEDICT - # 306936
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:    (408) 299-5900
Facsimile:     (408) 292-7240

KEKER & VAN NEST LLP
JOHN W. KEKER - # 49092
jkeker@kvn.com
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
CODY S. HARRIS - # 255302
charris@kvn.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

Attorneys For Plaintiff COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>        Plaintiff,<br><br>        v.<br><br>DONALD J. TRUMP, President of the United States of America, JOHN F. KELLY, in his official capacity as Secretary of the United States Department of Homeland Security, DANA J. BOENTE, in his official capacity as Acting Attorney General of the United States, MARK SANDY, in his official capacity as Acting Director of the Office of Management and Budget, and DOES 1-50,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1144761

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

JURISDICTION AND VENUE ........................................................................................5

INTRADISTRICT ASSIGNMENT..................................................................................5

THE PARTIES.....................................................................................................................5

FACTUAL ALLEGATIONS ............................................................................................6

    A.    The County Relies on Federal Funding. ..............................................6

        1.    1.9 million residents depend upon the County for essential services. ........6

        2.    The County relies on federal funds to provide essential services and meet its budget. ........................................................................7

        3.    The County must make budgetary decisions today for future services.............................................................................................11

        4.    County policies and practices regarding cooperation with U.S. Immigration and Customs Enforcement ("ICE") conflict with the President's stated policies. ........................................................12

    B.    The President's Executive Order Regarding "Sanctuary Jurisdictions" is Unconstitutional. ..............................................................................16

        1.    The Executive Order constitutes an unprecedented attempt to expand executive power. ......................................................16

        2.    Section 9 of the Executive Order purports to vest the President with legislative powers that even Congress does not lawfully possess. ...........18

        3.    The President's and his subordinates' statements reveal the Executive Order's unconstitutionally broad scope. ..................................22

    C.    Congress Considered and Rejected Conditioning Federal Law Enforcement Funds on Compliance with Section 1373. ............................................25

    D.    The County Requires Immediate Relief. ................................................29

CLAIMS FOR RELIEF ....................................................................................................31

CONCLUSION..................................................................................................................39

PRAYER FOR RELIEF ...................................................................................................40

1144761

## INTRODUCTION

1.      This lawsuit challenges President Donald J. Trump's January 25, 2017 executive order directing reprisals against state, local, and municipal governments that he deems to be so-called "sanctuary jurisdictions."  Exec. Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (the "Executive Order").  The Executive Order is patently unconstitutional under the Constitution's plain text, as well as settled United States Supreme Court precedent.  The Executive Order throws Plaintiff County of Santa Clara's current budgetary and planning process into chaos, and also poses a real risk to the health, welfare, and safety of thousands of County residents.

2.      The Executive Order purports to seize for the President and his subordinate executive officers—namely, the Attorney General and the Secretary of Homeland Security—the power to declare any "sanctuary jurisdiction" ineligible to receive any federal funds.  The Executive Order nowhere defines the term "sanctuary jurisdiction."  The Secretary of Homeland Security has plenary authority to designate any state, city, county, or other entity as a "sanctuary jurisdiction," despite that term having no defined meaning.

3.      The Executive Order fails to provide any state or local government designated as a "sanctuary jurisdiction" with a right to challenge the designation through judicial review or any other means.  Indeed, the Executive Order does not even require the federal government to provide notice to a state or local government that it has been designated a "sanctuary jurisdiction."  Accordingly, the Executive Order gives the President and his executive agents unfettered, unreviewable discretion to strip any state or local government of its right to obtain any federal money, at any time or for any purpose, including money Congress has already appropriated and directed be paid.

4.      The Executive Order does not stop there.  It also directs the Attorney General to "take appropriate enforcement action" not only against so-called "sanctuary jurisdictions," but also any "entity" that "has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."  The Executive Order does not define what constitutes "preventing" or "hindering" enforcement of federal law.  As a result, this broadly and carelessly worded directive requires our nation's top law-enforcement officer to take reprisals against any state, city,

1

1144761

county, or other municipality that he may decide, in his sole and unreviewable discretion, has taken any act that he believes "hinders" any interest set forth in the vast body of federal law.  An aggrandizement of executive power of this magnitude has rarely been attempted in the history of the Republic.

5.      The Executive Order also grants the Attorney General authority to commandeer local law enforcement officers to carry out the President's immigration agenda.  It further obligates the Attorney General to retaliate against a local government whose law enforcement officers fail to provide what he considers "full compliance," in his sole and unreviewable discretion.

6.      The Executive Order contains other enormous and obvious problems.  Section 5, for example, vastly expands federal immigration enforcement priorities by prioritizing for removal undocumented immigrants who, *inter alia*, have allegedly "committed acts that constitute a chargeable criminal offense," "abused any program related to receipt of public benefits," or who, "[i]n the judgment of an immigration officer, otherwise pose a risk to public safety or national security."  Executive Order, Sec. 5(c), (e), (g) at 8800.  These standardless provisions encourage and sanction arbitrary, subjective, and discriminatory enforcement.  And Section 6 of the Executive Order requires assessment of "fines and penalties" against not only undocumented persons but anyone who "facilitate[s] their presence in the United States."  This undefined and unbounded category may include anyone who unknowingly rents a room to or conducts business with an undocumented person, medical personnel who provide essential or even life-saving services to an undocumented person, or even a lawyer defending such a person in immigration proceedings.

7.      Through this lawsuit, the County of Santa Clara ("the County") challenges only those aspects of the Executive Order's unconstitutionality that directly injure the County's interests and are ripe for judicial review.  Other challenges by other plaintiffs are sure to follow.  This action alleges that the Executive Order is unconstitutional for the following independent reasons.

8. First, the Executive Order seizes for the President and the executive branch the power of the federal purse, which belongs exclusively to Congress under Article I, section 8, clause 1 of our federal Constitution. Only Congress has the power to appropriate and spend federal dollars. This power includes the right to determine who is eligible to receive federal funds, as well as which conditions, if any, they must fulfill to receive those funds. The President has no power to appropriate funds or unilaterally place conditions on eligibility for receipt of federal money, much less to bar by fiat a state, city, or county from receiving any federal money whatsoever. Yet that is what the Executive Order purports to do.

9. In fact, the Executive Order is so unconstitutionally overbroad that it claims spending power for the President and the executive branch that even Congress lacks. Under a long and unbroken line of United States Supreme Court precedent, Congress's power to place conditions on the receipt of federal funds is limited in several fundamental respects. Once it provides money to a state, county, or city and the money is accepted, Congress is barred from imposing new conditions. Nor may Congress impose conditions on federal money that are unrelated to the federal interest furthered by the appropriated funds. And Congress cannot impose a condition that is so coercive that it amounts to "a gun to the head," leaving the state or local government with no real choice but to buckle to a federal demand. The Executive Order attempts to do all these things. Accordingly, even if the Executive Order were an Act of Congress, or authorized by one, it would be unconstitutional.

10. Congress has not only failed to grant the President the spending power he now claims, but it also considered and rejected the very policy the Executive Order now seeks to impose by dictate. Indeed, Senator Jeff Sessions—the man tapped to become the Attorney General referenced in the Executive Order—introduced a Senate bill in 2015 that would have conditioned the receipt of certain, law-enforcement-related federal funds on compliance with federal immigration enforcement directives and priorities. The bill died in committee, as did its counterpart in the House of Representatives. After Mr. Sessions failed to achieve his policy ends through the legislative process, the President simply imposed them through the Executive Order, which repeats portions of Mr. Sessions's failed bill verbatim. A long line of Supreme Court

precedent makes clear that when the President acts in derogation of the "expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  That is the case here.  The President cannot enact Mr. Sessions's bill by executive order, especially when Congress itself declined the opportunity.

11.     Second, the Executive Order is unconstitutional because it is too vague to provide the County with reasonable notice of what it must do to comply with its terms and avoid unspecified "enforcement actions."  The Executive Order requires states, cities, and counties to refrain from "hinder[ing]" any enforcement of any federal law.  Because this standard is nowhere defined in the Executive Order and its application is left up entirely to the sole and unreviewable discretion of the Attorney General, a state, city, or county could suffer whatever reprisals deemed appropriate by the Attorney General for any act deemed insufficiently supportive of federal law enforcement.  Such a vague order cannot stand.

12.     Third, the Executive Order denies the County the procedural due process protections afforded to it by the Fifth Amendment.  The Executive Order provides the County no clue as to which acts would trigger the "hindrance" standard, and no opportunity to contest the Attorney General's decision or have that decision reviewed by an independent tribunal.  Indeed, the Executive Order fails to guarantee that the County will even receive notice that it has been designated a "sanctuary jurisdiction" subject to deprivation of federal funds and unspecified enforcement actions.  Because it fails to provide affected jurisdictions with reasonable notice or any opportunity to be heard, the Executive Order violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

13.     Fourth, the Executive Order violates the Tenth Amendment and the federalism principles that animate our governmental structure.  By requiring that County officials take unspecified actions to avoid "prevent[ing] or hinder[ing]" the federal government in the enforcement of "Federal law," the Executive Order commandeers state and local officials, transforming them into federal apparatchiks and severing the bonds of political accountability inherent in our federal system.

