OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS - # 271253
County Counsel
james.williams@cco.sccgov.org
GRETA S. HANSEN - # 251471
DANIELLE L. GOLDSTEIN - # 257486
KAVITA NARAYAN - # 264191
JAVIER SERRANO - # 252266
JULIA B. SPIEGEL - # 292469
ADRIANA L. BENEDICT - # 306936
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:      408 299-5900
Facsimile:      408 292-7240

KEKER & VAN NEST LLP
JOHN W. KEKER - # 49092
jkeker@kvn.com
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
CODY S. HARRIS - # 255302
charris@kvn.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@kvn.com
EDWARD BAYLEY - # 267532
ebayley@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:      415 391 5400
Facsimile:      415 397 7188

Attorneys For Plaintiff COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States of America, JOHN F. KELLY, in his official capacity as Secretary of the United States Department of Homeland Security, JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States, JOHN MICHAEL "MICK" MULVANEY, in his official capacity as Director of the Office of Management and Budget, and DOES 1-50,<br><br>Defendants. | Case No. 17-cv-00574-WHO<br><br>**COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     April 5, 2017<br>Time:     2:00 p.m.<br>Dept.:    Courtroom 2<br>Judge:   Hon. William H. Orrick<br><br>Date Filed: February 3, 2017<br><br>Trial Date:  Not yet set |

1148461

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on Wednesday, April 5, 2017, at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 of the Honorable William H. Orrick at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff County of Santa Clara (the "County") shall and hereby does move the Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction against Defendants Donald J. Trump, President of the United States of America, John F. Kelly, in his official capacity as Secretary of the United States Department of Homeland Security, Jefferson B. Sessions,[1] in his official capacity as Attorney General of the United States, and John Michael "Mick" Mulvaney,[2] in his official capacity as Director of the Office of Management and Budget (collectively, "Defendants"), and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them (the "Enjoined Defendants").  Defendants are responsible for issuing, implementing, and enforcing an unconstitutional executive order—Executive Order 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (the "Executive Order")—which attempts to render "sanctuary jurisdictions" ineligible to receive all "Federal funds," and to subject them to "enforcement action[s]."  The County respectfully moves the Court to enter a nationwide preliminary injunction prohibiting the Enjoined Defendants from:

1.   Enforcing Section 9 of the Executive Order;

2.   Taking any action in furtherance of any withholding or conditioning of federal funds pursuant to the Executive Order; and

3.   Taking any action pursuant to the Executive Order to declare any jurisdiction ineligible for federal funds or deprive any jurisdiction of funds already appropriated or allocated by Congress.

---

[1] Mr. Sessions was sworn in as Attorney General on February 9, 2017, thereby replacing Acting Attorney General Dana Boente as a defendant pursuant to Fed. R. Civ. P. 25(d).

[2] Mr. Mulvaney was sworn in as Director of the Office for Management and Budget on February 16, 2017, thereby replacing Acting Director Mark Sandy as a defendant pursuant to Fed. R. Civ. P. 25(d).

Absent a preliminary injunction, the County and its approximately 1.9 million residents will suffer immediate, ongoing, and irreparable harm resulting from the Executive Order's violation of the Constitution's separation of powers, the Tenth Amendment's prohibition on commandeering state or local governments to act as arms of the federal government, and the Fifth Amendment's Due Process Clause.  The County is suffering four types of irreparable harm, any one of which justifies the injunctive relief the County seeks.  First, the County's constitutional injuries constitute irreparable harm as a matter of law.  Second, the Executive Order irreparably harms the County by attempting to force it to alter its policies and practices under threat of losing its federal funding.  Third, because the County's federally funded programs operate continuously and largely on a reimbursement basis, the County must decide *now* whether to continue expending those funds, or instead discontinue essential safety-net services, shelve plans, and cut staff.  Fourth, by threatening roughly 35% of the County's annual budget, the Executive Order has created a cloud of fiscal and budgetary uncertainty so overwhelming that it is imperiling the County's ability to function.  The requested injunction will alleviate these harms.  And the public—including the County's residents—have an overwhelming interest in preventing Defendants from implementing this unconstitutional order.

This motion is based on this Notice of Motion and Motion, the accompanying supporting Memorandum of Points and Authorities, the supporting declarations of Sara H. Cody, M.D. (County Public Health Officer), Paul Lorenz (Chief Executive Officer of Santa Clara Valley Medical Center), Miguel Márquez (County Chief Operating Officer), Robert Menicocci (Director of the County's Social Services Agency), Carl Neusel (Undersheriff of the County), Dana Reed (Director of the County's Office of Emergency Services), Jeffrey F. Rosen (District Attorney of the County), Jeffrey V. Smith (County Executive), Laurie Smith (Sheriff of the County), and Cody S. Harris, as well as the papers, evidence and records on file in this action, and any other written or oral evidence or argument as may be presented at or before the time this motion is heard by the Court.

1148461

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................1

II.  STATEMENT OF FACTS .................................................................................3

    A.  The Executive Order threatens to strip the County of previously allocated federal funds and deny the County of all federal funds going forward. .................3

    B.  The County's policies and practices regarding cooperation with ICE conflict with the President's immigration enforcement agenda. ...........................5

    C.  The County relies on federal funding to provide essential services to 1.9 million residents...................................................................................................9

    D.  The Executive Order forces the County to make immediate budget decisions...............................................................................................................11

III.  LEGAL STANDARD........................................................................................11

IV.  ARGUMENT ....................................................................................................12

    A.  The County is likely to succeed on the merits of its claims...................................12

        1.  The County is likely to prevail on its separation of powers claim because the Executive Order usurps and distorts Congress's spending power without any constitutional or statutory authorization. ...............................................................................................12

            a.  The Executive Order attempts to exercise spending power that even Congress lacks.............................................................12

            b.  The Executive Order is an invalid exercise of executive power under *Youngstown*.............................................................15

        2.  The County is likely to prevail on its claim that the Executive Order violates the Tenth Amendment. ...............................................................17

        3.  The County is likely to prevail on its claim that the Executive Order is void for vagueness...............................................................................19

        4.  The County is likely to prevail on its claim that the Executive Order deprives the County of procedural due process. .......................................20

    B.  The Executive Order causes imminent and irreparable harm to the County. ........21

    C.  The balance of hardships and the public interest both favor the County.............24

V.  CONCLUSION..................................................................................................25

1148461

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>Federal Cases</u>

4

*Alliance for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011) .............................................................................. 11

5

6

*Arc of Cal. v. Douglas*
   757 F.3d 975 (9th Cir. 2014) ................................................................................ 11

7

*Ariz. Dream Act Coal. v. Brewer*
   757 F.3d 1053 (9th Cir. 2014) .......................................................................... 17, 24

8

9

*Bd. of Regents v. Roth*
   408 U.S. 564 (1972) .............................................................................................. 20

10

11

*City of Chicago v. Morales*
   527 U.S. 41 (1999) ................................................................................................ 20

12

*Clinton v. New York*
   524 U.S. 417 (1998) .............................................................................................. 12

13

14

*Coal. for Econ. Equity v. Wilson*
   1996 WL 691962 (N.D. Cal. Nov. 27, 1996) ...................................................... 24

15

16

*County of Santa Cruz v. Sebelius*
   399 Fed. App'x 174 (9th Cir. 2010) ..................................................................... 20

17

*Dames & Moore v. Regan*
   453 U.S. 654 (1981) .............................................................................................. 16

18

19

*Doran v. Houle*
   721 F.2d 1182 (9th Cir. 1983) .............................................................................. 20

20

21

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) .............................................................................. 24

22

*Giaccio v. Penn.*
   382 U.S. 399 (1966) .............................................................................................. 19

23

24

*In re Aiken Cty.*
   725 F.3d 255 (D.C. Cir. 2013) ............................................................................. 15

25

26

*Legal Aid Soc. of Alameda Cty. v. Brennan*
   608 F.2d 1319 (9th Cir. 1979) .............................................................................. 21

27

*Melendres v. Arpaio*
   695 F.3d 990 (9th Cir. 2012) .......................................................................... 22, 24

28

1148461

*Mendia v. Garcia*
2016 WL 2654327 (N.D. Cal. May 10, 2016) ................................................................ 8, 14

*Miranda-Olivares v. Clackamas Cnty.*
2014 WL 1414305 (D. Or. Apr. 11, 2014) ............................................................... 8, 14, 22

*Morales v. Chadbourne*
793 F.3d 208 (1st Cir. 2015) ................................................................................ 8, 14, 22

