1  OFFICE OF THE COUNTY COUNSEL
   COUNTY OF SANTA CLARA
2  JAMES R. WILLIAMS - # 271253
   County Counsel
3  james.williams@cco.sccgov.org
   GRETA S. HANSEN - # 251471
4  DANIELLE L. GOLDSTEIN - # 257486
   KAVITA NARAYAN - # 264191
5  JAVIER SERRANO - # 252266
   JULIA B. SPIEGEL - # 292469
6  ADRIANA L. BENEDICT - # 306936
   70 West Hedding Street
7  East Wing, Ninth Floor
   San Jose, CA  95110-1770
8  Telephone:    408 299-5900
   Facsimile:    408 292-7240
9

   KEKER & VAN NEST LLP
   JOHN W. KEKER - # 49092
   jkeker@kvn.com
   ROBERT A. VAN NEST - # 84065
   rvannest@kvn.com
   DANIEL PURCELL - # 191424
   dpurcell@kvn.com
   CODY S. HARRIS - # 255302
   charris@kvn.com
   NICHOLAS S. GOLDBERG - # 273614
   ngoldberg@kvn.com
   633 Battery Street
   San Francisco, CA 94111-1809
   Telephone:    415 391 5400
   Facsimile:    415 397 7188

   Attorneys For Plaintiff COUNTY OF SANTA CLARA

10
11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14  COUNTY OF SANTA CLARA,                    Case No. 5:17-cv-00574-WHO

15              Plaintiff,                    **DECLARATION OF SANTA CLARA
                                              COUNTY CHIEF OPERATING OFFICER
16       v.                                   MIGUEL MÁRQUEZ**

17  DONALD J. TRUMP, President of the         Date:       April 5, 2017
    United States of America, JOHN F. KELLY,  Time:       2:00 p.m.
18  in his official capacity as Secretary of the   Dept.:      Courtroom 2
    United States Department of Homeland      Judge:      Hon. William H. Orrick
19  Security, DANA J. BOENTE, in his official
    capacity as Acting Attorney General of the   Date Filed: February 3, 2017
20  United States, JOHN MICHAEL "MICK"
    MULVANEY, in his official capacity as     Trial Date:    Not yet set
21  Director of the Office of Management and
    Budget, and DOES 1-50,
22
                Defendants.
23

24
25
26
27
28

I, Miguel Márquez, hereby declare as follows:

1.     I am the Chief Operating Officer for the County of Santa Clara (the "County").  I make this declaration in support of the County's motion for preliminary injunction based on my personal knowledge.  If called upon to do so, I could and would testify competently to the contents of this declaration.

2.     I have been the Chief Operating Officer for the County since August 2016.  In this capacity, I supervise and oversee the County's operations, including among many other things, the development and implementation of County departments' budgets.  From 2012-2016, I served as an Associate Justice on California's Sixth District Court of Appeal.  Before my appointment to the Court of Appeal, from 2009-2012, I served as County Counsel and the Acting County Counsel of the County.  In this capacity, I advised the County Board of Supervisors and executives on a broad range of legal issues, including issues involving finance, local governance, and local policy issues, including cooperation with Immigration and Customs Enforcement. Before my employment at the County, I represented several other public entities in connection with matters involving governance and finance, among other things.

3.     In all, I have been in high-level roles at the County and other public entities for nearly twenty years.  I am extremely familiar with the County's policies, structure, operations, and budgeting processes, and have been involved in the preparation of dozens of public entity budgets.  I am currently integrally involved in the County's budget process.

4.     I am familiar with Executive Order 13768 of January 25, 2017, entitled "Enhancing Public Safety in the Interior of the United States" (the "Order").  That Order threatens to withhold federal funds from "sanctuary jurisdictions."  The potential loss of federal funding if the County is deemed to be a sanctuary jurisdiction has placed the County's budget process and its plans for providing services in an untenable position.  This is due to the tremendous uncertainty relating to the amount of resources that may or may not be available to provide critical services—now and in the future—to County residents.

5.     The County provides basic safety-net services to the most vulnerable residents in our community. It also serves the public more generally in areas such as emergency planning and

1146013

1   public health services.

2       6.     The County was established in 1850 as one of the first counties in California.