1144761

14.     It is no exaggeration to say that the Executive Order contravenes centuries of constitutional law establishing the separation of powers between the legislative and executive branches of the federal government.  It likewise flouts basic principles of federalism that prevent the federal government from invading the sovereignty of state and local governments.  It is a naked grab for power that never has, does not, and cannot belong to the President or the executive branch.  It is wholly unconstitutional and must be struck down.

## JURISDICTION AND VENUE

15.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action or claim against the United States founded upon the Constitution, an Act of Congress, and an executive regulation.  Finally, this Court has mandamus jurisdiction under 28 U.S.C. § 1361, which provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

16.     Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are officers and employees of the United States or any agency thereof acting in their official capacities, Plaintiff resides in this District, and a substantial part of the events or omissions giving rise to this action are occurring in this District.

17.     The Court is authorized to award the requested declaratory, and preliminary and permanent injunctive relief, pursuant to 28 U.S.C. §§ 2201–2202.

## INTRADISTRICT ASSIGNMENT

18.     Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Jose Division of this Court because the action arises in Santa Clara County.

## THE PARTIES

19.     Plaintiff County of Santa Clara is a charter county organized and existing under the laws of the State of California.

20.     Defendant Donald J. Trump is the President of the United States.  He is sued in his

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

1    official capacity.

2        21.    Defendant John F. Kelly is the Secretary of the U.S. Department of Homeland

3    Security, a federal government agency responsible for, among other things, the enforcement of

4    U.S. immigration laws.  Defendant Kelly is sued solely in his official capacity.

5        22.    Defendant Dana J. Boente is the Acting Attorney General of the U.S. Department

6    of Justice.[1]  Defendant Boente is sued solely in his official capacity.

7        23.    Defendant Mark Sandy is the Acting Director of the Office of Management and

8    Budget.[2]  Defendant Sandy is sued solely in his official capacity.

9        24.    The true names and capacities of Defendants identified as DOES 1-50 are

10   unknown to Plaintiff, and Plaintiff will amend this Complaint to insert the true names and

11   capacities of those fictitiously named Defendants when they are ascertained.

## FACTUAL ALLEGATIONS

**A.    The County Relies on Federal Funding.**

**1.    1.9 million residents depend upon the County for essential services.**

25.    The County was established in 1850 as one of the first counties in California

statehood.  Today, 1.9 million people reside in the County, and rely on it to provide essential

services, such as law enforcement, health and hospital care, education, care for youth and elderly,

and social services.  Many of the County's programs serve the neediest County residents, such as

abused and neglected children, indigent and uninsured individuals requiring health care, persons

who are mentally ill or substance dependent, and persons who are physically or mentally

disabled.

26.    The County also oversees most regional public health and public safety functions,

including emergency planning and services, disease control and prevention, and criminal justice

administration, in addition to operating roads, airports, parks, libraries, election systems, fire

departments, and many other critical functions.

---

[1] The President has nominated Senator Jeff Sessions to serve as Attorney General, and, if confirmed, Senator Sessions will replace Acting Attorney General Boente.

[2] The President has nominated Congressman Mick Mulvaney to serve as Director of the Office of Management and Budget and, if confirmed, Representative Mulvaney will replace Acting Director Sandy.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

**2.    The County relies on federal funds to provide essential services and meet its budget.**

27.    The County receives approximately $1 billion annually in federal funds, representing about 15% of its $6 billion annual budget.  Only a small fraction of the federal funding the County receives relates to immigration or law enforcement.  Much of the federal funding the County receives is passed through the State of California.

28.    As discussed below, the vast majority of federal funding the County receives is used to provide essential safety-net programs and social services to its residents.  Without these federal funds, the County would be forced to make extraordinary cuts to critical services—and in some cases totally eliminate key County services and functions.  The elimination, or even reduction, of federal funding would require the County to fundamentally and globally reallocate funds and services.  And, because the Executive Order purports to withdraw *all* federal funds from "sanctuary jurisdictions," the County is forced to determine now whether and how much to cut services, and whether a global reallocation of resources is necessary.

Santa Clara Valley Medical Center

29.    Santa Clara Valley Medical Center ("SCVMC") is the only safety-net healthcare provider in the County.  Wholly owned and operated by the County, SCVMC provides healthcare services to indigent and underserved patients whom other healthcare providers often refuse to serve.  It operates a 574-bed hospital, specialized centers that provide trauma, burn and rehabilitation, renal and ambulatory care, ten ambulatory care clinics, and four medical and dental units.

30.    Approximately seventy percent of SCVMC's $1.4 billion annual budget comes from direct federal funding, as well as funds from other sources that are dependent on the existence of a federal funding stream, and would not be provided in the absence of federal funds.  Together, these funds help pay for the full suite of health care that SCVMC provides, including critical ambulatory primary and specialty care, women's and children's health services, neonatal and pediatric intensive care, comprehensive adult and pediatric specialty services, comprehensive oncology services, comprehensive trauma and emergency services, and other essential medical

services, as well as emergency and acute psychiatric services.  Federal funds also allow SCVMC to invest in research, programs, and technologies that benefit all patients and society more broadly.

31.     If SCVMC were to lose the funding that it receives from federal grants and reimbursements, hundreds of thousands of patients—including infants and children, the elderly, and those with chronic disease—would be left without viable healthcare options.  This would create an untenable healthcare crisis in the community.

Social Services Agency

32.     The County's Social Services Agency ("SSA") provides a wide array of services to the County's most vulnerable residents, including child welfare and child protective services, aid to needy families, services and support to disabled children and adults, services and protection to elderly individuals, and administration of many public benefits programs.

33.     The SSA receives over $300 million in federal funding each year—approximately 40% of its budget—to support these essential safety-net services.  Nearly all of the County's SSA funding is reimbursement-based, requiring the County to front the money necessary to provide services to its residents now based on the federal government's promise to reimburse the County later.

34.     The County relies on these federal funds to provide critical social services to its neediest residents—including child welfare services, in-home care and nutrition services for the elderly, and time-limited assistance to the County's lowest-income families.  Furthermore, because a substantial amount of SSA's federal funding pays for service providers, cutting those funds would threaten the jobs of approximately 23,000 workers who perform social work, home health care, and food services.

Behavioral Health Services Department

35.     The County's Behavioral Health Services Department provides essential services to residents struggling with mental illness and substance abuse.  It offers a broad range of services including mental health urgent care, crisis intervention, housing and support services, psychiatric

1144761

services, residential treatment programs, substance abuse treatment and services, jail diversion programs, and substance abuse prevention and education services.

36.     The Behavioral Health Services Department receives approximately $131 million in direct federal funding annually, accounting for over 30% of its operating budget.

37.     Without this federal funding, the County would be forced to drastically reduce the quantity and quality of behavioral health services it provides, and would be forced to significantly cut staff.  In turn, residents would lose access to critical behavioral health services, making them more vulnerable to crises or decompensation, relapse, and increased risk of homelessness, addiction, criminal activity, incarceration, and death.

Public Health Department

38.     The County's Public Health Department protects and promotes the health of the County's residents through programs to identify, treat, and stop the spread of communicable and potentially lethal diseases; to provide disease and injury prevention; to offer immunizations for children and travelers; and to provide health education.  The fifteen cities within the County lack their own public health departments and depend entirely on the County's Public Health Department to provide these services.

39.     Federal funds comprise approximately $40 million of the Public Health Department's $100 million annual budget.

40.     The loss of federal funds would have a devastating impact on the County's ability to continue providing core public health services for the communities most in need.  The County depends on these federal funds to support, among other things: the prevention of communicable diseases; maternal, child, and adolescent health care; food benefits, breastfeeding support, and nutrition education for low-income mothers and their children; medical care for uninsured and underinsured individuals living with HIV/AIDS; services for severely disabled children with chronic diseases; immunization support and vaccination services for children and schools; and programs to prepare for and respond to public health emergencies and potential terrorism.

Office of Emergency Services

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

41.     The County's Office of Emergency Services ("OES") is responsible for facilitating the County's preparation for, response to, and recovery from disasters of all types—from severe weather events to terrorism to major earthquakes.  Among its responsibilities, OES provides emergency management training exercises; engages in region-wide hazard planning; operates the Santa Clara County Emergency Operations Center during emergency incidents; and coordinates regional efforts to recover following emergency incidents.

42.     For fiscal year 2016, OES has been awarded more than $5 million in federal funding, representing almost two-thirds of its budget.  All of this funding is provided by the federal government on a reimbursement basis, with several million in grant funding currently outstanding—i.e., the funds have been awarded by the federal government, but the County has not yet been reimbursed.

43.     These federal funds are critical to keeping the local community safe during natural disasters, man-made emergencies, acts of terrorism, and other large-scale catastrophic events. Furthermore, these funds are essential to the County's community- and region-wide emergency planning and preparedness.

Other Federal Funding

44.     Despite their broad reach, the funding streams described above represent only a fraction of the County's federal funding sources.  Numerous other County departments and agencies rely on federal funding to provide essential health, safety, and welfare services to the community, including the Consumer and Environmental Protection Agency, the Office of Supportive Housing, the Roads and Airports Department, the Facilities and Fleet Department, the Department of Child Support Services, the Probation Department, the Sheriff's Office, the Department of Parks and Recreation, and the Office of the County Executive.