*Nat'l Fed. of Indep. Bus. v. Sebelius*
132 S. Ct. 2566 (2012) ................................................................... 13, 14, 15, 19, 20

*New York v. United States*
505 U.S. 144 (1992) ............................................................................................. 18

*Nken v. Holder*
556 U.S. 418 (2009) ............................................................................................. 24

*Orellana v. Nobles Cnty.*
2017 WL 72397 (D. Minn. Jan. 6, 2017) ..................................................................... 8, 14

*Pangilinan v. I.N.S.*
809 F.2d 1449 (9th Cir. 1987) ................................................................................ 17

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981) ............................................................................................... 20

*Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*
822 F.2d 1390 (6th Cir. 1987) ................................................................................ 25

*Printz v. United States*
521 U.S. 898 (1997) ............................................................................................. 18

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) ................................................................................ 22

*Shell Offshore, Inc. v. Greenpeace, Inc.*
709 F.3d 1281 (9th Cir. 2013) ................................................................................ 24

*South Dakota v. Dole*
483 U.S. 203 (1987) ................................................................................ 12, 13, 14, 20

*Steinle v. City & Cty. of San Francisco*
2017 WL 67064 (N.D. Cal. Jan. 6, 2017) ..................................................................... 13

*Susan B. Anthony List v. Driehaus*
134 S. Ct. 2334 (2014) ......................................................................................... 24

*Texas v. United States*
809 F.3d 134 (5th Cir. 2015) .................................................................................. 25

1148461

*Texas v. United States*
    2016 WL 4426495 (N.D. Tex. Aug. 21, 2016).................................................... 22

*Thornton v. City of St. Helens*
    425 F.3d 1158 (9th Cir. 2005) ........................................................................... 20

*United States v. Soussi*
    316 F.3d 1095 (10th Cir. 2002) ......................................................................... 19

*United States v. Williams*
    553 U.S. 285 (2008)............................................................................................ 19

*Valle del Sol Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) ........................................................................... 22

*Washington v. Trump*
    No. 17-35105, 2017 WL 526497 (9th Cir. Feb. 9, 2017) .................................. 25

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008).......................................................................................... 11, 24

*Youngstown Sheet & Tube Co. v. Sawyer*
    343 U.S. 579 (1952)............................................................................ 2, 15, 16, 17

**State Cases**

*Bologna v. City & Cty. of San Francisco*
    192 Cal. App. 4th 429 (2011) ............................................................................ 13

**Federal Statutes**

2 U.S.C. § 683..................................................................................................................... 17

5 U.S.C. § 3331................................................................................................................... 16

8 U.S.C. § 1101.............................................................................................................. 3, 16

8 U.S.C. § 1373 .......................................................................................................... *passim*

**State Statutes**

Cal. Gov't Code § 7282.5 ............................................................................................... 8, 23

**Federal Regulations**

Exec. Order 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017)............................................. *passim*

**Constitutional Provisions**

U.S. CONST. art. I § 7 cls. 2–3 ........................................................................................... 12

1148461

U.S. CONST. art. I, § 8 ................................................................................... 2, 12, 13

U.S. CONST. art. II, § 3 ......................................................................................... 12, 16

**Other Authorities**

A Bill to Prohibit Appropriated Funds from Being Used in Contravention of Section
642(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
S. 80, 114th Cong. (2015) ........................................................................................ 17

Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016) ........................................ 16

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ................................. 17

Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on
Separation of Powers of the S. Comm. on the Judiciary,
92d Cong. 279, 282 (1971) ...................................................................................... 16

Improving Cooperation with States and Local Governments and Preventing the Catch and
Release of Criminal Aliens Act of 2015, S. 1812, 114th Cong. (2015) ................................... 16

Kristen F. Butcher & Anne Morrison Piehl, *Why are Immigrants' Incarceration Rates So
Low? Evidence on Selective Immigration, Deterrence, and Deportation*, National
Bureau of Economic Research Working Paper 13229, July 2007 ............................................ 7

Letter from Peter J. Kadzik, Asst. Att'y Gen. U.S. Dep't of Justice, to Hon. John A.
Culberson, Chairman of the Subcomm. on Commerce, Justice, Sci. & Related
Agencies (Jul. 7, 2016) ......................................................................................... 6

Michael Davis, Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act,
S. 1640, 114th Cong. (2015) .................................................................................. 17

Memo. from William H. Rehnquist, Assistant Att'y Gen., Office of Legal Counsel, to
Edward L. Morgan, Dep. Counsel to the President (Dec. 1, 1969)   ....................................... 15

Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015) ................................... 16

Protecting American Citizens Together Act, S. 1764, 114th Cong. (2015) ................................... 17

Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. (2015) ...................... 16

Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016) ...................................... 16

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) ........................................ 16

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) .................................................... 16

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) ......................... 16

U.S. Dep't of Homeland Sec. Mem. from John Kelly, Sec'y of Homeland Sec.,
"Enforcement of the Immigration Laws to Serve the National Interest" (Feb. 20, 2017) ........ 6

1148461

Walter A. Ewing, Ph.D. et al., *The Criminalization of Immigration in the United States*,
     American Immigration Council, July 2015 ............................................................................ 7

COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1148461

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   INTRODUCTION

On January 25, 2017, President Donald J. Trump issued an executive order granting the Attorney General and the Secretary of Homeland Security (the "Secretary") the power to declare any state or local government a "sanctuary jurisdiction," thereby rendering any such jurisdiction ineligible to receive federal funds.  Exec. Order 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (the "Executive Order").  The Executive Order also directs the Attorney General to take unspecified "enforcement action" against any state, local government, or other "entity" that he believes has a "practice that prevents or hinders the enforcement of Federal law." *Id.* § 9(a).

The Executive Order is patently unconstitutional and the Court must enjoin Defendants from implementing it.  It usurps and expands Congress's spending power in a naked effort to coerce state and local governments, including Plaintiff County of Santa Clara ("County"), into enforcing the Trump Administration's immigration agenda.  It brazenly disregards fundamental principles of federalism and separation of powers that define our republican government.

In doing so, the Executive Order has also thrown the County's budgeting and planning process into immediate and ongoing disarray.  Because it annually receives roughly $1.7 billion in federal and federally dependent funds (about 35% of its total annual revenues), the Executive Order places the County—a governmental entity responsible for providing safety-net services to 1.9 million residents—in an untenable position.  Unless Defendants are immediately restrained from implementing the Executive Order, the County will be forced to take one of three paths, none of which is viable: (1) continue to spend money today on services for which it may be denied federal reimbursement tomorrow, thereby courting a financial crisis; (2) begin slashing essential services, programs, and staff; or (3) comply with an unconstitutional directive to participate in the President's federal immigration enforcement regime.  Each of these three pathways leads to irreparable harm to the County.  The County must make these decisions right now, and the health, welfare, and safety of the County's 1.9 million residents hang in the balance.  Sitting squarely in the President's crosshairs, the County cannot wait and see what will become of the federal funding Congress has allocated to it, or what "enforcement actions" await it.

1148461

The County is likely to succeed on all four of its claims for relief.

**First**, the Executive Order shatters the constitutional boundary between executive and legislative authority.  Article I, section 8 of the Constitution grants *Congress* the power of the purse, not the executive branch.  *Congress*, not the President, may place conditions on federal funding, and even then only within clearly defined constitutional limitations that respect the independence of state and local governments.  Ignoring these fundamental precepts, the President's Executive Order purports to exercise spending powers so overbroad, retaliatory, and coercive that *even Congress* could not constitutionally have exercised them.  In fact, Congress has repeatedly considered and rejected legislation that would have done what the President seeks to do through fiat: tying federal funds to local participation in federal immigration enforcement.  The Supreme Court has long held that the President's power is at its "lowest ebb" where, as here, he contravenes the "expressed or implied will of Congress."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

**Second**, the Executive Order is so sweeping and coercive that it violates the Tenth Amendment's prohibition on commandeering local officials to become federal functionaries.

**Third**, the challenged sections of the Executive Order are so vague and standardless that they violate the Fifth Amendment's Due Process Clause.

**Fourth**, by depriving the County—without any process whatsoever—of congressionally allocated funds to which it is legitimately entitled, the Executive Order fails to provide the procedural due process guaranteed by the Fifth Amendment.

The Executive Order is neither a housekeeping measure nor an idle threat.  It carries the force of law.  And President Trump has repeatedly made clear, most recently in a televised interview on Super Bowl Sunday, that he believes he can deploy defunding as a "weapon" against state and local governments, withholding "the money they need to operate properly as a city or state" unless they fall in line with his vision of federal immigration enforcement.