3   Today, approximately 1.9 million people reside in the County, and rely on it to provide essential

4   services, such as law enforcement, health care, care for the County's youth and elderly, and other

5   social services. Many of the County's programs serve the County's neediest residents, including

6   abused and neglected children, indigent and uninsured individuals requiring health care,

7   individuals who are mentally ill or substance dependent, and those who are physically or mentally

8   disabled.

9       7.     The County oversees most public health and public safety functions in Santa Clara

10   County, including emergency planning and services, disease control and prevention, and criminal

11   justice administration.  The County also operates roads, airports, parks, libraries, election

12   systems, and many other critical functions

13       8.     The County's budgeted expenditures for the 2015-2016 fiscal year were

14   approximately $5.6 billion.  The County's actual revenues for the same fiscal year, however, were

15   approximately $4.8 billion.[1]  Federal funds not commingled with other funding sources

16   comprised approximately $1 billion (21%) of this revenue.  An *additional* approximately $680

17   million (14%) was comprised of revenues that included a significant federal funding component.

18   This additional amount was dependent upon the receipt of federal funds through a matching

19   requirement or other mechanism.  Much of this additional funding was passed through the State

20   of California.

21       9.     The County receives federal funding through several types of arrangements, but

22   the most common arrangements are fee-for-service and reimbursement-based.  In these

23   arrangements, the County first spends funds or provides a service using County resources, then is

24   reimbursed fully or partially with federal funds.  Many of these arrangements are pass-through

25   arrangements, in which the payment is made by another governmental agency (in many cases, the

26
27
28

---

[1] The County's actual revenue received is a more useful measure than budgeted expenditures.  A budget reflects anticipated revenues and expenditures for an upcoming fiscal year, which may or may not materialize.  By contrast, actual revenues have been received and verified through an independent audit.

DECLARATION OF SANTA CLARA COUNTY CHIEF OPERATING OFFICER MIGUEL MARQUEZ
Case No. 5:17-cv-00574

1146013

State of California) from federal funds that are earned by the County. Much of the federal funding received by the County's Health and Hospital system, for example, was earned in fee-for-service payments. These funds were paid by the State of California's Medicaid program to reimburse the County for the services it previously provided to eligible residents. For each type of funding, the County faces the possibility that, even after reimbursements or other payments are received, those federal funds may later be clawed back through retroactive ineligibility determinations.

10.     Only a small portion of the federal revenue the County receives is related to law enforcement. Most of the revenues received from the federal government are used to provide health care and social services to County residents.

11.     As a result of the Order, the County faces the immediate possibility that a minimum of roughly $1.7 billion of its anticipated annual revenues will be abruptly—and perhaps retroactively—clawed back or withheld. While the County has some contingency reserves, they are not remotely adequate to cover such a funding shortfall. As a result, and because the County is continuing to operate federally funded programs on a daily basis, the County needs to know whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts.

12.     In developing the County's annual budget, the County Executive is required to present a balanced recommended budget for approval by the County's Board of Supervisors. Development of the recommended budget involves careful analysis and weighing a multitude of factors, including anticipated revenues, specific service needs for diverse subsets of County residents, salary and benefit costs for the County's approximately 19,000 employees, and an array of local priorities. The County's adopted budget represents the outcome of this weighing of resources and priorities, and represents the County's determination of what services can and should be provided, given the limited resources at the County's disposal. The services the County

1146013

1    provides and the resources it has available are inextricably linked.

2        13.    In November of each year, the County Executive's Office of Budget and Analysis

3    (OBA) begins to forecast its estimate of the subsequent fiscal year's anticipated revenues. Then,

4    before March 1 of the ensuing year, each County department must provide a budget submittal to

5    OBA in which the department requests a level of funding necessary to provide services during the

6    upcoming fiscal year. During March and April, OBA balances anticipated revenues with

7    proposed departmental budgets to prepare the County Executive's recommended balanced budget

8    for consideration by the Board of Supervisors during May and June. By June 30, the Board of

9    Supervisors approves a balanced budget for the next fiscal year, as set forth in the County Budget

10   Act, Cal. Gov't Code § 29064(a).

11       14.    This process has already been completed for the current fiscal year. The County's

12   current operations and services are being provided pursuant to the balanced budget that was

13   adopted last year using this process. As with any other budget, that budget reflects the County's

14   judgment of how best to fulfill its obligations and priorities with limited resources. Central to this

15   judgment was the expectation that the County would receive the federal funds to which it is

16   entitled under its agreements with a number of federal and state agencies. Disrupting this

17   expectation would throw the County's budget—and therefore its operations—into complete

18   disarray.