45.     Without federal funding, these departments and agencies would have to roll back their support of programs that comprise the very fabric of the community, including housing and community development, housing stability and supportive services for the chronically homeless, highway planning and construction, water quality improvement, agricultural pest management, child support, juvenile justice, security and intelligence initiatives, and multifaceted crime

1144761

1    prevention.  It is a near certainty that the County's federal funding touches each and every one of

2    its 1.9 million residents in some way or another.

3               **3.        The County must make budgetary decisions today for future services.**

4          46.    Each year, as required by the County Charter, the County Executive develops a

5    recommended budget for approval by the Board of Supervisors.  To develop that budget, County

6    staff carefully analyzes and weighs a multitude of factors including anticipated revenues, specific

7    service needs for diverse subsets of County residents, salary and benefits costs for the County's

8    18,000 employees, and an array of local priorities.

9          47.    The County is currently in the process of formulating its budget for the fiscal year

10   beginning on July 1, 2017.

11         48.    Reliable access to federal funding plays a critical role in the County's budgeting

12   process.  The County receives federal funds in several different forms.  For example, many of the

13   federal funds the County receives are provided as reimbursements, under which the County first

14   expends its own funds, and later seeks partial or complete reimbursement from the federal

15   government.  Other federal revenues are provided on a fee-for-service basis, under which the

16   County must expend its own resources to deliver services, and then subsequently seek fee-based

17   payments from the federal government.  Still other federal funds are provided to the County in the

18   form of direct, upfront grants.  The County receives all federal funding either directly from the

19   federal government, or passed through the State of California or other government entities.

20         49.    The Executive Order has thrown the County's budget process into chaos, as the

21   County suddenly faces the possibility that more than $1 billion of its anticipated revenues could

22   disappear at the executive branch's whim.  The County's contingency reserve is approximately

23   $130 million, so there is no means by which the County could possibly absorb the resulting

24   shortfall.  Because the County's federally funded programs operate continuously, the County

25   must decide whether to continue incurring hundreds of millions of dollars in costs that may never

26   be reimbursed by the federal government, or instead discontinue basic safety-net services

27   delivered to its most vulnerable residents.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

### 4. County policies and practices regarding cooperation with U.S. Immigration and Customs Enforcement ("ICE") conflict with the President's stated policies.

50.     The County is responsible for operating numerous criminal justice agencies, including the County Sheriff's Office, Department of Correction, District Attorney's Office, Public Defender's Office, Probation Department, and Office of Pretrial Services.  These agencies investigate and prosecute crimes; provide criminal defense to indigent defendants; provide services to arrestees during the pretrial phase as well as post-sentencing to reduce flight and recidivism; and ensure the safety and security of all residents of the County, including those in custody in the County jail system, which is the fifth largest in California.

51.     As part of their responsibility to apprehend and detain those suspected or convicted of committing criminal offenses, the County Sheriff's Office and Department of Correction have had significant experience with ICE "civil detainer requests" and other immigration enforcement mandates.

52.     An ICE civil detainer request asks a local law enforcement agency to continue to detain an immigrant inmate—who is generally being held in a local jail for violations or suspected violations of state criminal laws—for up to 48 additional hours after his or her regularly scheduled release date so that ICE can decide whether to take the individual into custody and initiate removal proceedings.

53.     Prior to late 2011, the County Sheriff's Office and Department of Correction regularly responded to ICE civil detainer requests and other inquiries from federal immigration officials.  As a result of ICE civil detainer request, during this period, the County was holding on average 135 additional inmates at a time, at a daily cost of $159 per person.

54.     In a public exchange of letters from August through October 2010, then-County Counsel Miguel Márquez asked ICE to clarify, among other things, (i) whether ICE viewed detainer compliance as compulsory, and (ii) whether the federal government would indemnify and reimburse the County for the costs associated with civil detainer requests.  ICE responded that detainers are "requests," but that ICE would neither reimburse detention costs nor indemnify localities for any liability arising from responding to detainer requests.

1144761

55.     Over the next several months, a task force convened by the County Board of Supervisors, and comprised of officials from each of the County criminal justice agencies listed above, carefully reviewed the County's history of compliance with ICE detainer requests, placing special focus on the impact on public safety in the community.  The task force determined that a tailored approach of honoring ICE detainer requests only for individuals with serious or violent felony convictions, as defined under California law, would best protect public safety in the County.

56.     When the Board of Supervisors formally adopted this position in the County Civil Detainer Policy in October 2011, it also included a provision stating that the County would honor ICE detainer requests for individuals with the requisite convictions only if ICE would enter into a prior written agreement "by which all costs incurred by the [C]ounty in complying with the ICE detainer shall be reimbursed."  To date, ICE has refused to enter into a reimbursement agreement with the County, so the County has not honored any detainer requests since October 2011.  Although the precise scope and meaning of the undefined term "sanctuary jurisdictions" is unknown and the executive branch's discretion to declare a state or local government to be such a jurisdiction is boundless, the County reasonably anticipates that its practices would place it on the Department of Homeland Security's weekly list of jurisdictions "that ignored or otherwise failed to honor any detainers."  Executive Order, Sec. 9(b) at 8801.

57.     Additionally, in 2010, the County Board of Supervisors adopted a Resolution affirming the separation between County services and the enforcement of federal civil immigration law.  The Resolution prohibits County employees, including law enforcement officers, from initiating an inquiry or enforcement action based solely on an individual's actual or suspected immigration status, national origin, race/ethnicity, or English-speaking ability.  It also prohibits the use of County funds or resources to investigate, question, apprehend, or arrest an individual solely because of an actual or suspected violation of immigration law, or to transmit to

13
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

ICE for purposes of federal immigration enforcement information collected by the County in the course of providing critical social services.[3]

58.     The County's policies relating to involvement in federal immigration enforcement were specifically designed to advance public safety.  County law enforcement officials rely on members of the local community—including those who lack lawful immigration status—to report crimes, come forward as witnesses, aid in apprehending individuals with bench warrants, and assist with criminal prosecutions.

59.     When local law enforcement officers are perceived as immigration enforcers, the result is a dangerous chilling effect on trust and cooperation from the community.  Individuals are less likely to seek police officers' help for fear of being questioned about their immigration status.  Crimes go unreported.  Victims and witnesses are hesitant to offer testimony.  And communities are less safe.  The view that involving local officials in federal immigration enforcement undermines public safety is not unique to the County of Santa Clara.  Indeed, local law enforcement agencies around the country echo the County's experience.

60.     The Executive Order wrongly suggests that only maximum cooperation with federal immigration enforcement priorities by local law enforcement agencies can protect public safety.  In fact, forcing local governments such as the County to engage in immigration enforcement—whether by requiring them to honor ICE civil detainer requests or, more broadly, by compelling them to act as federal immigration officers—drives a wedge between local law enforcement officers and the communities they serve and protect, undercutting law enforcement's core public safety mandate.

61.     Compelling the County to engage in immigration enforcement also threatens the County's fiscal stability.  First, civil detainer requests impose significant costs that the federal

---

[3] Starting in 2016, two federal grant programs in which the County had participated—the State Criminal Alien Assistance Program (SCAAP) and Edward Byrne Memorial Justice Assistance Grant (JAG)—required the County to certify its compliance with "all applicable federal laws." On July 7, 2016, the U.S. Department of Justice issued guidance explaining that 8 U.S.C. § 1373, which relates to sharing of immigration status information, is now considered an "applicable federal law" for purposes of SCAAP and JAG funds, and that state and local governments with *any* restrictions on information-sharing with ICE would be viewed as noncompliant.  To retain its discretion, the County decided in October 2016 not to apply for or accept future SCAAP or JAG funds from the federal government.

government refuses to reimburse.  Although a civil detainer request formally asks a local law enforcement agency to maintain custody of an individual for an additional 48 hours beyond when he or she would otherwise be released, individuals subject to civil detainers typically are held for much longer than they would absent the detainer—largely because the existence of a detainer request makes an individual highly unlikely to be offered a bail bond to facilitate his or her release from custody pending trial. The costs associated with compliance with ICE detainer requests can quickly skyrocket, diverting County resources away from critical public safety functions to federal civil immigration enforcement.

62.    Second, honoring civil detainer requests would expose the County to substantial liability for constitutional violations.  Federal courts around the country have held that honoring ICE civil detainer requests exposes local law enforcement agencies to liability under the Fourth Amendment.  *E.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 215-16 (1st Cir. 2015); *Miranda-Olivares v. Clackamas County*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *11-12 (D. Or. Apr. 11, 2014).  The federal government has made clear that it will not indemnify local law enforcement agencies against constitutional claims, even when they arise directly out of actions the local agency has taken at the federal government's behest.

63.    In addition, the County is currently a defendant in a class action lawsuit alleging Eight and Fourteenth Amendment violations relating to significant overcrowding in the County jails.  Substantially increasing the jail population by honoring ICE detainers would directly and immediately compound the County's potential liability.