The President is wrong.  In their wisdom, our nation's founders declined to place such punitive and coercive powers in the hands of any branch of the federal government—especially the President's.  The Constitution secures for state and local governments the ability to make

1  policy decisions regarding the health, welfare, and safety of the people to whom they are

2  politically accountable.  By misappropriating Congress's spending power in an attempt to force

3  local jurisdictions into carrying out the President's immigration enforcement agenda, the

4  Executive Order tramples the principles of federalism that embody and safeguard our American

5  system of government.

6        Because the County satisfies the well-established standard for injunctive relief, it

7  respectfully asks the Court to enter the requested preliminary injunction blocking implementation

8  and enforcement of the Executive Order.

9  **II.     STATEMENT OF FACTS**

10       **A.    The Executive Order threatens to strip the County of previously allocated
   federal funds and deny the County of all federal funds going forward.**

11

12        On January 25, 2017, President Donald J. Trump issued Executive Order 13768, entitled

13  "Enhancing Public Safety in the Interior of the United States."  *See* Decl. of Cody S. Harris in

14  Support of Mot. for Prelim. Injunction ¶ 2 & Ex. A ("EO").  The Executive Order's plain text

15  reveals its broad scope, as well as its frontal assault on federalism and the separation of powers.

16  Section 1 sets forth the Order's purpose, declaring that "Sanctuary jurisdictions across the United

17  States willfully violate Federal law in an attempt to shield aliens from removal from the United

18  States" and "have caused immeasurable harm to the American people and to the very fabric of

19  our Republic."  EO § 1.  Section 2 announces the "policy of the executive branch."  *Id.* § 2.  It

20  describes that policy as, among other things, "[e]nsur[ing] that jurisdictions that fail to comply

21  with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.* § 2(c).[3]

22        Section 9 of the Executive Order concerns "Sanctuary Jurisdictions."  That section vests

23  executive branch officials with unlimited, unreviewable discretion to deny federal funds to

24  whichever jurisdictions they deem to be "sanctuary jurisdictions," and mandates unspecified

25

26  [3] Section 3 of the Executive Order is titled "Definitions," but contains no specific definitions
   applicable to the Order.  EO § 3.  Instead, it states that "the terms of this order, where applicable,

27  shall have the meaning provided by" 8 U.S.C. § 1101, which is the definition section of the
   Immigration and Naturalization Act.  *Id.*  The most significant terms appearing in the Executive

28  Order, however, appear nowhere in 8 U.S.C. § 1101.

1148461

enforcement action against them.  The phrase "sanctuary jurisdictions" applies—at a minimum—to state and local governments who "willfully refuse to comply with 8 U.S.C. § 1373," EO § 9(a), or decline to honor Immigration and Customs Enforcement ("ICE") civil detainer requests.  *Id.* § 9(b) (identifying "sanctuary jurisdictions," as those "that ignored or otherwise failed to honor any detainers with respect to such aliens").  The section begins by directing executive branch officials to strip state and local jurisdictions of all federal funding:

> [T]he Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

*Id.* § 9(a) (the "Defunding Provision").  Thus, if the Attorney General and Secretary determine (in their discretion) that the County is "willfully refus[ing] to comply with 8 U.S.C. 1373," then it "shall" be rendered "not eligible to receive Federal grants."  *Id.*

The Defunding Provision is intended to apply to all federal funds.  The Executive Order describes the President's policy as ensuring "that jurisdictions that fail to comply" with federal law "do not receive Federal funds."  EO § 2(c).  To achieve this goal, Section 9(c) orders the Director of the Office of Management and Budget to provide "information on all Federal grant money that currently is received by any sanctuary jurisdiction." *Id.* § 9(c).[4]

Section 9(a) also contains an enforcement provision, which orders the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." EO § 9(a) (the "Enforcement Provision").  The order nowhere defines what it means to "prevent[] or hinder[]" federal law enforcement, leaving that determination to the Attorney General.  Nor does the provision specify which federal laws are at issue, applying equally to federal statutes,

---

[4] Because the Executive Order nowhere defines or limits the phrase "Federal grants," the County must interpret that phrase to apply to all federal funds, whatever their source.  This interpretation is consistent with the Section 2(c) of the Executive Order, as well as the President's many statements affirming his intention to deny all taxpayer funds to state and local governments he considers "sanctuary jurisdictions."  *See* Compl. ¶ 93.

1   treaties, and presumably the entire Code of Federal Regulations.

2          The Executive Order contains vague caveats suggesting that at least some of its terms will

3   be applied to the extent "consistent with law," although that caveat is noticeably absent from the

4   Enforcement Provision.  *See* EO §§ 9(a), 18(b).  But the Executive Order cannot be applied

5   "consistent with law," because it gives the executive branch power it cannot constitutionally

6   possess.  The President repeatedly pledged on the campaign trail and after election to deny *all*

7   federal funding to jurisdictions he believes are hindering his immigration enforcement agenda,

8   thereby "ending" such jurisdictions altogether.  *See* Compl. ¶ 93 (listing statements).  For

9   example, after the Executive Order was issued, the President characterized defunding as a

10  "weapon" he could wield to deprive jurisdictions of "the money they need to properly operate as

11  a city or state."  Harris Decl. ¶ 3 & Ex. B (Tr. of Feb. 5, 2017 Bill O'Reilly Interview with

12  President Donald J. Trump ["O'Reilly Interview"]) at 4.  The President's press secretary

13  underscored the Executive Order's broad reach, telling reporters that the President intended to

14  ensure that "counties and other institutions that remain sanctuary cities don't get federal

15  government funding in compliance with the executive order."  *Id.* ¶ 4 & Ex. C (Tr. of Feb. 8,

16  2017 White House Press Briefing by Press Sec'y Sean Spicer) at 4–5.

17         **B.     The County's policies and practices regarding cooperation with ICE conflict
18                  with the President's immigration enforcement agenda.**

19         The County is undoubtedly one of the President's intended targets.  The Executive Order

20  expressly conditions federal funding, at a minimum, on "compl[iance] with 8 U.S.C. § 1373" and

21  "honor[ing]" ICE civil detainer requests.  *See* EO § 9(a), (b).  The County's policies and practices

22  are at odds with this directive.

23         Section 1373 bars any local government from prohibiting "any government entity or

24  official from sending to, or receiving from, the Immigration and Naturalization Service

25  information regarding the citizenship or immigration status . . . of any individual."  8 U.S.C. §

26  1373(a).  It further forbids any person or agency from restricting any government entity from

27  sending, maintaining, or exchanging such information with federal immigration officials.  *Id.* §

28  1373(b).  Although Section 1373 nowhere mentions compliance with ICE civil detainer requests,

the Executive Order links the two.  *See* EO § 9(b) (identifying "sanctuary jurisdictions" as those "that ignored or otherwise failed to honor any detainers with respect to such aliens").

In 2010, the County Board of Supervisors adopted a Resolution barring all County employees from using County resources to transmit to ICE information collected by the County in the course of providing critical services or benefits, as well as initiating an inquiry or enforcement action based solely on an individual's actual or suspected immigration status, national origin, race/ethnicity, or English-speaking ability.  Márquez Decl. ¶ 27 & Ex. G; Neusel Decl. ¶ 7; L. Smith Decl. ¶ 6.  The Resolution further prohibits the use of County resources to pursue an individual solely because of an actual or suspected violation of immigration law.  *Id.* Given these policies, the County declined two federal grants, both of which required the County to certify its compliance with "all applicable federal laws," including 8 U.S.C. § 1373.[5]

Based on its extensive experience, the County has also developed policies and practices regarding ICE civil detainer requests that are inconsistent with the Executive Order and the President's stated immigration enforcement agenda.[6]  An ICE civil detainer request asks a local law enforcement agency voluntarily to continue to hold an immigrant inmate—who is generally

---

[5] In July 2016, the U.S. Department of Justice issued guidance linking two federal grant programs in which the County had participated—the State Criminal Alien Assistance Program ("SCAAP") and Edward Byrne Memorial Justice Assistance Grant ("JAG")—to compliance with 8 U.S.C. § 1373, stating that jurisdictions with *any* restrictions on information-sharing with ICE would be viewed as noncompliant.  *See* Letter from Peter J. Kadzik, Asst. Att'y Gen. U.S. Dep't of Justice, to Hon. John A. Culberson, Chairman of the Subcomm. on Commerce, Justice, Sci. & Related Agencies, (Jul. 7, 2016), http://culberson.house.gov/uploadedfiles/2016-7-7_section_1373_-_doj_letter_to_culberson.pdf.  After receiving this guidance, to retain its full discretion in this policy area, the County decided in October 2016 to decline federal SCAAP or JAG funds. Márquez Decl. ¶ 29 & Ex. H.