19       15.    The County is *currently* spending hundreds of millions of dollars on services for

20   which it is otherwise entitled to receive federal reimbursement. If the Order is fully implemented,

21   those funds will be withheld. The County is actively considering how to manage this risk. The

22   County Executive, for example, recently discussed with the County's Board of Supervisors, in a

23   public meeting, the enormous financial risks faced by the County, including the Hobson's choice

24   described above due to the uncertainty regarding current and ongoing federal funding.

25       16.    As the County Executive pointed out, a majority of budget cuts would impact the

26   County's Health and Hospital system. The Santa Clara Valley Medical Center (VMC), which is

27   the only safety-net healthcare provider in Santa Clara County, relies heavily on federal funds and

28   federally dependent funds. In the 2015-2016 fiscal year, VMC received federal revenues and

4

DECLARATION OF SANTA CLARA COUNTY CHIEF OPERATING OFFICER MIGUEL MARQUEZ
Case No. 5:17-cv-00574

1    federally dependent revenues of approximately $1 billion.  For the same fiscal year, VMC's total

2    expenditures were approximately $1.4 billion.  The County cannot absorb a $1 billion annual

3    funding gap at VMC.  Thus, if federal funds were withheld, the County would be unable to

4    provide thousands of the County's indigent residents with the healthcare services they are

5    otherwise entitled to receive absent extremely deep cuts in other areas.

6         17.    Similarly, the County's Social Services Agency (SSA), which provides services

7    that include child protective services, child welfare, and support to elderly and disabled children

8    and adults, receives more than $300 million a year in federal revenues.  For comparison, SSA's

9    expenditures for the same fiscal year were approximately $777 million.  Thus, if federal funding

10   were withheld, the County would need to decide which of SSA's critical functions it could

11   continue to fund and at what level, and which functions could no longer be funded.

12        18.    As another example, the County's Public Health Department, which provides

13   disease control and pandemic response services throughout the County—and functions as the

14   public health agency for each of the cities within Santa Clara County—had, in fiscal year 2015-

15   2016, federal revenues of approximately $39 million. Its expenditures for the same fiscal year

16   were approximately $97 million.  The County would have to significantly reduce or cut these

17   critical services in the absence of federal funding.

18        19.    The Order forces a current, daily choice about these departments' ongoing

19   operations.  But it also fundamentally disrupts the County's budgeting process for the upcoming

20   fiscal year.  The County Executive is in the process of developing a proposed budget for fiscal

21   year 2017-2018 for submission to the Board of Supervisors.  Without certainty in the near term,

22   the County Executive will be forced to make one of the three choices outlined in paragraph 11 of

23   this declaration with respect to his recommended budget to the Board of Supervisors—cementing

24   one of three untenable choices in the budget for the upcoming fiscal year.

25        20.    Even if the Order is not fully implemented, and is used to target only those funds

26   that would qualify as "grants" under a narrow definition that does not include entitlement

27   programs, a significant portion of the County's resources are at risk.  For example, the County

28   conducts a "Single Audit" compiling major federal awards that are subject to annual audit

1146013

1   requirements.  While this document significantly understates the magnitude of County federal

2   awards because it only includes those that are subject to an annual financial audit requirement, it

3   nonetheless reflects that the County received more than $338 million in federal grant awards in

4   fiscal year 2014-2015.  A true and correct copy of the Federal Compliance Section of the

5   County's Single Audit Report for the Fiscal Year Ended June 30, 2015 is attached hereto as

6   Exhibit A.

7      21.   Compliance with the full scope of the federal government's immigration-related

8   laws, requests, and priorities could also result in significant liability and cost exposure to the

9   County.  This could include exposure to liability for Fourth Amendment and other constitutional

10   violations (as several federal courts have held), as well as significant fiscal and administrative

11   costs.  The federal government has made clear to the County that it does not provide indemnity

12   for such liability or costs.  And, of course, the County has an independent duty not to violate the

13   constitutional rights of its residents, whether or not at the behest of another governmental entity.

14      22.   In 2010, the County had significant correspondence with the Department of

15   Homeland Security (DHS) relating to DHS's Immigration and Customs Enforcement's (ICE)

16   Secure Communities program.  While serving as County Counsel, I was the primary author of

17   most of the correspondence sent on behalf of the County.