64.    Even if the County rescinded its policies governing local participation in federal immigration enforcement, as the Executive Order seeks to compel, the County would still be required to comply with state laws that also significantly constrain its participation in federal immigration enforcement activities.  California's Transparency and Responsibility Using State Tools (TRUST) Act, Cal. Gov. Code § 7282.5, permits local law enforcement agencies to honor ICE detainer requests only with respect to individuals in their custody who have specific prior criminal convictions or criminal charges as to which a judge has made a finding of probable cause.  Moreover, the pending "California Values Act," Senate Bill 54, would (a) prohibit state

1144761

and local law enforcement agencies and school police from using public resources to investigate, interrogate, detain, detect, or arrest anyone solely for immigration enforcement purposes, and (b) require state agencies to ensure that information collected from individuals in the course of service delivery is limited to that necessary to provide services and is not used or disclosed for any other purpose.

65.     Indeed, in a memorandum issued by the Department of Justice's Office of the Inspector General (OIG) relating to 8 U.S.C. § 1373, the OIG called out the entire State of California as a jurisdiction that does not fully comply with federal immigration enforcement priorities.[4]   Because much of the County's federal funding is passed through agencies of the State of California, these active questions about the continuation of federal funding streams to the State of California as a whole substantially exacerbate the County's fiscal uncertainty.

**B.     The President's Executive Order Regarding "Sanctuary Jurisdictions" is Unconstitutional.**

**1.     The Executive Order constitutes an unprecedented attempt to expand executive power.**

66.     On January 25, 2017, President Donald J. Trump issued Executive Order 13768, entitled "Enhancing Public Safety in the Interior of the United States."  That Executive Order was published in the Federal Register on January 30, 2017, at Vol. 82, No. 18.  It is available on the White House public website (https://www.whitehouse.gov/the-press-office/2017/01/25/Presidential-executive-order-enhancing-public-safety-interior-united), and is attached hereto as **Exhibit A**.

67.     The Executive Order represents a gross overreach of executive power.  This power grab comes at the expense of powers constitutionally vested in the Congress, as well as state and local governments.

68.     Section 1 of the Executive Order announces the order's "[p]urpose."  Executive Order, Sec. 1 at 8799.  It declares that "Sanctuary jurisdictions across the United States willfully

---

[4] Memorandum from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen. for the Office of Justice Programs, "Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients," at 13 (May 31, 2016), https://oig.justice.gov/reports/2016/1607.pdf ("Horowitz Memo").

violate Federal law in an attempt to shield aliens from removal from the United States.  These jurisdictions have caused immeasurable harm to the American people and to the very fabric of our Republic." *Id.*

69. Section 2 of the Executive Order sets forth the "policy of the executive branch." *Id.* Sec. 2 at 8799.  It describes that policy as, among other things, "[e]nsur[ing] that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.* Sec. 2(c) at 8799.

70. Section 3 of the Executive Order is titled "Definitions," but contains no specific definitions applicable to the order.  *Id.* Sec. 3 at 8799.  Instead, it states that "the terms of this order, where applicable, shall have the meaning provided by" 8 U.S.C. § 1101.  *Id.*

71. In a sharp break with past practice, Section 5 of the Executive Order expands the federal government's immigration enforcement priorities well beyond any threshold needed to protect public safety.  Section 5 calls upon the Department of Homeland Security to "prioritize for removal those aliens" who are removable on a large number of grounds, including that they:

i) have criminal charges that have not been resolved;

ii) "have committed acts that constitute a chargeable criminal offense" even if no charges have been filed;

iii) are arriving without prior admission (e.g., asylum-seekers);

iv) have "abused any program related to receipt of public benefits"; or

v) "otherwise pose a risk to public safety or national security" in the judgment of "an immigration officer," not an immigration judge.  Executive Order, Sec. 5 at 8800.

72. These vague categories sweep in millions of individuals who have not been convicted of any criminal offense, let alone a serious or violent one.  For example, "acts that constitute a chargeable criminal offense" could include a wide range of ordinary and nonthreatening conduct.  Leaving unbridled discretion in the hands of immigration officers to brand individuals as "criminals" or "risks to public safety or national security"—without any clear standards or criteria—raises serious due process concerns.

73.     Section 6 of the Executive Order is equally vague and subject to arbitrary and discriminatory enforcement.  Section 6 purports to impose "fines and penalties" upon not only "aliens unlawfully present in the United States," but also upon "those **who facilitate their presence** in the United States."  Executive Order, Sec. 6 at 8800 (emphasis added).  This undefined phrase could result in attempts by the executive branch to impose penalties upon County employees who provide essential or even lifesaving services to immigrants who are unlawfully present; their friends and family members; churches and other religious organizations that assist them; landlords, co-workers, or employers; or even attorneys who represent them in immigration proceedings.

### 2.     Section 9 of the Executive Order purports to vest the President with legislative powers that even Congress does not lawfully possess.

74.     Section 9 of the Executive Order concerns the so-called "Sanctuary Jurisdictions" that are the subject of the order, as noted in Section 1.  The Executive Order includes no clear definition of that phrase, nor is that phrase defined in 8 U.S.C. § 1101.

75.     Section 9(a) purports to vest executive branch officials with broad authority and unlimited, unreviewable discretion to deny federal funds to whichever jurisdictions they deem to be Sanctuary Jurisdictions, and to take unspecified enforcement action against them.  It begins with an unconstitutional provision allowing the executive branch to strip federal funding from such purported Sanctuary Jurisdictions:

> [T]he Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

Executive Order, Sec. 9(a) at 8801 (the "Defunding Provision").

76.     The Defunding Provision places entirely new and amorphous conditions on jurisdictions, like the County, which rely on federal funds to provide services to their residents. Under the Executive Order, if the Attorney General and Secretary of Homeland Security determine (in their unbounded discretion) that a jurisdiction is "willfully refus[ing] to comply

1144761

with 8 U.S.C. 1373," then those jurisdictions will be rendered "not eligible to receive Federal grants."[5]  *Id.*

77.     Section 1373 provides, *inter alia*, that local governments may not prohibit or restrict "any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status . . . of any individual."  8 U.S.C. § 1373(a).  It further forbids any person or agency from prohibiting or restricting any government entity from sending, maintaining, or exchanging such information with federal immigration officials.  *Id.* § 1373(b).[6]

78.     The Defunding Provision includes no process or procedure by which a state or local government may review, challenge, or even receive notice regarding its designation as a "sanctuary jurisdiction."

79.     The Defunding Provision makes no mention of any statutory authority for the new conditions it imposes on the affected jurisdictions.  Indeed, it makes no reference to Congress or Congressional action whatsoever.  Rather, it grants the power to impose the new conditions—as well as to determine if those conditions have been met and to deny funding on that basis—solely to executive branch officials.

80.     The Defunding Provision is incredibly broad.  On its face, it appears to apply to existing and expected federal funds.  It makes no distinction between block grants provided to states or municipalities, funds disbursed as reimbursements for previous or expected expenditures, funds disbursed under a fee-for-service model, or funds provided to state and local governments through entitlements such as Medicare or Medicaid.

81.     Section 9(c) of the Executive Order makes clear that the Defunding Provision is intended to apply to all federal funds.  Section 9(c) orders the Director of the Office of

---

[5] Because the phrase "Federal grant" is nowhere defined in the Executive Order, the County must interpret that phrase to apply to all federal funds, whatever their source.  This interpretation is consistent with the President's statements regarding his desire to cut off taxpayer funds to state and local governments he considers to be "sanctuary jurisdictions."  *See infra* ¶¶ 91–95.

[6] The federal government has expanded on its view of what Section 1373 requires through various memoranda and guidance documents.  *See, e.g.*, Horowitz Memo; Office of Justice Programs, *Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. Dep't of Justice (July 7, 2016); Office of Justice Programs, *Additional Guidance Regarding Compliance with 8 U.S.C. § 1373*, U.S. Dep't Just. (October 6, 2016).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

Management and Budget "to obtain and provide relevant and responsive information on *all Federal grant money that currently is received* by any sanctuary jurisdiction." Executive Order, Sec. 9(c) at 8801 (emphasis added). On its face, the order targets "all" federal funds, whatever their source, and includes funds that affected jurisdictions—including the County—have "currently received." *Id.* It is therefore unbounded in both scope and time. Furthermore, the notion that the federal government may, pursuant to this order, attack County funds retroactively is no hypothetical scenario. For each type of funding the County receives, the federal government may attempt to claw back those funds.

82. By executive fiat, the Defunding Provision imposes new funding conditions that Congress could not constitutionally have imposed. The Defunding Provision applies to all "Federal grants," regardless of whether those grants have any connection, relation, or nexus to immigration. Executive Order, Sec. 9(a) at 8801. Such an untethered condition far exceeds Congress's power under the Spending Clause.

83. The order provides a mechanism by which certain monies "deemed necessary for law enforcement purposes" may be exempted from the blanket Defunding Provision. *Id.* That exemption gets the law exactly backwards, because funds related to law enforcement bear at least some connection to compliance with 8 U.S.C. § 1373, and are arguably the only funds that Congress could conceivably have tied to such compliance in a constitutional manner. *See* S. 1640, 114th Cong. § 114(d) (2015); H.R. 1148, 114th Cong. § 114(d) (2015). But Congress has never imposed any such restriction, and in fact has specifically considered and rejected similar restrictions. *See id.*

84. By threatening all of a jurisdiction's federal funding, the Defunding Provision goes beyond encouragement and becomes unduly coercive. It is, in effect, "a gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 132 S. Ct. 2566, 2604 (2012). The point of the threat is to compel each affected jurisdiction to "adopt a federal regulatory system as its own," which is "contrary to our system of federalism." *Id.*

85. The new spending conditions are also constitutionally infirm. Section 1373 itself raises a host of constitutional issues, particularly under the Tenth Amendment. And to the extent

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

that the executive branch determines that compliance with 8 U.S.C. § 1373 requires jurisdictions to detain individuals who would otherwise be released from custody, the Executive Order forces jurisdictions to violate the Fourth, Eighth, and Fourteenth Amendment rights of individuals within those jurisdictions, thereby risking civil liability, including personal liability against individual law enforcement officers.