[6] On February 20, 2017, the Secretary issued guidance primarily relating to Section 5 of the Executive Order, which is not the subject of the requested injunction.  *See* U.S. Dep't of Homeland Sec. Mem. from John Kelly, Sec'y of Homeland Sec., "Enforcement of the Immigration Laws to Serve the National Interest" (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_ S1 _Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.  The Secretary's guidance confirms the linkage between compliance with ICE civil detainer requests and the Trump Administration's immigration enforcement agenda. The guidance directs the Director of ICE to provide a weekly report to the public "of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction."  *Id.* at 6.

1  in a local jail because of actual or suspected violations of state criminal laws—for up to 48 hours

2  after his or her scheduled release date so that ICE can decide whether to take the individual into

3  custody and initiate removal proceedings.  Neusel Decl. ¶ 9; Márquez Decl., Ex. C at 3.

4       Before late 2011, the County regularly responded to ICE civil detainer requests and other

5  inquiries from federal immigration officials, housing an average of 135 additional inmates each

6  day at a daily cost of approximately $159 per inmate.  Neusel Decl. ¶ 4.  These additional inmates

7  strained the County jail's resources and facilities.  *Id.*  When the County raised these concerns

8  publicly, ICE refused to reimburse detention costs or indemnify the County for liability arising

9  from detainer requests.  Márquez Decl. ¶¶ 21–25 & Exs. B–D.

10       The County Board of Supervisors then convened a task force composed of top officials

11  from each of the County's criminal justice agencies to review the issue and recommend a local

12  policy.  L. Smith Decl. ¶ 5; Neusel Decl. ¶ 5.  The task force recommended that the County honor

13  ICE detainer requests only for individuals with serious or violent felony convictions, as defined

14  by California law, and the final policy adopted by the County honors such requests only if ICE

15  agrees to reimburse the full costs to the County of honoring the requests.  L. Smith Decl. ¶ 5;

16  Neusel Decl. ¶ 6; Márquez Decl. ¶ 26 & Ex. E.  ICE continues to refuse to reimburse costs

17  associated with honoring detainers.  Neusel Decl. ¶ 6.  The County has declined to honor ICE

18  detainer requests since the policy's implementation in November 2011.  *Id.*

19       The County's policies and practices are critical to protecting and enhancing public safety.

20  As the County's District Attorney, Sheriff, and Undersheriff all attest, based on their judgment

21  and experience, enforcement of federal immigration law by the County has a toxic effect on the

22  County's ability to fight crime and makes the entire community less safe.  Rosen Decl. ¶¶ 6–12;

23  L. Smith Decl. ¶¶ 4–9; Neusel Decl. ¶¶ 4–8.  Immigrants are no more likely to commit crimes

24  than U.S. citizens, *see* Rosen Decl. ¶ 7,[7] and County law enforcement officials rely on members

---

[7] *See also, e.g.*, Walter A. Ewing, Ph.D. et al., *The Criminalization of Immigration in the United States*, American Immigration Council, July 2015 at 1, https://www.americanimmigrationcouncil .org/sites/default/files/research/the_criminalization_of_immigration_in_the_united_states.pdf; Kristen F. Butcher & Anne Morrison Piehl, *Why are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation*, National Bureau of Economic Research Working Paper 13229, July 2007, http://www.nber.org/papers/w13229.pdf.

1148461

of the local community—including those who lack lawful immigration status—to assist with criminal investigations and prosecutions. *Id*. ¶¶ 8–11; L. Smith Decl. ¶¶ 7–8; Neusel Decl. ¶ 8. When residents perceive local law enforcement officers as ICE agents in disguise, they are less willing to report crimes or offer testimony. Rosen Decl. ¶¶ 8–11; L. Smith Decl. ¶ 9; Neusel Decl. ¶ 8. This compromises the County's ability to promote public safety—one of its core functions.

The County cannot enforce federal immigration law in accordance with the Executive Order. First, forcing the County to honor ICE civil detainer requests would impose significant, non-reimbursable costs that would strain the County's already severely impacted jail system. Neusel Decl. ¶¶ 9–10; Márquez Decl. ¶ 28. Second, honoring civil detainer requests would force the County to violate the constitutional rights of its residents and expose the County to substantial liability. Márquez Decl. ¶¶ 21, 28.[8] Third, even if the County were to change its own policies, it must still comply with state law that constrains or prohibits its participation in federal immigration enforcement activities. For example, California's Transparency and Responsibility Using State Tools (TRUST) Act, Cal. Gov't Code § 7282.5, prohibits local law enforcement agencies from honoring ICE detainer requests for individuals without specific prior criminal convictions or charges as to which a judge has made a finding of probable cause. Perhaps with the TRUST Act in mind, President Trump identified the entire State of California as an "out of control" sanctuary jurisdiction, threatening to "defund" it completely. Harris Decl., Ex. B (O'Reilly Interview) at 4. Finally, it is a core County function to determine and implement policies and practices that enhance and protect public health, welfare and safety. The County has determined that its current policies, rather than those demanded by the President, serve those objectives. *See generally* Rosen, L. Smith, and Neusel Decls.

---

[8] *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 215–16 (1st Cir. 2015); *Orellana v. Nobles Cnty.*, 2017 WL 72397, at *9 (D. Minn. Jan. 6, 2017); *Mendia v. Garcia*, 2016 WL 2654327, at *6–7 (N.D. Cal. May 10, 2016); *Miranda-Olivares v. Clackamas Cnty.*, 2014 WL 1414305, at *11–12 (D. Or. Apr. 11, 2014).

C. **The County relies on federal funding to provide essential services to 1.9 million residents.**

In fiscal year 2015-2016, the County received approximately $1.7 billion in federal and federally dependent funds, representing roughly 35% of the County's revenue during that fiscal year.[9] J. Smith Decl. ¶ 6; Márquez Decl. ¶ 8.  The County uses the vast majority of this federal funding to provide essential safety-net programs and social services to its residents.  Márquez Decl. ¶¶ 5–8.  Without these federal funds, the County would be forced to make extraordinary cuts to critical services—or even eliminate key County services and functions altogether.  *Id.* ¶¶ 4, 16-18; J. Smith Decl. ¶¶ 6–11.  The withdrawal, or any substantial reduction, of federal funding "would decimate the County budget and cause immediate and devastating injury to the 1.9 million residents who rely on the essential services that the County provides."  J. Smith Decl. ¶ 6.

The Executive Order poses an immediate and concrete threat to the County and its residents.  In support of this motion, the County has submitted declarations from the County Executive, Chief Operating Officer, Director of Emergency Management, Public Health Officer, Director of the Social Services Agency, and CEO of Santa Clara Valley Medical Center detailing the Executive Order's devastating impact on the County and its residents.  *See generally* J. Smith, Márquez, Reed, Cody, Menicocci, and Lorenz Decls.  These declarations demonstrate that the Executive Order's threat to strip the County of federal funding would decimate the County's ability to provide basic services to its residents.[10]

For example, Valley Medical Center, Santa Clara County's only public safety-net healthcare provider for indigent and underserved patients, relies on approximately $1 billion in federal funds—comprising roughly 70% of its annual expenses.  Lorenz Decl. ¶¶ 3, 7.  If Valley

---

[9] The County received roughly $1 billion in federal funds not commingled with other funding sources.  Márquez Decl. ¶ 8.  It received an additional approximately $680 million in revenues which included a significant federal funding component and was dependent upon the receipt of federal funds through a matching requirement or other mechanism.  *Id.*  These two funding streams are referred to herein, collectively, as the County's "federal funding" or "federal funds."

[10] As discussed above, the phrase "Federal grants" in Section 9(a) of the Executive Order applies to all federal funds, whatever their source.  But even if that phrase were limited to federal funds that are *not* provided through entitlement programs, the County still received more than $338 million in non-entitlement federal grant awards in fiscal year 2014-2015.  Márquez Decl. ¶ 20.

9

1148461

1    Medical Center were to lose this funding, it could no longer provide services to thousands of

2    poor, elderly and vulnerable people that rely on it for their basic healthcare needs, leaving them

3    with no viable healthcare options. *Id.* ¶ 8. The complete loss of federal funding, and resulting

4    service cuts, would force the Valley Medical Center to lay off thousands of employees, and

5    potentially close the County's only public safety-net hospital. *Id.*; *see also* Márquez Decl. ¶ 16.