18      23.   In 2010, the County was considering the implications of the Secure Communities

19   program.  This program called for local law enforcement agencies to share information with ICE

20   regarding the detention and release of individuals held in local jails. It also called for the

21   County to comply with ICE detainer requests.[2]  During this time, the County became aware that

22   compliance with detainer requests could expose the County to significant potential costs and

23   liabilities.

24      24.   I addressed these issues in my August 16, 2010 letter to DHS, attached hereto as

25   Exhibit B.  In particular, I inquired whether "ICE [will] reimburse localities for the cost of

26

27   [2] This program was replaced by the Priority Enforcement Program (PEP) on November 2014.
     The Order orders termination of PEP in favor of reinstatement of the Secure Communities

28   program.  Order, § 10.

DECLARATION OF SANTA CLARA COUNTY CHIEF OPERATING OFFICER MIGUEL MÁRQUEZ
Case No. 5:17-cv-00574

1146013

1    detaining individuals … beyond their scheduled release times [and whether] ICE [will] indemnify

2    localities for any liability incurred because of that detention[.]"   (Exhibit B at p. 3.)  In its

3    response, a true and correct copy of which is attached hereto as Exhibit C, DHS unequivocally

4    indicated that, pursuant to its Regulations, ICE would not be responsible for incarceration costs

5    except at its option and pursuant to a written agreement.  (Exhibit C at p. 3.)  It also indicated that

6    it would "not indemnify localities for any liability incurred."  (*Id.*)

7        25.    In light of my correspondence with DHS, the County Board of Supervisors

8    instructed me, in my capacity as County Counsel, to take all necessary action to allow the County

9    to opt out of participation in the Secure Communities program.  I informed ICE of the County's

10   intention to do so in correspondence dated October 13, 2010, a true and correct copy of which is

11   attached hereto as Exhibit D.

12       26.    To "limit County resources spent on the enforcement of civil immigration law,"

13   the County Board of Supervisors, on October 18, 2011, adopted Board Policy 3.54 on Civil

14   Detainer Requests, a true and correct copy of which is attached hereto as Exhibit E.  Board Policy

15   3.54 permits compliance with ICE civil detainer requests only under certain limited circumstances

16   involving serious or violent felonies, and only if ICE agrees to reimburse the County for the full

17   costs associated with compliance.  I sent a copy of Board Policy 3.54 to ICE.   A true and correct

18   copy of the October 21, 2011 letter to ICE is attached hereto as Exhibit F.

19       27.    The County Board of Supervisors also adopted a Resolution affirming the

20   separation between County services and the enforcement of federal civil immigration law.  The

21   Resolution prohibits County employees, including law enforcement officers, from initiating an

22   inquiry or enforcement action based solely on an individual's actual or suspected immigration

23   status, national origin, race/ethnicity, or English-speaking ability.  It also prohibits the use of

24   County funds or resources to investigate, question, apprehend, or arrest an individual solely

25   because of an actual or suspected violation of immigration law, or to transmit to ICE, for

26   purposes of federal immigration enforcement, information collected by the County in the course

27   of providing social services.  A true and correct copy of that Resolution is attached hereto as

28   Exhibit G.

DECLARATION OF SANTA CLARA COUNTY CHIEF OPERATING OFFICER MIGUEL MARQUEZ
Case No. 5:17-cv-00574

1146013

28.     Rescission of the County's policies on immigration enforcement efforts and priorities, could expose the County to significant liability.  For example, compliance with detainer requests could expose the County and its officers to liability based on violations of County residents' constitutional rights, and would require the reallocation of resources to accommodate a large number of additional jail inmates who would otherwise not be incarcerated.

29.     In view of the aforementioned policies, the County has declined certain grants that require, as a condition of receipt, a certification of compliance with 8 U.S.C. § 1373.  For example, the County declined to accept funding from the 2016 Justice Assistance Grant program.  A true and correct copy of a November 1, 2016 letter informing the Chief of Police for the City of San José of the County's decision is attached hereto as Exhibit H.  The County also declined to accept State Criminal Alien Assistance Program funds for 2016, for the same reason.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on February 21, 2017, in Santa Clara County, California.

_____
MIGUEL MÁRQUEZ

DECLARATION OF SANTA CLARA COUNTY CHIEF OPERATING OFFICER MIGUEL MARQUEZ
Case No. 5:17-cv-00574

1146013