86.     The Executive Order not only claims the power to strip affected jurisdictions of the federal funding they rely on to govern, but also promises unspecified enforcement action against those jurisdictions:

> The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

Executive Order, Sec. 9(a) at 8801 (the "Enforcement Provision").

87.     Like the Defunding Provision, the Enforcement Provision is both extremely broad and entirely vague in its wording.  It promises enforcement action against any jurisdiction that "prevents or hinders the enforcement of Federal law."  *Id.*  By its terms, this provision applies to *all* federal law—all 54 titles of the U.S. Code, and presumably the entire Code of Federal Regulations to boot.  Nor is it limited to violations of federal law; it targets any jurisdiction that has a "statute," "policy," or "practice" that simply "hinders" enforcement of those laws.  The Enforcement Provision does not define what "hinders" means, vesting entirely in the executive branch the power to make that determination and offering no judicial review or other recourse to any jurisdiction deemed to have violated it.

88.     Taken at face value, the Enforcement Provision reworks the entire structure of our federal republic, granting the federal executive branch untrammeled discretion to punish state and local governments for taking any action—or simply having a policy or practice—that the federal government finds inconvenient.  The Enforcement Provision thus violates the anti-commandeering aspect of the Tenth Amendment, as well as federalism principles more generally.

89.     The Executive Order makes no attempt to ground the vast new authority it seizes for the executive branch in any specific constitutional or statutory authority.  The only sources of authority President Trump has claimed for the sweeping and unprecedented order are "the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

authority vested in me as President by the Constitution and laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*)," as well as "Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code." Executive Order, Secs. 1, 2 at 8799.

90.    None of these cited provisions grants the President any of the powers he has taken for his own.  Justifying itself by reference to the "authority vested" in the President by the Constitution and federal law, the Executive Order begs the question of whether the President has such authority in the first place.  The INA says nothing about withdrawing or restricting federal funds from jurisdictions that fail to comply with 8 U.S.C. § 1373, or imposing "appropriate enforcement action" against certain jurisdictions.  Indeed, the phrase "sanctuary jurisdiction" is found nowhere in the Act.  Article II, Section 3 of the Constitution is the "Take Care" clause, which by its terms requires the President to follow and execute the law Congress enacted, not to seize legislative power for himself.  That clause has never been interpreted to allow the power grab the President is attempting here.  And 5 U.S.C. § 3331 is the oath of office every federal official—except the President—takes when appointed to a federal office.  The oath provides no independent authority for the powers claimed by the Executive Order.

### 3.    The President's and his subordinates' statements reveal the Executive Order's unconstitutionally broad scope.

91.    The Executive Order contains a few vague caveats indicating that it will, in part, be applied "to the extent consistent with law" (a caveat noticeably absent from the Enforcement Provision).  *See* Executive Order, Sec. 9 at 8801.  But the President's and his subordinates' own statements belie that blithe assurance.  On the contrary, there is no indication that the executive branch understands, respects, or has any intention to interpret or enforce the Executive Order consistent with governing law and well-established constitutional limitations.

92.    The President's own statements—and those of other officials in his administration—reveal that the executive branch intends the Executive Order to go far beyond current law.  Indeed, the President has repeatedly promised, both on the campaign trail and once elected, that his goal is not to use the spending power (which is not his, in any event) to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

encourage jurisdictions to cooperate with his federal immigration program.  Rather, he proposes to deny *all* federal funding to jurisdictions he believes are failing to comply with federal immigration laws, "ending" them altogether.  That approach is undoubtedly unconstitutional, however implemented.

93.   The President's and his aides' statements unambiguously point to a broad, and therefore unconstitutional, interpretation of the Executive Order.  For instance:

i)   On August 31, 2016, then-candidate Donald J. Trump issued an "Address on Immigration," which included a heading entitled "Block Funding for Sanctuary Cities." *Donald J. Trump: Address on Immigration*, Donald J. Trump for President (Aug. 31, 2016), https://www.donaldjtrump.com/press-releases/donald-j.-trump-address-on-immigration.   Mr. Trump stated, "We will end the Sanctuary Cities that have resulted in so many needless deaths. ***Cities that refuse to cooperate with federal authorities will not receive taxpayer dollars***, and we will work with Congress to pass legislation to protect those jurisdictions that do assist federal authorities." *Id.* (emphasis added).

ii)   On January 25, 2017—the day on which the President issued the Executive Order—the President's press secretary, Sean Spicer, made clear that the order targets all federal funding: "***We are going to strip federal grant money from the sanctuary states and cities that harbor illegal immigrants.***  The American people are no longer going to have to be forced to subsidize this disregard for our laws."  White House, *1/25/17: White House Press Briefing*, YouTube (Jan. 25, 2017), https://www.youtube.com/watch?v=OaPriMVvtZA (begin at 3:57 mark) (emphasis added).

iii)   On January 26, 2016, President Trump reiterated his plan to target sanctuary jurisdictions during remarks at the Congressional Republican Retreat: "And finally, at long last, ***cracking down on sanctuary cities***.  It's time to restore the civil rights of Americans, to protect their jobs, their hopes and their dreams for a much better future."  Donald J. Trump, *President Trump Remarks at Congressional Republican Retreat*, C-Span (Jan. 26, 2017), https://www.c-span.org/video/?422829-1/President-trump-tells-congressional-republicans-now-deliver (begin at 13:54 mark) (emphasis added).

23

1144761

iv)    On January 28, 2017, the White House issued a press release stating, "President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, *including halting federal funding for sanctuary cities*."  Press Release, The White House, Office of the Press Secretary, President Trump's First Week of Action (Jan. 28, 2017), https://www.whitehouse.gov/the-press-office/2017/01/28/President-trumps-first-week-action (emphasis added).

v)    That same day, the President stated, "Here are just a few of the executive actions that I have taken in the last few days . . . .  An order to immediately begin the border wall and to *crack down on sanctuary cities*.  They are not safe, we have to take care of that horrible situation."  Press Release, The White House, Office of the Press Secretary, President Trump's First Weekly Address (Jan. 28, 2017), https://www.whitehouse.gov/the-press-office/2017/01/28/President-trumps-first-weekly-address (emphasis added).

vi)    The White House's public website likewise states that President Trump "is dedicated to enforcing our border laws, *ending sanctuary cities*, and stemming the tide of lawlessness associated with illegal immigration."  The White House, *Standing Up For Our Law Enforcement Community*, https://www.whitehouse.gov/law-enforcement-community (last accessed on February 1, 2017) (emphasis added).

vii)    Mr. Spicer, the President's press secretary, reiterated this goal on February 1, 2017, stating in a press briefing, "I think the President's goal in *ending sanctuary cities* is pretty clear. . . . [T]he President has been very clear through his executive order that *federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities*."  Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-press-office/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6 (emphases added).

94.    The Executive Order itself confirms the sweeping scope outlined by the President and his aides.  It cannot refer merely to existing executive power to limit spending; if that is all the order accomplishes, then it is superfluous.  There would be no need to order what the President may already accomplish through existing statutory authorization.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

95.     In addition to comments regarding the Executive Order, the President's more recent statements reveal a complete lack of understanding of, and respect for, the boundaries between executive and legislative powers.  For example, commenting on reports of violent protests at U.C. Berkeley in response to a planned speaking event, the President tweeted, "If U.C. Berkeley does not allow free speech and practices violence on innocent people with a different point of view – NO FEDERAL FUNDS?"  @realDonaldTrump, Twitter (Feb. 2, 2017, 3:13 AM), https://twitter.com/realDonaldTrump/status/827112633224544256 (last accessed Feb. 2, 2017).  The President seems to hold the misimpression that the executive branch controls the power of the purse, and that he can simply turn off the federal funding spigot to states, local governments, and other publicly funded entities he disfavors.  The Founders drafted and designed our Constitution to avoid precisely this result.

C.     **Congress Considered and Rejected Conditioning Federal Law Enforcement Funds on Compliance with Section 1373.**

96.     The Executive Order not only claims legislative power in excess of what the Constitution grants to Congress, but it also represents an attempt to enact a policy that Congress has already expressly considered and rejected.  In fact, one of the individuals who will likely be tasked with implementing and enforcing the Executive Order is the same person who tried and failed to persuade Congress to enact the policy the executive branch is now imposing by dictate: Jeff Sessions.

97.     On June 22, 2015, Senator Jeff Sessions—now the President's nominee for Attorney General of the United States—introduced a bill in the United States Senate.  The bill, S. 1640, is entitled the "Michael Davis, Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act," and is attached hereto as **Exhibit B**.  Senator Sessions's bill sought to tie certain federal funds to compliance with 8 U.S.C. § 1373.  S. 1640, 114th Cong. (2015).  That is the same power, on a narrower scale, the President now claims.