6         Similarly, the County's Social Services Agency receives more than $300 million in

7    federal funding annually, compared to approximately $775 million in its total expenditures.

8    Menicocci Decl. ¶ 5. The Social Services Agency uses this money to provide services to the

9    County's most vulnerable residents, including child welfare and protection, aid to needy families,

10   support for disabled children, adults, and the elderly, and various other public benefits programs.

11   *Id.* ¶¶ 7–16. Eliminating federal funding would force the Social Services Agency to drastically

12   reduce its services and cut staff, severely harming the County's most vulnerable communities and

13   threatening more than 23,000 jobs that fully or partially depend on federal funding received by

14   the Social Services Agency. *Id.* ¶¶ 17–26; *see also* Márquez Decl. ¶ 17.

15        The County's Public Health Department receives more than $38 million in federal funding

16   annually—nearly 40% of its expenditures—for public health services provided to residents. Cody

17   Decl. ¶¶ 5–12. Eliminating this funding would compromise the County's ability to staff its

18   facilities and respond to public health emergencies. *Id.* ¶¶ 13–15; *see also* Márquez Decl. ¶ 18.

19        The County Office of Emergency Services ("OES") relies on millions of dollars in federal

20   grant funds to help the County prepare for and respond to disasters of all types, from earthquakes

21   to terrorism. Reed Decl. ¶¶ 3–9. This federal funding represents more than two-thirds of OES's

22   total funding, and it "could not perform its current functions without it." *Id.* ¶¶ 8, 10–20.

23        It is a near certainty that the County's approximately $1.7 billion in federal funding

24   touches each of its 1.9 million residents. Without this federal funding, the County would be

25   forced to roll back the programs and services that comprise the very fabric of the community, and

26   protect the health, welfare, and safety of its residents. *See* J. Smith Decl. ¶¶ 5–7.

27

28

COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1148461

**D.     The Executive Order forces the County to make immediate budget decisions.**

The Executive Order has thrown the County's current budgetary and planning processes into disarray.  Márquez Decl. ¶ 19.  Each year, the County Executive develops and recommends a budget for approval by the Board of Supervisors.  *Id.* ¶ 13.  The ability to rely on federal funding commitments plays a critical role in the County's budgeting process.  *Id.* ¶ 14.  For the current fiscal year, the County adopted a balanced budget based on the expectation that it will receive the federal funds to which it is entitled under existing agreements with federal and state agencies.  *Id.* The County largely receives these federal funds on a reimbursement or fee-for-service basis, which means the County first spends its own money before being repaid in whole or part with federal funds.  *Id.* ¶ 9.  The County is *currently* spending millions of dollars on services for which it ultimately will seek to be reimbursed from federal funds.  *Id.* ¶ 15.

As a direct result of the Executive Order, the County suddenly faces the reality that roughly $1.7 billion in anticipated annual revenues could disappear at the President's whim.  J. Smith Decl. ¶¶ 6–11; Márquez Decl. ¶¶ 4, 11, 14–15.  Because the Executive Order includes no notice provision, these funds could vanish without the County receiving notice of its ineligibility. The County has no means by which it could absorb the resulting shortfall.  J. Smith Decl. ¶ 11; Márquez Decl. ¶ 11.

## III.   LEGAL STANDARD

To secure a preliminary injunction, the plaintiff must establish that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts evaluate these factors on a "sliding scale," such that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011)).

1148461

1  **IV.     ARGUMENT**

2          **A.     The County is likely to succeed on the merits of its claims.**

3                  **1.     The County is likely to prevail on its separation of powers claim
                            because the Executive Order usurps and distorts Congress's spending
                            power without any constitutional or statutory authorization.**

4

5          Because neither the Constitution nor an act of Congress grants the President the coercive

6  spending powers he now claims, the Executive Order violates the separation of powers inherent in

7  the Constitution. *See* Compl. ¶¶ 118–34.

8                  **a.     The Executive Order attempts to exercise spending power that
                            even Congress lacks.**

9

10         The President has attempted, through the Executive Order, both to take Congress's

11  spending power for himself, and to extend that power far beyond its constitutional limits. Article

12  I of the Constitution vests the federal spending power exclusively in Congress. *See* U.S. Const.

13  art. I, § 8, cl. 1. Nothing in the Constitution's text, or in more than two centuries of judicial

14  decisions interpreting that text, confers on the executive branch any power either to dictate federal

15  spending or to place conditions or limits on such spending. The Executive Order contravenes the

16  constitutional provisions that establish the separation of powers between the political branches,

17  including the President's obligation to "take Care that the Laws be faithfully executed," *id.* art. II

18  § 3, cl. 5, and the limitation that Congressional enactments "be presented to the President of the

19  United States," who may then sign or veto them, but may not revise or amend them, *id.* art. I § 7

20  cls. 2–3; *Clinton v. New York*, 524 U.S. 417, 440 (1998).

21         Not only has the President attempted to seize power that the Constitution grants to

22  Congress alone, he also purports to wield that power in a manner not available even to Congress.

23  No branch of the federal government has the power to use spending in a manner that is "so

24  coercive as to pass the point at which pressure turns into compulsion." *South Dakota v. Dole*, 483

25  U.S. 203, 211 (1987) (internal quotations omitted). But that is the Executive Order's goal. The

26  Supreme Court has articulated five limitations on the congressional spending power, and this

27  Executive Order violates them all.

28

12

1148461

1
2
3
4
5

*First*, any federal spending must be made "in pursuit of 'the general welfare.'" *Id.* at 207 (quoting U.S. Const. art. I, § 8). Courts typically defer to Congress's policy judgment on this question. *Id.* Here, however, there is no congressional judgment to which the Court may defer—the President has usurped Congress's authority. For its part, as discussed below, Congress has repeatedly *declined* to provide the executive branch the "weapon" it now seeks to unleash.

6
7
8
9
10
11
12
13

*Second*, if Congress wishes to place certain conditions on federal funds, "it must do so unambiguously," so that states and local governments may "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 203 (internal quotation marks omitted). Accordingly, Congress may not surprise a state or local government by approving spending, then later imposing a condition on those funds. *See Nat'l Fed. of Indep. Bus. v. Sebelius* ("*NFIB*"), 132 S. Ct. 2566, 2602–04 (2012). "The legitimacy of Congress's exercise of the spending power thus rests on whether the state voluntarily and knowingly accepts the terms of the contract" at the time Congress offers the money. *Id.* at 2602.

14
15
16
17
18
19
20
21
22
23
24

The Defunding Provision fails this test, imposing a new, retroactive condition on all "Federal funds," "Federal grants," and "all Federal grant money that currently is received by any sanctuary jurisdiction." EO §§ 2(c), 9(a), 9(c). It is also ambiguous regarding what the County must do to avoid defunding. There is conflicting judicial guidance on how to "comply with 8 U.S.C. § 1373." *Compare, e.g.*, *Bologna v. City & Cty. of San Francisco*, 192 Cal. App. 4th 429, 438–39 (2011) *with Steinle v. City & Cty. of San Francisco*, 2017 WL 67064, at *11 (N.D. Cal. Jan. 6, 2017) (disagreeing "with the *Bologna* court's characterization of the scope of § 1373(a)"). Further, it is unclear whether Section 1373 requires a jurisdiction to honor ICE detainer requests, although the Executive Order links the two. *See* EO § 9(b). And it is anyone's guess what conduct the executive branch might deem "hinder[ing] the enforcement of Federal law"—a vast category that includes statutes, regulations, and international treaties.

25
26
27
28

*Third*, "Congress may condition grants under the spending power only in ways reasonably related to the purpose of the federal program" at issue. *Dole*, 483 U.S. at 213. This nexus requirement means that Congress may not burden the payment of funds to a state or local government for one purpose with a condition that serves a different federal interest. The

13

1148461

Executive Order ignores this limitation, withholding *all* federal funds, whether or not they relate to immigration enforcement.  EO § 9(a) & (c).  Indeed, the Order renders the County ineligible for funding related to Medicare and Medicaid, transportation, child welfare services, immunization and vaccine programs, emergency preparedness, and a myriad of other programs and services that have absolutely nothing to do with immigration.  *See* J. Smith Decl. ¶ 5; Márquez Decl. ¶¶ 16–18; Lorenz Decl. ¶ 8; Cody Decl. ¶ 13–15; Reed Decl. ¶¶ 8, 10–20.  Congress has no constitutional authority to enact such a sweeping condition on all federal spending—and certainly the President has no power to do so by diktat.