98.     Only seven Senators co-sponsored Mr. Sessions's bill, which died in the Senate Judiciary Committee.

99.     Senator Sessions's bill had a counterpart in the United States House of Representatives.  There, U.S. Representative Trey Gowdy introduced H.R. 1148, entitled the "Michael Davis, Jr. in Honor of State and Local Law Enforcement Act."  H.R. 1148, 114th Cong. (2015).  The House bill is attached hereto as **Exhibit C**.  Only 50 House Members co-sponsored Mr. Gowdy's bill, which was reported out of the House Judiciary Committee, but languished in the Committee on Homeland Security.  It never received a vote on the floor of the House.

100.     Senator Sessions's unsuccessful legislation, as well as its companion bill in the House, was a narrower version of the sweeping Executive Order the President issued after nominating Mr. Sessions to be his Attorney General.  Its declared purpose was to "amend the Immigration and Nationality Act to improve immigration law enforcement within the interior of the United States."  S. 1640, 114th Cong. (2015).  Section 114 of the bill, entitled, "State Violations of Enforcement of Immigration Laws," proposed an amendment to 8 U.S.C. § 1373 that is strikingly similar to the Executive Order Mr. Sessions will enforce if he is confirmed as the Attorney General.  Section 114(d) provided as follows:

"(d) Compliance.—

"(1) IN GENERAL.—A State, or a political subdivision of a State, that has in effect a statute, policy, or practice that prohibits law enforcement officers of the State, or of a political subdivision of the State, from assisting or cooperating with Federal immigration law enforcement in the course of carrying out the officers' routine law enforcement duties shall not be eligible to receive—

"(A) any of the funds that would otherwise be allocated to the State or political subdivision under section 241(i) of the Immigration and Nationality Act (8 U.S.C. 1231(i)) or the 'Cops on the Beat' program under part Q of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3796dd et seq.); or

"(B) any other law enforcement or Department of Homeland Security grant.

"(2) ANNUAL DETERMINATION.—The Secretary shall determine annually which State or political subdivision of a State are not in compliance with this section and shall report such determinations to Congress on March 1 of each year.

"(3) REPORTS.—The Attorney General shall issue a report concerning the compliance of any particular State or political subdivision at the request of the House or Senate Judiciary Committee. Any jurisdiction that is found to

26

1144761

be out of compliance shall be ineligible to receive Federal financial assistance as provided in paragraph (1) for a minimum period of 1 year, and shall only become eligible again after the Attorney General certifies that the jurisdiction is in compliance.

S. 1640, 11th Cong. § 114(d) (2015).[7]

101.    Shortly after introducing his bill in the U.S. Senate, Mr. Sessions issued a press release calling on Congress to pass a law restricting federal funds to sanctuary cities—the very authority the President now claims as his own.  Senator Sessions said: "I am calling today on Congress to make its first item of business ***the immediate passage of legislation to cut off relevant federal monies to sanctuary cities.***"  News Release, Office of Senator Jeff Sessions, *Senator Sessions Calls on Congress to Take Up Immigration Reform for Americans* (July 9, 2015), http://www.sessions.senate.gov/public/index.cfm/2015/7/senator-sessions-calls-on-congress-to-take-up-immigration-reform-for-americans (emphasis added).

102.    Two aspects of Senator Sessions's statement bear emphasizing, and each of them demonstrates the unconstitutionality of the Executive Order Mr. Sessions will be charged with implementing if he is confirmed as Attorney General.  First, Senator Sessions is flatly admitting that current law does *not* allow funds to be "cut off" from sanctuary jurisdictions.  As Senator Sessions understood, new legislation would be needed to accomplish that objective.  Second, Senator Sessions is recognizing that only "***relevant*** federal monies" may be conditioned on compliance with certain immigration laws.  *Id.* (emphasis added).  Senator Sessions did not call on Congress to render sanctuary jurisdictions ineligible from receiving *all* federal grants, whether or not those grants were germane to immigration or law enforcement, because such a law would be patently unconstitutional.

103.    Despite Senator Sessions's exhortation, Congress never enacted his proposed bill, which would have cut off certain federal funding to state and local governments deemed insufficiently compliant with federal immigration directives.   In fact, the precise opposite is true:

---

[7] The companion House bill, H.R. 1148, contained an identical provision.  *See* H.R. 1148, 114th Cong. § 114(d) (2015).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

both houses of Congress have independently and expressly considered and rejected the policy that the President and Mr. Sessions now claim for the executive branch by fiat.

104.    The similarities between Senator Sessions's failed bill and the Executive Order are striking, and likely not coincidental.[8]  The two documents share common phrases nearly verbatim, targeting any jurisdiction that "has in effect a statute, policy, or practice" that the federal government finds problematic.  They both declare that such jurisdictions shall not be "eligible to receive" federal funds.  And they both vest in the Secretary of Homeland Security the ability to designate certain jurisdictions as noncompliant.  They also both contemplate the Attorney General publishing a report listing jurisdictions that the Attorney General has deemed noncompliant.

105.    The differences between the failed bill and the Executive Order are also telling.  The bill appears to have made at least some effort to conform to constitutional limitations on Congress's spending power.  For example, the bill tied only certain law-enforcement-related funds to the proposed funding condition, signaling out "Cops on the Beat" funds, and other law enforcement or Department of Homeland Security grants.  S. 1640, 114th Cong. § 114(d)(1)(A-B).  That limitation stands in stark contrast to the Executive Order, which renders affected jurisdictions ineligible to receive all "Federal grants."  Executive Order, Sec. 9(a) at 8801.  The failed bill also vested the Secretary of Homeland Security with primary authority for implementing the legislation.  By contrast, the Executive Order vests the Attorney General— presumably Mr. Sessions—as well as the Secretary with ensuring fund ineligibility.  *Id.*

106.    The President's attempt to secure by executive fiat what Senator Sessions failed to win through the legislative process violates the separation of powers principles that undergird our

---

[8] Media reports confirm that Senator Sessions played a prominent role in the executive orders that the President issued during his first week in office.  One article states that Senator Sessions was the "intellectual godfather" of Mr. Trump's executive orders, and that his longtime chief of staff, along with one of his mentees, drafted the orders.  *See* Philip Rucker & Robert Costa, *Trump's Hard-Line Actions Have an Intellectual Godfather: Jeff Sessions*, Wash. Post, Jan. 30, 2017.  Indeed, administration officials have stated that Senator Sessions "helped devise the President's first-week strategy, in which Trump signed a blizzard of executive orders that begin to fulfill his signature campaign promises — although Sessions had advocated going even faster."  *Id.*  According to the reports, Senator Sessions "lobbied for a 'shock-and-awe' period of executive action that would rattle Congress, impress Trump's base and catch his critics unaware."  *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1   system of government.  As Justice Jackson stated in his seminal concurrence in *Youngstown*,

2   "When the President takes measures incompatible with the expressed or implied will of Congress,

3   his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus

4   any constitutional powers of Congress over the matter."  343 U.S. at 637 (Jackson, J.,

5   concurring).  In issuing the Executive Order, the President operated at his lowest ebb of power,

6   since Congress had already expressed its will by considering and rejecting the very powers the

7   President has claimed for himself with the stroke of a pen.

8       **D.    The County Requires Immediate Relief.**

9       107.    The County has standing to challenge the Executive Order and its claims are ripe

10  for adjudication today.

11      108.    The County has suffered an injury-in-fact.  As set forth above, the County receives

12  approximately $1 billion in federal funding per year, which amounts to more than 15% of its total

13  budget.  The Executive Order purports to strip away all of this federal funding, decimating the

14  County's ability to provide basic services to its residents.  The "loss of funds promised under

15  federal law" is a quintessential economic injury that "satisfies Article III's standing requirement."

16  *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (en banc),

17  *cert. denied sub nom. Alaska v. Organized Vill. of Kake, Alaska*, 136 S. Ct. 1509 (2016).

18      109.    Furthermore, the Executive Order applies to, and purportedly would bar the

19  County from receiving, federal funds to reimburse the County for established programs and

20  services that the County is ***currently*** providing, and for which Congress has already approved

21  funding.  The County is an eligible recipient of, expects to receive, and has made budgeting,

22  programming, and hiring decisions based on these prior congressional funding decisions.  Now,

23  the Executive Order purports to require retroactive imposition of the condition that municipalities

24  comply with federal immigration provisions to already-approved funds.  This is precisely the sort

25  of "substantial contingent liability" that confers standing because it "immediately and directly

26  affects the borrowing power, financial strength, and fiscal planning" of the County.  *See Clinton

27  v. City of N.Y.*, 524 U.S. 417, 430-31 (1998).

28

1144761

110.    The County's injuries are "actual or imminent." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quotations omitted).  The County has already suffered harm as a result of the Executive Order, and its injuries will only continue to grow unless the Executive Order is declared unlawful and its implementation enjoined.  Indeed, the Executive Order has thrown the County's ongoing budgeting process into chaos, forcing the County to choose whether to continue incurring hundreds of millions of dollars in costs that may never be reimbursed or discontinue providing basic safety-net services to its most vulnerable residents.  And, because the County's federally funded programs operate continuously, the County is currently spending millions of dollars that may never be reimbursed by the federal government pursuant to the Executive Order.