The Defunding Provision not only fails the *Dole* nexus test—it does the *opposite* of what *Dole* requires.  It denies sanctuary jurisdictions all federal funds with the exception of funding "deemed necessary for law enforcement purposes," which the Attorney General or Secretary may discretionarily allow to be remitted.  EO § 9(a).  These are the sorts of funds to which Congress *might* have been able to impose immigration enforcement conditions consistent with *Dole*.  Instead, the Executive Order threatens all funding *unrelated* to law enforcement, while paradoxically providing a mechanism by which potentially relevant funding may escape the ban.

**Fourth**, Congress may not condition federal spending on a local jurisdiction taking actions that violate the Constitution.  *Dole*, 483 U.S. at 208.  Here, the order makes clear that any jurisdiction that fails to honor ICE civil detainer requests will find itself ineligible for federal funding.  *See* EO § 9(b).  But federal courts in this District and across the country have held that detaining individuals who would otherwise be released from custody, at ICE's request, violates the Fourth Amendment.  *See, e.g.*, *Morales*, 793 F.3d at 215–16; *Orellana*, 2017 WL 72397, at *9; *Mendia*, 2016 WL 2654327, at *6–7; *Miranda-Olivares*, 2014 WL 1414305, at *11–12.

**Fifth**, Congress may not offer "financial inducement . . . so coercive as to pass the point at which pressure turns to compulsion."  *Dole*, 483 U.S. at 211 (internal quotation marks omitted).  As the Supreme Court most recently held in *NFIB* when striking down the Affordable Care Act's Medicaid expansion provision, where legislation becomes coercive,  it "runs contrary to our system of federalism" because Congress may not use the power of the purse to "coerce[] a State to adopt a federal regulatory system as its own."  132 S. Ct. at 2602.  The Constitution therefore

1148461

forbids Congress from imposing spending conditions so draconian that they amount to "a gun to the head," leaving the state or local government no realistic choice but to comply. *Id.* at 2604.

The Executive Order easily fails this test. If the Affordable Care Act's threat of denying Medicaid funds was an unconstitutional "gun to the head," *id.*, then the Executive Order is a nuclear weapon. The Medicaid expenditures at issue in *NFIB* amounted to 20% of the average state's budget, "with federal funds covering 50 to 83 percent of those costs." *Id.* Here, the Executive Order threatens not only the County's Medicaid funding, but also every other federal dollar the County receives.

Just as the President said, the Executive Order is crafted to deprive the County and similar entities of their ability "to properly operate." Harris Decl., Ex. B (O'Reilly Interview) at 4. But the President's threat is "contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602. The Constitution simply does not give the federal government the authority to coerce a state or local government "to adopt a federal regulatory scheme as its own." *Id.*

### b.   The Executive Order is an invalid exercise of executive power under *Youngstown*.

It is well-settled that the President's power, "if any," to issue executive orders "must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The Constitution in no way grants the President the spending power he now claims. Although "a President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program," "even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). While serving as Assistant Attorney General, the late-Chief Justice Rehnquist put it this way: "With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."[11] The future Chief Justice had it right—the President lacks the power he has granted himself with a pen stroke.

---

[11] Memo. from William H. Rehnquist, Assistant Att'y Gen., Office of Legal Counsel, to Edward L. Morgan, Dep. Counsel to the President (Dec. 1, 1969), *reprinted in* Executive Impoundment of

The Executive Order evinces little attempt to ground the vast new authority it seizes for the executive branch in any specific constitutional or statutory authority.  In issuing this sweeping order, President Trump points only to "the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq*.)," as well as "Article II, Section 3 of the United States Constitution and section 3331 of title 5, United States Code."  EO §§ 1, 2.  But none of those provisions grants the President the powers he now claims.  The INA says nothing about withholding federal funds from "sanctuary jurisdictions" or taking enforcement actions against them.  Indeed, the phrase "sanctuary jurisdiction" is found nowhere in the Act.  Article II, Section 3 of the Constitution is the "Take Care" clause, which by its terms requires the President to follow and execute the laws Congress enacted, not to seize legislative power for himself.  That clause has never been interpreted to allow a power grab of the type the President now attempts.  And 5 U.S.C. § 3331 is the oath of office every federal official—except the President—takes when appointed to a federal office.  It provides no independent authority for the President's order.

Not only does the Executive Order lack any statutory basis, it also enacts a policy that Congress has already expressly considered and rejected.  "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) (adopted in *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981)).  The President's power is at its lowest ebb here.  On multiple occasions, both houses of Congress have expressly considered and rejected tying state and local governments' compliance with 8 U.S.C. § 1373 to their eligibility for particular federal funding streams.[12]  The fact that none of these introduced bills became law

---

Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary, 92d Cong. 279, 282 (1971).

[12] *See, e.g.*, Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015); Improving Cooperation with States and Local Governments and Preventing the Catch and Release of Criminal Aliens Act of 2015, S.

16

1148461

indicates that Congress has considered the matter and rejected the President's defunding scheme as bad policy. *Cf. Youngstown*, 343 U.S. at 637–38; *see also Pangilinan v. I.N.S.*, 809 F.2d 1449, 1455 n.2 (9th Cir. 1987) (where legislation "died in committee," Congress "considered the matter and refused to provide a remedy") (Kozinski, J., dissenting from order denying en banc review).

Moreover, by granting the executive branch absolute authority to impound federal funds, the Executive Order contravenes the Impoundment Control Act of 1974. 2 U.S.C. § 683. That statute requires the President to *propose* the rescission of specific, congressionally allocated funds, allowing *Congress* to decide whether to approve that rescission. *Id.* The Executive Order, by contrast, unilaterally impounds federal funds wholesale.

In sum, the Executive Order claims for the executive branch powers that the Constitution grants to other branches by design. That design was no accident. These powers, consolidated, represent the threat to liberty James Madison warned of in the Federalist Papers. *See* The Federalist No. 47 (James Madison). Quoting Montesquieu, Madison warned: "When the legislative and executive powers are united in the same person or body . . . there can be no liberty, because apprehensions may arise lest THE SAME monarch or senate should ENACT tyrannical laws to EXECUTE them in a tyrannical manner." *Id.* The Executive Order epitomizes the danger the Founders designed the Constitution to thwart. The County is therefore likely to succeed on the merits of its separation of powers claim.

## 2. The County is likely to prevail on its claim that the Executive Order violates the Tenth Amendment.

Because the County is likely to prevail on its separation of powers claim, the Court need not consider its other claims to grant the requested preliminary injunction. *See Ariz. Dream Act*

---

1812, 114th Cong. (2015); Protecting American Citizens Together Act, S. 1764, 114th Cong. (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015); A Bill to Prohibit Appropriated Funds from Being Used in Contravention of Section 642(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, S. 80, 114th Cong. (2015). Most strikingly, then-Senator Jeff Sessions introduced one such bill in 2015. *See* Michael Davis, Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act, S. 1640, 114th Cong. (2015). Although Mr. Sessions's bill died in the Senate Judiciary Committee, the Executive Order now grants him—as U.S. Attorney General—the same power (plus more) that he failed to win through the legislative process as a Senator. *See* Compl. ¶¶ 96–106.

1148461

1  *Coal. v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014).  Even so, the County is equally likely to

2  succeed on the merits of its remaining claims.

3        The County is likely to prevail on its Tenth Amendment claim.  The Supreme Court has

4  "made clear that the Federal Government may not compel the States to implement, by legislative

5  or *executive* action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925

6  (1997) (emphasis added); *see also New York v. United States*, 505 U.S. 144, 175–76, 188 (1992)

7  (federal government may not "compel the states to enact or administer a federal regulatory

8  program").  Yet that is exactly what the Executive Order is designed to accomplish.

9        Under the Supreme Court's Tenth Amendment jurisprudence, the federal government may

10  neither direct a state or locality to enact certain legislation, nor require it to implement and

11  enforce federal law.  In *Printz*, for example, the Supreme Court held that the federal government

12  violates the Tenth Amendment's prohibition against commandeering local governments even

13  when the federal government requires the states only to provide "limited, non-policymaking help

14  in enforcing" federal law.  521 U.S. at 926–27.