111.    Furthermore, Defendants have made clear that their express purpose in adopting the Executive Order is to "[h]alt federal funding for," "strip federal grant money from," and "crack down on" municipalities, like the County of Santa Clara, which do not comply with federal directives, as purportedly required by the Executive Order.  *See supra* ¶¶ 91–95.

112.    Given the County's policies described above, and Defendants' repeated threats to pull federal funding from jurisdictions that refuse to carry out the commands of federal immigration officials, there is a "credible threat" that Defendants will seek to enforce the unconstitutional Executive Order against the County.  *See Susan B. Anthony List*, 134 S. Ct. at 2342 (collecting cases).  The County is not required to "expose [itself] to liability before bringing suit to challenge the basis for [Defendants'] threat."  *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–129 (2007).

113.    The County's injuries are "fairly traceable to the challenged action"—in fact, they are directly caused by the Executive Order.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000).  But for the Executive Order, the County would continue to receive federal funds for programs and services that it currently provides, and would be able to make budgeting and programming decisions without the threat that its federal funds will disappear.

114.    The Court can redress the County's injuries by declaring the Executive Order unconstitutional and enjoining its implementation and enforcement.

1144761

115.    The issues in this case are fit for judicial decision.  The Executive Order is final and the County's challenge to that Order presents legal issues that "will not be clarified by further factual development."  *Susan B. Anthony List*, 134 S. Ct. at 2347 (quotations omitted).

116.    Postponing judicial review would impose a significant hardship on the County. Requiring the County to "proceed without knowing whether the [Executive Order] is valid would impose a palpable and considerable hardship" by forcing the County to decide now whether to continue providing essential safety-net services to its residents, without knowing that it will recoup the promised federal funding.  *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 581 (1985) (quoting *Pac. Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 201 (1983)).

117.    In light of this substantial and imminent constitutional injury, the County is left with no choice but to seek immediate judicial relief, including a preliminary and permanent injunction.

## CLAIMS FOR RELIEF

### COUNT 1

**Violation of the Separation of Powers Inherent in the U.S. Constitution**

118.    The County incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

119.    Sixty-five years ago, in the midst of the Korean War, our Supreme Court held that the power of the President, "if any," to issue executive orders "must stem either from an act of Congress or from the Constitution itself."  *Youngstown*, 343 U.S. at 585.  Accordingly, an executive order lacking congressional or constitutional authority is unconstitutional.

120.    Furthermore, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Id.* at 637 (Jackson, J., concurring) (adopted in *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981)).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

121.    Article I of the Constitution vests the federal government's spending power exclusively in Congress.  *See* U.S. Const. art. I, § 8, cl. 1.  By contrast, nothing in the Constitution's text, or in more than two centuries of judicial decisions interpreting the Constitution, purports to confer on the President or the executive branch any power either to dictate government spending or to place conditions or limits on the spending power that is vested in the legislative branch.  Those powers reside solely with Congress.

122.    Although the Constitution vests the spending power exclusively in Congress, it does not confer unlimited discretion on the legislative branch when that branch seeks to place conditions on federal spending directed to states and local governments.  As the Supreme Court held in *South Dakota v. Dole*, 483 U.S. 203, 207 (1987), "[t]he spending power is of course not unlimited."  In its *Dole* decision, the Court identified and explained particular limits on Congress's power to spend.  Subsequent cases have given further definition to those limits.

123.    First, as the words of the Constitution make clear, any "exercise of the spending power must be in pursuit of 'the general welfare.'"  *Dole*, 483 U.S. at 207.

124.    Second, if Congress wishes to place certain conditions on federal funds, "it must do so unambiguously," so that states and local governments may "exercise their choice knowingly, cognizant of the consequences of their participation."  *Id.* (internal quotation marks omitted).  Accordingly, Congress may not surprise a state or local government by initially approving spending unconditionally, then later imposing a condition on receipt of those funds.  *See NFIB*, 132 S. Ct. at 2602–04.  As the Court explained in *NFIB*, "[w]e have repeatedly characterized … Spending Clause legislation as much in the nature of a *contract*."  *Id.* at 2602 (internal quotation marks omitted) (emphasis in original).  Under this framework, "[t]he legitimacy of Congress's exercise of the spending power thus rests on whether the state voluntarily and knowingly accepts the terms of the contract" at the time Congress offers the money.  *Id.* (internal quotation marks omitted).

125.    Third, the Supreme Court has "repeatedly said that Congress may condition grants under the spending power only in ways reasonably related to the purpose of the federal program"

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

1144761

at issue. *Dole*, 483 U.S. at 213. In other words, Congress may not burden the payment of funds to a state or municipality for one purpose with a condition that serves a different federal interest.

126.    Fourth, a conditional grant of federal funds may be barred if it would violate some independent constitutional provision. *Id.* at 208. For example, Congress could not condition federal grants on a municipality's agreement to perform unlawful searches and seizures in violation of the Fourth Amendment.

127.    Fifth, "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion.'" *Dole*, 483 U.S. at 211 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). Congress may not constitutionally "force the States to implement a federal program," *NFIB*, 132 S. Ct. at 2602, and may not end-run this limitation by imposing conditions on federal spending that are so draconian that they amount to "a gun to the head" leaving the state or municipality no realistic choice but to comply. *Id.* at 2604.

128.    Section 9(a) of the Executive Order violates most, if not all, of the constitutional principles and binding precedents outlined above.

129.    The Executive Order claims the power to establish conditions governing federal spending—which Congress has declined to impose through legislation—and to direct subordinate executive branch officials to restrict eligibility for federal spending without statutory authority to do so. Such powers lie beyond the President's constitutional authority. They claim for the executive branch powers exclusively assigned to Congress under the Spending Clause, U.S. Const. art. I, § 8, cl. 1.

130.    To the extent the President is purporting to impose any conditions or limitations on federal spending, or to direct subordinate executive branch officials to do the same, without express statutory authority, the Executive Order also unlawfully exceeds the President's powers under other provisions of the Constitution that establish the separation of powers among the branches of our government, including:

      i)    the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cl. 5 (Take Care Clause); and

1144761

ii) the limitation that Congressional enactments must "be presented to the President of the United States," who then may sign that enactment or veto it, but has no power to merely revise it, either upon presentment or after enactment, U.S. Const. art. I, § 7, cls. 2-3 (Presentment Clause).

131.    The Executive Order not only attempts to commandeer Congress's spending power, but it also establishes conditions on federal spending that even Congress could not constitutionally impose. In other words, the President has claimed powers over federal spending that even Congress does not possess, and could therefore never delegate. For example:

i) The Defunding Provision makes no distinction between federal funding already approved by Congress and funding to be approved in the future, and thus applies equally to both categories. But Congress, let alone the President, could not impose a condition on federal spending retroactively.

ii) The Defunding Provision applies to *all* federal funding related to any subject. It is not restricted to funding related to a legitimate federal interest in enforcement of immigration laws by municipalities. But the Constitution requires that any federal funding conditions Congress imposes must be reasonably related to the federal interest to which the expenditure relates (the "*Dole* nexus test"). The Executive Order fails that test utterly: the Defunding Provision applies to, and would bar the County from being eligible for funding for, Medicare and Medicaid programs, transportation, child welfare services, elder care programs, mental health services, immunization and vaccine programs, and a myriad of other programs and services that have absolutely nothing to do with the enforcement of federal immigration laws by state or local governments. *See supra* ¶¶ 27–45.[9]

---

[9] The Defunding Provision not only fails the *Dole* nexus test—it gets it exactly backwards. It contains only one possible exception, for funding "deemed necessary for law enforcement purposes," which the Attorney General or Secretary of Homeland Security discretionally allow to be remitted. These are the sorts of funds that *might* have withstood constitutional scrutiny had Congress passed them (and indeed, Congress considered such restrictions and declined to impose them, *see* S. 1640, 114th Cong. § 114(d) (2015)). The Executive Order threatens all funding unrelated to law enforcement, while paradoxically allowing a mechanism by which relevant funding may escape the ban.

34

iii) The Executive Order requires County law enforcement officers to undertake actions that are themselves unconstitutional.  For example, the Executive Order's text, as well as the President's statements, indicate that he interprets the Executive Order to require County law enforcement officers to comply with federal directives regarding detainer actions by U.S. Immigration & Customs Enforcement.  Courts across the country have already determined that these directives violate the Fourth Amendment.  If County law enforcement personnel are obligated to violate the Fourth Amendment in order to receive the federal funds they rely upon to provide services, County personnel would subject themselves to personal liability (including punitive damages), and potentially subject the County to municipal liability, under 42 U.S.C. § 1983 and related federal civil rights laws.

iv) The new funding conditions the Executive Order imposes are profoundly coercive to the County.  Affecting all federal funds, the conditions go far beyond the potential withdrawal of Medicaid funds, which the Supreme Court described as an unconstitutional "gun to the head" in *NFIB*.  As set forth above, the County receives about $1 billion in federal funding per year, amounting to approximately 15% of its total budget.  If the President makes good on his threat to strip all of this federal funding away, it would decimate the County's ability to provide basic services, including health care, to its residents.  Furthermore, unlike the congressional enactment in *NFIB*, which permitted withdrawal of Medicaid funding if the Secretary of Health and Human Services so decided, the Executive Order here unambiguously requires the Attorney General and the Secretary of Homeland Security to "ensure that jurisdictions" refusing the condition "are not eligible to receive Federal grants."  In other words, the conditions the Executive Order imposes are not only broader in scope than the unconstitutional condition Congress imposed in *NFIB*, but they are also mandatory rather than permissive.