15        The Executive Order makes the unconstitutional provision struck down in *Printz* appear

16  modest by comparison.  There, Congress had required local law enforcement officers to perform

17  background checks on firearm purchasers using existing federal and state databases.  *Id.* at 933–

18  34.  Here, the Executive Order conscripts state and local law enforcement officials, under penalty

19  of the most severe federal reprisal possible, to participate in federal immigration enforcement

20  activities by actively sharing information with ICE and jailing immigrants who would otherwise

21  be eligible for release.  EO § 9(a)–(b).  To make matters worse, the Executive Order directs the

22  Attorney General to "take appropriate enforcement action"—whatever that might be—"against

23  any entity," including a local government such as the County, that "has in effect a statute, policy,

24  or practice that prevents or hinders the enforcement of Federal law."  *Id.* § 9(a).

25        These conditions violate the Tenth Amendment.  They put a gun to the head of state and

26  local governments, forcing them to make the unconstitutional choice of doing whatever the

27  federal government tells them to or forfeiting the federal funds they depend on to provide

28  essential services and responsibly budget, all the while fearing unspecified federal "enforcement

1    actions" brought in the Attorney General's unfettered discretion.  As the Court held in *NFIB*, even

2    Congress could not constitutionally "force the States to implement a federal program" through a

3    coercive use of the spending power.  132 S. Ct. at 2602.  The President certainly cannot do so via

4    executive order.  Accordingly, the County is likely to succeed on its Tenth Amendment claim.

5              **3.    The County is likely to prevail on its claim that the Executive Order is
                       void for vagueness.**

6

7         The County is likely to prevail on its claim that the Executive Order is unconstitutionally

8    vague under the Fifth Amendment's Due Process Clause.  *See* Compl. ¶¶ 135–42.  A federal law

9    is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of

10   what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously

11   discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  The

12   constitutional vagueness standard applies with full force to executive orders.  *See United States v.*

13   *Soussi*, 316 F.3d 1095, 1101 (10th Cir. 2002).  The Executive Order fails both of these tests.

14        ***First***, the Executive Order fails to provide the County with fair notice of what conduct is

15   required or prohibited.  *See supra* at 12–13.  It is far from clear what full compliance with the

16   Trump Administration's immigration enforcement agenda entails, let alone what the County must

17   do (or stop doing) to persuade the Attorney General that it has no "practice that prevents or

18   hinders the enforcement of Federal law."  EO § 9(a).  Indeed, the order is "so vague and

19   standardless" that even one of the Defendants charged with implementing it—Secretary of

20   Homeland Security John Kelly—is at a loss to explain it.  *See Giaccio v. Penn.*, 382 U.S. 399,

21   402–403 (1966).  When asked during a recent press event to define a "sanctuary city," he

22   responded, "***I don't have a clue.***"  Harris Decl. ¶ 5 & Ex. D (Dep't of Homeland Sec., *Pool Notes*

23   *from Secretary Kelly's Trip to San Diego*, Feb. 10, 2017) at 3 (emphasis added).

24         ***Second***, the Executive Order lacks any clear standards or criteria, vesting the Attorney

25   General and Secretary with unfettered discretion to determine which jurisdictions fall within the

26   Executive Order's ambit, whether they have "willfully refuse[d] to comply" with Section 1373,

27   and whether "appropriate enforcement action" is required.  *Id.* § 9(a).  Where, as here, "vagueness

28

1148461

1    permeates the text" of a law, it violates the Fifth Amendment.  *City of Chicago v. Morales*, 527

2    U.S. 41, 56 (1999).  The County is likely to succeed on the merits of this claim.

3        **4.      The County is likely to prevail on its claim that the Executive Order**
         **deprives the County of procedural due process.**

4

5    Finally, the County is likely to succeed on its claim that the Executive Order fails to

6    provide it with the procedural due process the Fifth Amendment demands.  The County must

7    establish two elements: (1) a protectable liberty or property interest; and (2) a denial of adequate

8    process.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005).

9        ***First***, to have a protectable property interest, a person "must have more than a unilateral

10   expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents*

11   *v. Roth*, 408 U.S. 564, 577 (1972).[13]  A legitimate claim of entitlement may be derived from

12   contracts with public entities.  *See Doran v. Houle*, 721 F.2d 1182, 1184–85 (9th Cir. 1983).

13   The County has a legitimate claim of entitlement to federal funds that Congress has

14   already appropriated and directed to local entities such as the County.  The Supreme Court has

15   "repeatedly characterized" congressional appropriations to state and local jurisdictions as "in the

16   nature of a *contract*."  *NFIB*, 132 S. Ct. at 2602 (internal quotation marks omitted) (emphasis in

17   original).  Once Congress appropriates federal money and the County has "voluntarily and

18   knowingly accept[ed] the terms of the contract," Congress (much less the President) lacks the

19   power to retroactively impose eligibility conditions on those funds, clawing the money back if the

20   County fails to meet the newly imposed conditions.  *Id.*; *see also Pennhurst State Sch. & Hosp. v.*

21   *Halderman*, 451 U.S. 1, 17 n.13 (1981) ("The legitimacy of Congress' power to legislate under

22   the spending power thus rests on whether the State voluntarily and knowingly accepts the terms

23   of the 'contract'").  Indeed, the Supreme Court has repeatedly recognized that state and local

24   governments have a constitutionally protected interest in being free from coercive violations of

25   the congressional spending power.  *See NFIB*, 132 S. Ct. at 2602; *Dole*, 483 U.S. at 211.  The

26

27   ───────────────
     [13]  The Ninth Circuit has held that counties are "persons" for the purpose of asserting due process
28   claims related to payment of federal funds.  *County of Santa Cruz v. Sebelius*, 399 Fed. App'x
     174, 176 (9th Cir. 2010).

1148461

1    Executive Order runs headlong into this constitutional prohibition.

2            The County has a "legitimate claim of entitlement" to funds that Congress committed and

3    the County accepted.  Indeed, the County developed its budget based on "the expectation that the

4    County would receive the federal funds to which it is entitled under its agreements with a number

5    of federal and state agencies."  Márquez Decl. ¶¶ 12–14.  In doing so, the County accepted the

6    terms of a congressional contract and began performing under it.  The livelihoods of thousands

7    and the welfare of hundreds of thousands more depend on the money's continued availability.

8    Accordingly, the County has a protectable property interest in federal appropriations previously

9    authorized by Congress, and the Executive Order directly threatens that interest.

10          **Second**, the Defunding and Enforcement Provisions provide no process at all.  Instead,

11   they set up a star chamber, where the Attorney General and Secretary caucus privately to

12   determine whether a state or local government is a "sanctuary jurisdiction" or "hinders the

13   enforcement of Federal law."  EO § 9(a).  And after making either such finding, those officials

14   "shall" find the jurisdiction ineligible for federal funds, and "shall" take enforcement action.  *Id*.

15          A targeted state or local government receives no notice, no opportunity to be heard before

16   its fate is decided, and no right to appeal any adverse finding.  The Executive Order fails even to

17   require that a jurisdiction deemed guilty of either offense be given notice when the finding is

18   made.  Instead, the jurisdiction might learn of the decision only when the expected funds never

19   arrive, when the federal government attempts to claw back previously appropriated funds

20   retroactively, or when the enforcement action is levied.  The targeted state or local government

21   has no administrative or judicial recourse at any stage of this process.

22          By purporting to strip the County of federal funding without notice, the opportunity to be

23   heard, administrative or judicial review, or appellate rights, the Executive Order violates the Fifth

24   Amendment.  The County is likely to succeed on the merits of this claim.

25          **B.       The Executive Order causes imminent and irreparable harm to the County.**

26          The Executive Order is intended to carry the force of law.  *Legal Aid Soc. of Alameda Cty.

27   v. Brennan*, 608 F.2d 1319, 1329 n.14 (9th Cir. 1979).  As such, it has concrete and immediate

28   effects on the County's budget and, fundamentally, its ability to operate.  The County is suffering

COUNTY OF SANTA CLARA'S MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1148461

1    at least four types of immediate and irreparable harm directly tied to the Executive Order—each

2    of which is independently sufficient to support the requested preliminary injunction.

3         *First*, as a matter of law, "the deprivation of constitutional rights 'unquestionably

4    constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

5    (internal quotation marks omitted); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1144–45 (9th

6    Cir. 2013) (same).  As explained above, the Executive Order shreds the County's constitutional

7    rights by contravening the separation of powers inherent in the Constitution, conscripting County

8    officials to carry out a federal regulatory program, and imposing crippling financial penalties

9    without any semblance of due process.