35

1144761

132.    Because the conditions in the Executive Order would be unconstitutional even if imposed by Congress, it is no defense for the government to argue that Congress may have delegated its Spending Clause authority to the President with respect to some or all of the federal funds at issue.  Plainly, Congress cannot delegate a power that it does not possess, so it could not authorize the President to impose an unconstitutional condition on federal spending.

133.    The County in no way concedes that any delegation of Congress's power under the Spending Clause is constitutionally permitted, or that Congress actually purported to delegate any spending power to the President with respect to the particular federal programs and funds at issue here.  In any event, the conditions imposed by the Executive Order are ones that no branch of the federal government has the power to impose, under settled United States Supreme Court precedent.

134.    For all these reasons, and as set forth elsewhere in this Complaint, section 9(a) of the Executive Order is unlawful and unconstitutional because it violates the constitutional separation of powers and the specific constitutional provisions identified herein.

## COUNT 2

### Violation of the Due Process Clause, Amend. 5 – Void for Vagueness

135.    The County incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

136.    Under the Fifth Amendment to the United States Constitution, a federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

137.    The constitutional vagueness standard applies with full force to executive orders. *See United States v. Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002).  When an executive order contains terms that are not "susceptible of a clear meaning," nor "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional.  *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

1144761

138.    The Executive Order, which reads more like a slapdash press release than it does a serious expression of federal policy, fails to satisfy this constitutional minimum.  It fails to provide fair notice of the conduct it requires from the County.

139.    Section 9(a) of the Executive Order fails to define key terms, such as "sanctuary jurisdiction," "Federal grants," "law enforcement purposes," "appropriate enforcement action," and "entity," as well as the all-important phrase "statute, policy, or practice that prevents or hinders the enforcement of Federal law."  Executive Order, Sec. 9(a) at 8801.  Having such a "practice" subjects a jurisdiction to "enforcement action," which could be draconian in nature.  *Id.* What such a practice might be is left undefined, and subject to the executive branch's unbridled discretion.

140.    The Executive Order lends itself to subjective interpretation and discriminatory enforcement; indeed, that seems to be its point.  The order grants the Secretary of Homeland Security unfettered discretion to designate a state or local government as a "sanctuary jurisdiction" that is "not eligible to receive Federal grants."  *Id.*  The order likewise grants the Attorney General unfettered discretion to take "appropriate enforcement action" against any "entity" that, in his estimation, violates 8 U.S.C. § 1373, or has a "statute, policy, or practice that prevents or hinders the enforcement of Federal law."  *Id.*  Such a vast, standardless, and overbroad power invites arbitrary, subjective, and discriminatory enforcement.

141.    Other portions of the Executive Order are equally vague.  Section 6, for example, requires assessment of "fines and penalties" against not only undocumented persons but also anyone who "facilitate[s] their presence in the United States."  *Id.* Sec. 6 at 8800.  It is unclear what "facilitate" means in this context, and could apply to County employees who provide undocumented persons with basic, safety-net services, landlords, employers, friends, family, churches or non-profit organizations who assist undocumented persons, or even lawyers who represent undocumented persons in immigration proceedings.  Not only does this standardless provision exceed the President's authority by legislating through executive order, but it also encourages and sanctions arbitrary, subjective, and discriminatory enforcement.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.

142.    For all these reasons, and as set forth elsewhere in this Complaint, the Executive Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

### COUNT 3

### Violation of the Due Process Clause, Amend. 5 – Procedural Due Process

143.    The County incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

144.    Under the Fifth Amendment to the United States Constitution, the federal government may not deprive the County of money or property without "due process of law."

145.    The County has a constitutionally protectable property interest in the federal funds it relies on to provide essential services to 1.9 million residents.  The County's property interest in those federal funds is established and governed by rules and mutually explicit understandings with the federal government.

146.    Section 9(a) of the Executive Order deprives the County of its procedural due process rights under the Fifth Amendment because it grants the Attorney General and Secretary of Homeland Security unfettered discretion to deprive the County of all federal funds, with no opportunity to review, challenge, or even obtain notice that the deprivation is coming.

147.    Specifically, the Executive Order grants the Attorney General and Secretary of Homeland Security unfettered discretion to "ensure" that certain jurisdictions "are not eligible to receive Federal grants."  Executive Order, Sec. 9(a) at 8801.  The order further grants those executive branch officials unfettered discretion to designate a state or local government as a "sanctuary jurisdiction" that may not receive federal funds.  *Id.*  The order likewise grants the Attorney General unfettered discretion to take "appropriate enforcement action" against any "entity" that, in his estimation, violates 8 U.S.C. § 1373, or has a "statute, policy, or practice that prevents or hinders the enforcement of Federal law."  *Id.*  The order provides no mechanism by which a state or local government may review, challenge, or even obtain notice that it has been designated a "sanctuary jurisdiction" ineligible for federal funds.

1144761

148.    Because the Executive Order deprives the County of a cognizable property interest while providing no notice, no pre-deprivation opportunity to be heard, and no post-deprivation opportunity to be heard, it violates the Fifth Amendment's due process clause.

## COUNT 4

### Violation of the Tenth Amendment

149.    The County incorporates and re-alleges each and every allegation contained above as if fully set forth herein.

150.    Executive Order Section 9(a) provides that "The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. § 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." Executive Order, Sec. 9(a) at 8801.

151.    The Executive Order requires state and local jurisdictions to affirmatively assist federal immigration officials by, *inter alia*, complying, at their own expense, with ICE detainer requests.  By demanding that state and local governments, including the County, imprison individuals subject to removal at the request of federal officials even if those individuals would otherwise be subject to release from County custody, the Executive Order commandeers state and local officials in furtherance of a federal regulatory program in violation of the Tenth Amendment to the United States Constitution.

152.    The Executive Order also demands that state and local governments, including the County, take other unspecified actions to avoid "prevent[ing] or hinder[ing]" the federal government in the enforcement of "Federal law" more generally.  *Id.*  That directive transforms state and local officials into ancillary arms of the federal government, destroying the political accountability that drives our federal system.  A more plain violation of the Tenth Amendment is difficult to fathom.

## **CONCLUSION**

153.    In Federalist No. 47, James Madison warned of the dangers inherent in "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands," pronouncing it "the very definition of tyranny."  The Federalist No. 47 (James Madison).  Mindful of the

39

threat, he continued: "Were the federal Constitution, therefore, really chargeable with the accumulation of power, or with a mixture of powers, having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system." *Id.* Quoting Montesquieu, Madison focused on the particular dangers posed by an executive that claims for himself the legislative power: "When the legislative and executive powers are united in the same person or body . . . there can be no liberty, because apprehensions may arise lest THE SAME monarch or senate should ENACT tyrannical laws to EXECUTE them in a tyrannical manner." *Id.*

154.    Capital lettering notwithstanding, Madison's statement was no tweet.  It describes a bedrock notion—the separation of powers—that lies at the very legal heart of our nation.  And if the nation, and the Constitution that created it, are to endure, then that principle must yet have force.  Executive Order 13768 is unconstitutional, and the courts must declare it so.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff County of Santa Clara respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.    A declaration that Section 9 of the Executive Order is unconstitutional and invalid on its face;

2.    A declaration that the Section 9 of the Executive Order is unconstitutional and invalid as applied to the policies and practices of the County;

3.    A preliminary and permanent injunction enjoining Defendants from enforcing Section 9 of the Executive Order, or taking any other action in furtherance of any withholding or conditioning of federal funds based on the Executive Order;

4.    A declaration that Section 6 of the Executive Order is unconstitutional and invalid on its face;

5.    A declaration that Section 6 of the Executive Order is unconstitutional and invalid as applied to the policies and practices of the County;

6.    A preliminary and permanent injunction enjoining Defendants from taking any action, or exercising any purported authority, against "those who facilitate [an alien's] presence in

40

1144761

the United States" pursuant to Section 6 of the Executive Order;

7. An award to the County of reasonable costs and attorneys' fees; and

8. Such other and further relief that this Court may deem fit and proper.

Respectfully submitted,

Dated:  February 3, 2017

OFFICE OF THE COUNTY COUNSEL,
COUNTY OF SANTA CLARA

By: _____
JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN
DANIELLE GOLDSTEIN
KAVITA NARAYAN
JAVIER SERRANO
JULIA SPIEGEL
ADRIANA BENEDICT

Attorneys For Plaintiff COUNTY OF
SANTA CLARA

Dated:  February 3, 2017

KEKER & VAN NEST LLP

By:  /s/ John W. Keker
JOHN W. KEKER
ROBERT A. VAN NEST
DANIEL PURCELL
CODY S. HARRIS
NICHOLAS S. GOLDBERG

Attorneys For Plaintiff COUNTY OF
SANTA CLARA

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No.