10        The County need not wait for a funding ineligibility determination or an enforcement

11   action before obtaining an injunction.  Injunctive relief is appropriate once a party has shown a

12   "credible threat of prosecution" under an unconstitutional law.  *Valle del Sol Inc. v. Whiting*, 732

13   F.3d 1006, 1029 (9th Cir. 2013).  Given the County's policies regarding ICE detainers and federal

14   immigration enforcement, there is no doubt that the County has a "credible threat" of being

15   targeted under the Executive Order.

16        *Second*, forcing the County to change its policies to comply with an unconstitutional order

17   invades its independent policymaking role and constitutes irreparable harm.  Where, as here, an

18   executive directive is "designed to force Plaintiffs to amend their policies to comply or place their

19   federal funding in jeopardy," preliminary injunctive relief is appropriate.  *Texas v. United States*,

20   No. 7:16-CV-00054-O, 2016 WL 4426495, at *5 (N.D. Tex. Aug. 21, 2016).

21        An injunction is especially necessary here in light of the fact that compliance with the

22   Executive Order is impossible.  The order is so vague that the County has no idea what it must do

23   to avoid being deemed ineligible for federal funds and other unspecified enforcement actions by

24   Defendants.  Moreover, if the County were to change its policies and begin holding inmates

25   beyond when they would otherwise be held on criminal charges, the County would violate the

26   Fourth Amendment rights of those inmates and potentially subject itself to civil liability.  *See*

27   *Morales*, 793 F.3d at 215–16; *Miranda-Olivares*, 2014 WL 1414305, at *11–12.  And it is far

28   from clear that the County could simultaneously comply with the Executive Order and

1148461

California's TRUST Act.  *See* Cal. Gov't Code § 7282.5 (limiting state and local governments' compliance with ICE civil detainer requests).  Finally, because much of the County's federal funds flow through the State of California, *see* Márquez Decl. ¶ 8, County compliance would do little good if the President follows through on his promise to rein in "out of control" California by withdrawing federal funds from the entire state.  Harris Decl., Ex. B (O'Reilly Interview) at 4.

*Third*, the County is currently spending hundreds of millions of dollars each month on services for which it is entitled to, but now may be denied, federal reimbursement.  As County Executive Jeff Smith explained, unless the Executive Order is enjoined, the County will be forced to choose between two devastating alternatives: either "continue to provide services to its residents without any assurance that it will be reimbursed by the federal government for those services," or "discontinue essential and mandatory services to its residents."  J. Smith Decl. ¶ 9.  And complying with the Executive Order is not a viable option, as discussed above.  *See id.* ¶ 12; Márquez Decl. ¶¶ 21, 28.  Because the County's federally funded programs operate continuously and largely on a reimbursement basis, the County must decide (and is deciding) *now* whether to continue incurring costs that the Executive Order imperils, or instead discontinue critical health, safety, and welfare services, shelve plans, and lay off scores of County employees and contractors.  J. Smith Decl. ¶¶ 8–10; Márquez Decl. ¶¶ 14–15, 19; *see also* Lorenz Decl. ¶ 8; Cody Decl. ¶ 13–15; Reed Decl. ¶¶ 8, 10–20.  Adopting a wait-and-see approach is not feasible; every day that the County expends funds on the expectation of federal reimbursement, the County risks a retroactive ineligibility determination and clawback under the Executive Order.

*Fourth*, the Executive Order has created a cloud of financial uncertainty so overwhelming that it irreparably harms the County's ability to budget, govern, and ultimately provide services to the residents it serves.  *See* J. Smith Decl. ¶¶ 6–11; Márquez Decl. ¶¶ 4, 11–21.  Based on its entitlement to receive previously allocated federal funds, the County has made (and is making) budgeting, programming, and hiring decisions.  Márquez Decl. ¶¶ 12–14, 17.  The Executive Order fundamentally destabilizes the foundation of those decisions.  Indeed, because the Executive Order provides no mechanism by which the federal government must notify the County that it has been rendered ineligible for federal funds, Defendants may already have made such a

1    determination unbeknownst to the County.

2        These injuries are neither speculative nor hypothetical—the County is suffering them

3    now.  As County Executive Jeff Smith stated in his sworn declaration, without preliminary

4    injunctive relief, "the County will be in an untenable financial situation, and decisions that must

5    be made while awaiting a final decision could cause the County to go into a financial crisis."  J.

6    Smith Decl. ¶ 8.  The County cannot operate under this cloud of fiscal uncertainty.[14]

7        **C.    The balance of hardships and the public interest both favor the County.**

8        The Court "must balance the competing claims of injury and must consider the effect on

9    each party of the granting or withholding of the requested relief," while paying "particular regard

10   for the public consequences" of entering the injunction.  *Winter*, 555 U.S. at 24.  Because both

11   parties are government entities, this balancing merges with the consideration of the public

12   interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v.*

13   *Holder*, 556 U.S. 418, 435 (2009)).  The County therefore addresses these two factors together.

14       The balance of hardships and the public interest tilt sharply in the County's favor.  As a

15   general matter, these factors favor "prevent[ing] the violation of a party's constitutional rights."

16   *Melendres*, 695 F.3d at 1002; *see also Ariz. Dream Act Coal.*, 757 F.3d at 1069.  In addition, the

17   harm to the County if the Executive Order is not enjoined far outweighs any harm an injunction

18   may cause Defendants.  If the Court enters the requested injunction, which is narrowly tailored to

19   affect only those parts of the Executive Order causing irreparable harm to the County, Defendants

20   will still be able to enforce federal immigration laws in a constitutional manner.  Further, because

21   the Executive Order will likely "be found unconstitutional, it is therefore questionable whether

---

[14] Because the County has shown irreparable harm, it has established Article III standing as a matter of law.  *See, e.g.*, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286–87 (9th Cir. 2013) ("The same facts by which Shell has shown (1) a likelihood of success on the merits . . . , and (2) that the resulting harm would be irreparable, necessarily establish that Shell has standing to seek injunctive relief."); *Coal. for Econ. Equity v. Wilson*, No. C 96 4024 TEH, 1996 WL 691962, at *2 n.4 (N.D. Cal. Nov. 27, 1996) ("Because the Court finds that plaintiffs have demonstrated immediate irreparable injury sufficient to support a TRO, plaintiffs have plainly met the lower threshold for standing.").  There can also be no question that the County's claims are ripe.  *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) ("[W]here threatened action by government is concerned," a plaintiff need not "expose himself to liability before bringing suit to challenge the basis for the threat.").

1148461

the [Administration] has any 'valid' interest in enforcing" it.  *Planned Parenthood Ass'n of Cincinnati, Inc. v. Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

The requested injunction would also serve the public interest.  "[T]he public is certainly interested in the prevention of enforcement of ord[ers] which may be unconstitutional."  *Id.* Moreover, according to the President, the Executive Order's very purpose is to allow him and his subordinates to deny disfavored jurisdictions, such as the County, the ability to "properly operate" as local governments.  *See* Harris Decl., Ex. B (O'Reilly Interview) at 4.  There is no valid federal interest in forcing state and local governments to act as federal immigration enforcers against their will.  Under our Constitution's federalist structure, the County cannot be coerced to enforce federal policy.  Absent an injunction, the Executive Order will subjugate the general public's health, welfare and safety to the President's whims.  The public interest in curbing this abuse of power is paramount.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant the preliminary injunctive relief requested.  Because the Executive Order applies to state and local governments across the country—and because partial geographic implementation would lead to inconsistent enforcement—the injunction should apply nationwide.  *See Washington v. Trump*, No. 17-35105, 2017 WL 526497, at *9 (9th Cir. Feb. 9, 2017) (declining to "limit the geographic scope" of a nationwide TRO enjoining application of President Trump's executive order banning entry of nationals from seven countries); *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (affirming nationwide injunction of federal immigration directive to ensure uniformity and provide full relief), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016) (per curiam).

1148461

Respectfully submitted,

Dated:  February 23, 2017

OFFICE OF THE COUNTY COUNSEL,
COUNTY OF SANTA CLARA

By:    /s/ *James R. Williams*
JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN
DANIELLE L. GOLDSTEIN
KAVITA NARAYAN
JAVIER SERRANO
JULIA B. SPIEGEL
ADRIANA L. BENEDICT

Attorneys For Plaintiff COUNTY OF
SANTA CLARA

Dated:  February 23, 2017

KEKER & VAN NEST LLP

By:    /s/ *John W. Keker*
JOHN W. KEKER
ROBERT A. VAN NEST
DANIEL PURCELL
CODY S. HARRIS
NICHOLAS S. GOLDBERG
EDWARD BAYLEY

Attorneys For Plaintiff COUNTY OF
SANTA CLARA

1148461