OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
JAMES R. WILLIAMS - # 271253
County Counsel
james.williams@cco.sccgov.org
GRETA S. HANSEN - # 251471
DANIELLE L. GOLDSTEIN - # 257486
KAVITA NARAYAN - # 264191
JAVIER SERRANO - # 252266
JULIE WILENSKY - # 271765
JULIA B. SPIEGEL - # 292469
ADRIANA L. BENEDICT - # 306936
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA  95110-1770
Telephone:      408 299-5900
Facsimile:      408 292-7240

KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
DANIEL PURCELL - # 191424
dpurcell@keker.com
CODY S. HARRIS - # 255302
charris@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
EDWARD A. BAYLEY - # 267532
ebayley@keker.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:      415 391 5400
Facsimile:      415 397 7188

Attorneys for Plaintiff COUNTY OF SANTA CLARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States of America, JOHN F. KELLY, in his official capacity as Secretary of the United States Department of Homeland Security, JEFFERSON B. SESSIONS, in his official capacity as Attorney General of the United States, JOHN MICHAEL "MICK" MULVANEY, in his official capacity as Director of the Office of Management and Budget, and DOES 1-50,<br><br>Defendants. | Case No. 17-cv-00574-WHO<br><br>**PLAINTIFF COUNTY OF SANTA CLARA'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          April 5, 2017<br>Time:         2:00 pm<br>Dept.:        Courtroom 2<br>Judge:       Hon. William Orrick<br><br>Date Filed: February 3, 2017<br><br>Trial Date:  Not yet set |

1154051

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..........................................................................................................1

II.  ARGUMENT ...............................................................................................................2

     A.   The Administration mischaracterizes the relevant provisions of the
          Executive Order, which was intended to, and does, change existing law. .............2

     B.   The Administration concedes the merits of the County's constitutional
          claims. ....................................................................................................................4

     C.   The County has established irreparable harm. .......................................................5

          1.   The Executive Order coerces local governments to change their
               policies under threat of defunding, establishing irreparable harm. ..............6

          2.   The County's undisputed constitutional injury constitutes
               irreparable harm as a matter of law ..............................................................7

          3.   The vast and undisputed harm to the County's core services,
               finances, and budgeting processes further justifies injunctive relief. ..........7

          4.   There is no reason to wait to enter an injunction until the
               Administration has taken acts that violate the Constitution .........................9

     D.   The balance of harms and public interest overwhelmingly favor the
          County ....................................................................................................................11

     E.   The County's claims are justiciable .......................................................................11

          1.   The County is suffering real and immediate injury-in-fact. .....................12

          2.   The County's claims are prudentially ripe. .................................................13

     F.   The President should be enjoined. .........................................................................14

     G.   The Court should enter a nationwide preliminary injunction. ...............................15

III. CONCLUSION ...........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967)..................................................................................................14

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) .................................................................................7

*Angeles v. U.S. Airways, Inc.,*
    2013 WL 622032 (N.D. Cal. Feb. 19, 2013) .........................................................4

*Arizona Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ...............................................................................11

*Bresgal v. Brock,*
    843 F.2d 1163 (9th Cir. 1987) ...............................................................................15

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)...............................................................................................15

*California Pro-Life Council, Inc. v. Getman,*
    328 F.3d 1088 (9th Cir. 2003) ...............................................................................13

*Cedar-Riverside People's Ctr. v. Minnesota Dep't of Human Servs.,*
    2009 WL 1955440 (D. Minn. July 6, 2009) .......................................................8, 9

*Chamber of Commerce v. Reich,*
    57 F.3d 1099 (D.C. Cir. 1995)..........................................................................13, 14

*Citicorp Servs., Inc. v. Gillespie,*
    712 F. Supp. 749 (N.D. Cal. 1989) .........................................................................7

*Clinton v. City of New York,*
    524 U.S. 417 (1998)...............................................................................................12

*Coalition for Econ. Equity v. Wilson,*
    1996 WL 691962 (N.D. Cal. Nov. 27, 1996) .......................................................12

*Decker v. O'Donnell,*
    661 F.2d 598 (7th Cir. 1980) .................................................................................15

*Doran v. Salem Inn, Inc.,*
    422 U.S. 922 (1975).................................................................................................8

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)...............................................................................................14

1154051

*Gordon v. Holder*,
　　721 F.3d 638 (D.C. Cir. 2013) ...................................................................................11

*Hawai'i v. Trump*,
　　2017 WL 1011673 (D. Haw. Mar. 15, 2017).......................................................6, 14

*In re Online DVD Rental Antitrust Litig.*,
　　2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) ..........................................................4

*Int'l Refugee Assistance Project v. Trump*,
　　No. TDC-17-0361 D. Md. (Mar. 15, 2017) ........................................................6, 14

*Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*,
　　31 F.3d 1536 (10th Cir. 1994) ...................................................................................9

*Lacroix v. Junior*,
　　2017 WL 837477 (Fla. Cir. Ct. Mar. 1, 2017) .......................................................15

*Lujan v. Defenders of Wildlife*,
　　504 U.S. 555 (1992).................................................................................................13

*MedImmune, Inc. v. Genentech, Inc.*,
　　549 U.S. 118 (2007).................................................................................................12

*Melendres v. Arpaio*,
　　695 F.3d 990 (9th Cir. 2012) ...............................................................................7, 11

*Morales v. Chadbourne*,
　　793 F.3d 208 (1st Cir. 2015) ...................................................................................10

*Morales v. Trans World Airlines, Inc.*,
　　504 U.S. 374 (1992)...................................................................................................7

*N.D. v. Hawaii Dep't of Educ.*,
　　600 F.3d 1104 (9th Cir. 2010) .................................................................................11

*National Fed'n of Indep. Bus. v. Sebelius*,
　　132 S. Ct. 2566 (2012)...............................................................................................5

*Nelson v. NASA*,
　　530 F.3d 865 (9th Cir. 2008) .....................................................................................7

*Nixon v. Sirica*,
　　487 F.2d 700 (D.C. Cir. 1973) .................................................................................14

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
　　795 F.3d 956 (9th Cir. 2015) ...................................................................................12

*Packard Elevator v. ICC*,
　　782 F.2d 112 (8th Cir. 1986) .....................................................................................8

1154051

*Printz v. United States*,
    521 U.S. 898 (1997)................................................................................................5

*Rubin ex rel. NLRB v. Vista del Sol Health Servs., Inc.*,
    80 F. Supp. 3d 1058 (C.D. Cal. 2015) ..............................................................11

*Schalk v. Teledyne, Inc.*,
    751 F. Supp. 1261 (W.D. Mich. 1990) ...............................................................8

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    709 F.3d 1281 (9th Cir. 2013)...........................................................................12

*South Dakota v. Dole*,
    483 U.S. 203 (1987)........................................................................................3, 5

*Sunbelt Rentals, Inc. v. Victor*,
    2014 WL 492364 (N.D. Cal. Feb. 5, 2014) .........................................................4

*Susan B. Anthony List v. Driehaus*
    134 S. Ct. 2334 (2014).................................................................................12, 13

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996)...........................................................................14

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016) ....................................................6, 12, 15

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ..............................................................6, 11

*Thomas v. Union Carbide Agric. Prod. Co.*,
    473 U.S. 568 (1985)...........................................................................................13

*Utley v. Varian Assocs.*,
    811 F.2d 1279 (9th Cir. 1987) .............................................................................6

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)...........................................................................................13

*Washington v. Trump*,
    2017 WL 462040 (W.D. Wash. Feb. 3, 2017)...................................................14

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ................................................................6, 14, 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)........................................................................................5, 14

iv

1154051

**Federal Statutes**

8 U.S.C. § 1373 .................................................................................................... 3

2 U.S.C. § 683 ................................................................................................... 10

**Federal Regulations**

Exec. Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) ........................................ *passim*

**Constitutional Provisions**

U.S. CONST. art. I, § 8, cl. 1 ................................................................................. 9

**Other Authorities**

Patricia Mazzei, *Miami-Dade Mayor Orders Jails to Comply with Trump
    Crackdown on 'Sanctuary' Counties*, Miami Herald, Jan. 26, 2017 ....................... 15

PLAINTIFF COUNTY OF SANTA CLARA'S REPLY BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1154051

## I. INTRODUCTION

In its opening brief, the County of Santa Clara explained that, under controlling Supreme Court precedent, Executive Order 13,768 (the "Executive Order" or "EO") violates fundamental separation of powers principles, the Fifth Amendment's bar against vagueness and its guarantee of procedural due process, and the Tenth Amendment's prohibition against federal commandeering of state and local officials. *See* ECF 26 ("Mot.") at 12–20. The Administration's opposition brief, ECF No. 46 ("opposition" or "Opp."), fails to address these arguments, conceding that the County is likely to prevail on the merits of its constitutional claims.

Rather than meeting the County's arguments head-on, the Administration mischaracterizes the Executive Order, ignoring both its plain language and the President's repeated and clear statements revealing its purpose and scope. Although the Administration styles its opposition as challenging "irreparable harm," "standing," or "ripeness," its only real arguments are that the Executive Order has yet to be implemented and will be applied "consistent with law." These arguments do not withstand scrutiny. The Executive Order *cannot* be implemented constitutionally because the President lacks the statutory or constitutional authority to defund and punish state and local governments as set forth in the Order. Further, the Administration ignores the Executive Order's immediate and ongoing coercive effects on local jurisdictions, which alone constitute irreparable harm justifying injunctive relief. And there is no question that under the Supreme Court precedent the Administration ignores, the County has standing and its claims are ripe.

The most notable feature of the Administration's opposition is that it significantly narrows the disputed issues before the Court by failing to contest much of what the County said in its motion. The opposition leaves the following critical points unaddressed:

**The merits of the County's constitutional claims.** Despite using only 20 of its allotted 25 pages, the Administration fails to muster a substantive defense of the Executive Order's constitutionality.

**The Executive Order's plain language.** The Administration focuses on sections of the Order that the County is not challenging, while distorting Section 9, the sole provision that the

1

County has moved to enjoin.  In particular, the Administration never addresses Section 9's Enforcement Provision, which directs the Attorney General to take undefined "enforcement actions" against jurisdictions he deems have shown insufficient obeisance to federal priorities.

*The President's statements.*  It is undisputed that the President has repeatedly made clear that the Executive Order is intended to strip "sanctuary jurisdictions" of ***all*** federal funding.  Yet the Administration artfully avoids committing to a concrete interpretation of the Order, positing a narrow reading of its threat to federal funds, at least for purposes of this motion.  That argument wholly ignores the President's clearly expressed intent.

*Binding precedent.*  The Administration spends several pages reciting general, undisputed legal principles regarding the standards for injunctive relief, standing, and ripeness, while ignoring the controlling cases the County relies on in support of its motion.

*The Executive Order's coercive effect.*  Being forced to change a local policy or practice under a threat of defunding constitutes immediate and irreparable harm justifying injunctive relief.  The Administration offers no response to this argument or the cases establishing it.

*The detailed factual record.*  The County presented nine sworn declarations, explaining in detail the concrete and irreparable harm the County is suffering to its policymaking, financial, budgetary, and constitutional interests.  The Administration fails to address this evidence, with proof of its own or otherwise.  Instead, it discusses the issue of harm only at the highest possible level of abstraction, and wrongly concludes that no harm exists because the Administration has not yet defunded the County.

For all these reasons, and as explained below in further detail, the Court should grant this motion and enter the requested nationwide preliminary injunction.

## II.   ARGUMENT

### A.   The Administration mischaracterizes the relevant provisions of the Executive Order, which was intended to, and does, change existing law.

Throughout its brief, the Administration mischaracterizes the text, reach, and impact of an Order it declines to defend on the merits, essentially arguing that the Executive Order can and should be read to have no substantive effect at all.  The Administration claims that the Order

"does not alter or expand the existing law that governs when the Federal Government may revoke a federal grant," and "does not change existing law."  Opp. at 3, 8.  It further appears to argue that the Executive Order targets only federal grants that specifically require recipients to comply with 8 U.S.C. § 1373.  *Id.* at 13 ("If the grant language does not require compliance with Section 1373, the Executive Order does not purport to give the Secretary or Attorney General the unilateral power to alter those terms.").  Those arguments ring hollow in light of the Executive's Order's plain text and clearly expressed purpose.

*First*, accepting the Administration's position would require the Court to ignore the plain language of the Executive Order, which compels not only compliance with section 1373, but also Immigration and Customs Enforcement ("ICE") detainer requests and "Federal law" in general.  EO § 9(a), (b).  Indeed, the Administration never once mentions, and in no way defends, Section 9(a)'s standardless Enforcement Provision granting the Attorney General *carte blanche* to "take appropriate enforcement action against any entity . . . which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law."  EO § 9(a).  That provision unquestionably changes the law.

So too does Section 9(a)'s Defunding Provision, which states that any jurisdiction that "willfully refuse[s] to comply" with section 1373 becomes "not eligible to receive Federal grants."  *Id.*  Nothing in the Order suggests that only federal appropriations that currently require compliance with section 1373 would be withheld.  Indeed, it is telling that the Administration neither identifies a single grant that imposes that condition, nor addresses the numerous bills to do so that Congress considered and rejected.  *See* Mot. at 16 n.12 (listing bills).  Further undermining the Administration's narrow interpretation, the Order specifically *exempts* grants for law-enforcement purposes, the only category of grants that Congress could conceivably link to compliance with section 1373 in a constitutional manner.[1]  *See South Dakota v. Dole*, 483 U.S. 203, 213 (1987) (conditions on federal appropriations must be linked to purpose of funds).  On its

---

[1]  Indeed, as the County explained in its opening brief, Mot. at 6 & n.5, in two cases where the Department of Justice issued guidance linking federal grant programs with compliance with section 1373, the County declined those grant funds.  Márquez Decl. ¶ 29 & Ex. H.

1   face, the Order withdraws eligibility for all other federal grants.  And notably, while the

2   opposition acknowledges the County's argument that the Order targets "Medicaid

3   reimbursements" and other entitlement programs, *see* Opp. at 7, it declines to state clearly that the

4   Order will leave those critical funds untouched.

5          ***Second***, the opposition ignores the many statements by the President and his top aides

6   confirming that the Executive Order effectuates a wholesale change in federal law, stripping

7   "sanctuary cities" of *all* federal funding.  Mot. at 3–5.  The Order itself confirms that stated

8   purpose.  *See* EO § 2(c) (describing the Order's purpose as ensuring that targeted jurisdictions

9   "do not receive federal funds").  Neither the County nor the Court can rely on the opposition's

10  narrower interpretation when the Order and its signatory contradict it.

11         ***Third***, if the Order does no more than direct executive branch officials to enforce existing

12  law, the Administration could have identified what "existing law" allows it to withhold federal

13  funding from "sanctuary jurisdictions" in accordance with the Order.  It did not, and cannot.

14  Rather, by ordering executive branch officials to impose new eligibility criteria for federal funds,

15  the Executive Order changes the law (and violates the Constitution), because that power belongs

16  solely to Congress.  The Administration's assurances that it will implement the Order "consistent

17  with law" are vacuous, because its defunding mechanism is unconstitutional in its very operation.

18         All this confirms that the Executive Order's and the Administration's references to

19  existing law are fig leaves designed to provide the Administration with sufficient plausible

20  deniability to oppose this motion, while leaving unchanged the Executive Order's plain meaning,

21  as repeatedly touted by the President who issued it.

22         **B.      The Administration concedes the merits of the County's constitutional claims.**

23         The most striking thing about the Administration's opposition is that it declines to defend

24  the Executive Order's constitutionality, or to rebut the County's arguments that it is likely to

25  succeed on the substantive merits of its claims.  This omission concedes the merits.  *See, e.g.*,

26  *Sunbelt Rentals, Inc. v. Victor*, 2014 WL 492364, at *9 n.7 (N.D. Cal. Feb. 5, 2014); *Angeles v.*

27  *U.S. Airways, Inc.*, 2013 WL 622032, at *4 (N.D. Cal. Feb. 19, 2013) ("The failure to respond

28  amounts to a concession."); *In re Online DVD Rental Antitrust Litig.*, 2011 WL 5883772, at *12

4

(N.D. Cal. Nov. 23, 2011) (absent unusual circumstances, failure to respond on the merits is "viewed as grounds for waiver or concession of the argument").  The Administration fails to mention, much less distinguish, controlling precedents such as *Dole*, 483 U.S. 203 (1987) (limiting Congress's spending power), *National Federation of Independent Businesses v. Sebelius*, 132 S. Ct. 2566 (2012) (forbidding coercive use of the spending power to impose a federal regulatory regime), and *Printz v. United States*, 521 U.S. 898 (1997) (barring the federal government from commandeering state and local officials to enact a federal program).  Nor does the Administration defend the Executive Order against the County's vagueness, procedural due process, and coercion challenges, which are wholly unconnected to the Order's implementation. And the Administration nowhere disputes that the President acted in derogation of Congress's will and without independent constitutional authority in issuing the Executive Order.  Even *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)—the seminal case on presidential power and executive orders—goes uncited in the opposition.

The Administration's concession of the merits has fatal consequences for its irreparable harm and ripeness arguments.  Why must the County wait for the government to take "the several steps necessary to implement" a facially unconstitutional order?  Opp. at 2.  Likewise, with respect to the balance of harms and public interest, there can be no harm in blocking an unconstitutional presidential directive, and no public interest in implementing or enforcing one.

### C.   The County has established irreparable harm.

Unable to muster any argument that the Executive Order is constitutional, the opposition cites generic case law on injunctive relief while ignoring the County's comprehensive factual showing that it is already suffering irreparable harm.  The County submitted detailed declarations from its top administrative officials identifying the specific harms the Executive Order has already caused.  The Administration never addresses this evidence, arguing only that the County could not possibly have suffered any harm, because the federal government has yet to declare the County a sanctuary jurisdiction and defund it accordingly. The Administration is wrong.

1154051

1.     **The Executive Order coerces local governments to change their policies under threat of defunding, establishing irreparable harm.**

The Administration never addresses, and thus concedes, the County's argument that it is suffering irreparable harm now, because the Executive Order invades the County's local policymaking role by coercing it to change its policies.  Directly on point are the recent *Texas v. United States* cases, where district courts and the Fifth Circuit found irreparable harm from separate executive actions "designed to force Plaintiffs to amend their policies to comply or place their federal funding in jeopardy," deeming preliminary injunctive relief necessary and appropriate to block that outcome.  *Texas v. United States*, 201 F. Supp. 3d 810, 820 (N.D. Tex. 2016) (finding irreparable harm where a DOJ letter regarding access to bathrooms for transgender students conflicted with local policies); *see also Texas v. United States*, 86 F. Supp. 3d 591, 673–74 (S.D. Tex. 2015) (finding irreparable harm where federal immigration directive would force states to grant benefits), *aff'd*, 787 F.3d 733, 749 (5th Cir. 2015).  The Administration ignores these cases and their reasoning entirely.

The Executive Order itself makes clear that it is intended to coerce state and local governments to comply with President Trump's immigration enforcement agenda.  *See* EO §§ 2(a), 2(c), 9.  In addition, the President has repeatedly pledged, both on the campaign trail and after taking office, to compel localities to support his immigration enforcement agenda by denying *all* federal funding to jurisdictions that he believes are hindering that agenda, describing defunding as a "weapon" to starve jurisdictions of "the money they need to properly operate as a city or state," thereby "ending" such jurisdictions entirely.[2]  *See* Compl. ¶ 93; Harris Decl. ¶ 3 & Ex. B at 4.  In his "Contract with the American Voter," then-candidate Trump promised flatly to "cancel all federal funding to sanctuary cities."  https://www.donaldjtrump.com /contract/ (last accessed March 13, 2017).  The Executive Order is structured in exactly this way, giving the

---

[2] Because the Court is interpreting an executive order, the President's intent in issuing the Order matters.  *See Utley v. Varian Assocs.*, 811 F.2d 1279, 1285 (9th Cir. 1987); *see also Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) (considering statements the President made about "his intent to implement a 'Muslim ban'" when analyzing an executive order's constitutionality under the Establishment and Equal Protection clauses); *Hawai'i v. Trump*, 2017 WL 1011673, at *13–15 (D. Haw. Mar. 15, 2017) (same); *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, slip op. at 8–10 (D. Md. Mar. 15, 2017) (Dkt. No. 149) (same).

PLAINTIFF COUNTY OF SANTA CLARA'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1154051

Administration maximum coercive power by failing even to define what constitutes a "sanctuary jurisdiction."  Such coercion—"change your policies or else"—constitutes irreparable harm.

### 2. The County's undisputed constitutional injury constitutes irreparable harm as a matter of law.

The Executive Order's violations of the County's constitutional rights "unquestionably constitute[] irreparable injury."  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The Administration argues that irreparable harm exists only as to claims involving "individual" constitutional rights, as opposed to rights derived from constitutional structures, such as the separation of powers.  Opp. at 14.  Here, the County has asserted "individual" constitutional claims under the Fifth Amendment's Due Process Clause and the Tenth Amendment, in addition to separation-of-powers principles.  Regardless, the Ninth Circuit does not recognize the Administration's purported distinction between individual and structural constitutional rights, instead consistently holding that irreparable harm exists whenever a plaintiff pleads both a constitutional violation and monetary harm.  *See American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058–59 (9th Cir. 2009) (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992), and *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011)).  *American Trucking* involved a challenge to a local port regulation under the dormant Commerce Clause, a wholly structural claim, and yet the court readily found irreparable harm where plaintiffs faced a choice between giving in to an unconstitutional practice or else suffering monetary harm.[3]  559 F.3d at 1058–59; *see also Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 753–54 (N.D. Cal. 1989) (presuming irreparable harm from an alleged violation of the Commerce Clause alone).

### 3. The vast and undisputed harm to the County's core services, finances, and budgeting processes further justifies injunctive relief.

Sidestepping the County's evidence, the Administration claims that there is no threat of irreparable harm from the Executive Order's facial constitutional violations because the federal

---

[3] The Administration cites the district court's opinion in *American Trucking* for the contrary proposition, claiming it was reversed "on other grounds."  Opp. at 14.  In fact, as noted above, the Ninth Circuit reversed *precisely* on this ground.  559 F.3d at 1058–59.

7

1154051

1    government has not yet stripped the County of funding.  That is not the law, and no case cited by

2    the Administration holds that loss of funds is a prerequisite to showing irreparable harm.

3           In its opening brief, the County set forth two ways in which the Executive Order is

4    presently causing irreparable harm to its ability to deliver vital health and social services to its 1.9

5    million residents, many of whom have nowhere else to turn.  *First*, the County is currently

6    spending hundreds of millions of dollars for which it is entitled to federal reimbursement each

7    month, so it must choose, right now, whether to continue providing essential services to its

8    residents given the Executive Order's plan to withhold that funding.  *See* J. Smith Decl. ¶¶ 8–10;

9    Márquez Decl. ¶¶ 14–15, 19; Lorenz Decl. ¶ 8; Cody Decl. ¶ 13–15; Reed Decl. ¶¶ 8, 10–20.

10   Every day, the effect of an ineligibility determination under the Executive Order grows more

11   catastrophic.  *Second*, the County cannot effectively budget and plan for future activities given

12   the financial uncertainty created by the Executive Order.  *See* J. Smith Decl. ¶¶ 6–11; Márquez

13   Decl. ¶¶ 4, 11–21.  This "financial planning burden" constitutes irreparable harm.  *Schalk v.*

14   *Teledyne, Inc.*, 751 F. Supp. 1261, 1268 (W.D. Mich. 1990).

15          The Administration's glib response fails to address these arguments and the evidence

16   supporting them.  Ignoring the magnitude of the impact to the County, its essential services, its

17   neediest residents if reimbursement is denied, and the cloud of financial uncertainty under which

18   the County labors, the Administration shrugs and says that monetary harm is usually not

19   irreparable and that budgeting always entails some uncertainty.  *See* Opp. at 13.  These answers

20   are inadequate and fail to rebut the County's evidence.  The issue here is not merely the loss of

21   money but the shuttering of life-sustaining services the County provides with that money.

22          In any case, a monetary loss that is significant enough to threaten the future viability of an

23   enterprise has long been deemed sufficiently "irreparable" to merit an injunction.  *See Doran v.*

24   *Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).  Where a plaintiff will "experience a substantial loss of

25   revenue, may face bankruptcy and there is no guarantee that defendants will follow through on

26   their promises to make future timely payments," irreparable harm exists.  *Cedar-Riverside*

27   *People's Ctr. v. Minnesota Dep't of Human Servs.*, 2009 WL 1955440, *2 (D. Minn. July 6,

28   2009) (citing *Doran*, 422 U.S. at 932); *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir.

8

1154051

1  1986) (monetary loss posing a danger to the viability of a business is irreparable harm).

2  Moreover, the reason monetary harm is typically not seen as irreparable is because a plaintiff can

3  sue for damages later.  But here the defendant would be the federal government, meaning the

4  County may face a claim of sovereign immunity.  *See Kansas Health Care Ass'n, Inc. v. Kansas*

5  *Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994); *Cedar-Riverside*, 2009 WL

6  1955440, at *2.  And even if the County could recover damages, by the time that claim is decided

7  the County would have been forced to fire employees and discontinue services—or else change

8  its local policies to succumb to an unconstitutional Order.  No after-the-fact monetary award

9  could make the County or its residents whole from harm caused by the closing of a local cancer-

10  treatment ward or shuttering of a neighborhood child-care program.  Nor could it repair the

11  constitutional injuries inflicted on the County and its residents if the County is commandeered

12  into participating in the Administration's immigration enforcement regime.

13  **4.      There is no reason to wait to enter an injunction until the
             Administration has taken acts that violate the Constitution.**

14

15  The Administration also disputes irreparable harm because, it contends, "a series of future

16  actions must occur before Section 9 [of the Executive Order] could have any effect on" the

17  County.  Opp. at 11–12.  As just demonstrated, this is false; the County is suffering irreparable

18  harm to its ability to make local policy, provide ongoing critical social and medical services, and

19  plan for future contingencies.  In any event, the "future actions" the Administration describes are

20  themselves unconstitutional and among the very things the County is moving to enjoin.

21  For instance, the Administration argues that the County must wait to sue until after the

22  Attorney General and Secretary of Homeland Security have taken actions to ensure that the

23  County is ineligible to receive federal funds.  Opp. at 12.  But the executive branch has no

24  unilateral power to declare the County ineligible for federal money.  Only Congress has the

25  power to direct federal spending, *see* U.S. Const. art. I, § 8, cl. 1, and even congressional

26  spending power must be exercised subject to well-settled limitations.  *See* Mot. at 12–15.

27  Because the Administration nowhere asserts that the President, Attorney General, or Secretary

28  have the constitutional authority to declare the County ineligible for federal funds, it makes no

1   sense to force the County to wait to seek an injunction until these officers take acts that

2   admittedly exceed their power.[4]  The Administration likewise argues that the Secretary has not

3   yet named the County a "sanctuary jurisdiction," but under the Executive Order, that

4   determination's only purpose is to facilitate the unconstitutional mandate of declaring such

5   jurisdictions ineligible for funding.  *See* EO § 9(a).  The Executive Order provides no notice to

6   jurisdictions in the crosshairs of such a determination, no opportunity to be heard to contest an

7   adverse decision, and no substantive standards to govern and impose reasonable limits on the

8   Attorney General's unilateral decision.  Because these "future actions" themselves involve

9   unconstitutional conduct, they are no obstacle to preliminary injunctive relief.[5]

10   Further, the Administration has no answer to the County's argument that there is no way

11   for it lawfully to comply with the Executive Order—another reason why irreparable harm exists

12   here.  Neither the County nor any other jurisdiction knows what the Executive Order requires of it

13   in order to avoid "hinder[ing] the enforcement of Federal law" in the Attorney General's

14   estimation.  EO § 9(a).  The Administration likewise fails to address whether jurisdictions must

15   honor ICE detainer requests (which the Order references in Section 9(b)), even though doing so

16   would violate the Fourth Amendment and subject the County to civil liability.  *See, e.g.*, *Morales*

17   *v. Chadbourne*, 793 F.3d 208, 215–16 (1st Cir. 2015); *see also* Mot. at 8 n.8.  Nor does the

18   Administration contest that even if the County complied with federal requests, it would

19   nonetheless remain in danger of losing federal funds passed through the State of California, which

20   the President has also threatened to defund.  Harris Decl. ¶ 3, Ex. B (O'Reilly Interview) at 4.

---

[4]  Although Congress may delegate to the executive branch some ability to withhold federal funding, it has enacted a statute governing this process, which the Executive Order ignores. Under the Impoundment Control Act of 1974, 2 U.S.C. §§ 683 *et seq.*, the President must identify specific allocated funds that he proposes to withhold, and Congress must approve that withholding.  The Executive Order unconstitutionally creates a separate process outside of the Impoundment Control Act, and independent from any congressional (or other) oversight.

[5]  In fact, the "series of future actions" the opposition identifies are nonsensical.  Taken at face value, the Administration is proposing ***first*** that the Secretary and Attorney General decide which jurisdictions are to be ineligible for federal funds, "ensure" their ineligibility, and only ***then*** "determine how to implement [defunding] 'consistent with law.'"  Opp. at 12.  In other words, the order of operations the Administration proposes puts the cart before the horse, taking funding away from "sanctuary jurisdictions" (an act already forbidden to the executive branch) before analyzing whether such defunding is lawful or not.

10

1154051

**D.      The balance of harms and public interest overwhelmingly favor the County.**

Because the Administration effectively concedes the substance of the County's constitutional claims, the balance of hardships and public interest necessarily favor the requested injunction. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *Melendres*, 695 F.3d at 1002. No harm can result from an order enjoining the government from violating the Constitution, nor can the enforcement of an unconstitutional order serve any legitimate public interest. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

The Administration's cursory discussion of the balance of harms completely ignores the uncontroverted declarations submitted by the County establishing the harm the County has suffered and continues to suffer. On the other side of the ledger, the Administration cannot identify ***any*** harm that either the government or the public might suffer if the Court issues the requested injunction, let alone back up such a claim with evidence. Instead, the Administration relies on the generalized public interest in "supporting the enforcement of federal immigration law." Opp. at 18. This argument assumes that the Executive Order is constitutional, and thus can embody a legitimate public interest, even though the Administration fails to advance any substantive defense against the County's constitutional claims. The argument is also unavailing, because the County seeks to enjoin the Administration only from coercing compliance with federal immigration laws through an unconstitutional Executive Order.[6] If the Court grants the requested injunction, the government would remain free to enforce federal immigration laws through all lawful means. *See Texas*, 86 F. Supp. 3d at 674 (enjoining executive immigration directive would "merely preserve the status quo that has always existed").

**E.      The County's claims are justiciable.**

Repeating the same themes it offered unconvincingly in its discussion of irreparable harm, the Administration argues that the County has suffered no injury-in-fact (and thus lacks standing),

---

[6] The Administration relies on *N.D. v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010), but that case supports the County. There, the court disparaged the asserted government interest of ensuring compliance with the law as "obvious," while observing that courts are expected to "look[] to many more factors affecting the public interest" before deciding a request for an injunction. *Id.*; *see also Rubin ex rel. NLRB v. Vista del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1108 (C.D. Cal. 2015) (citing *N.D.* for the same proposition).

1154051

1    and that its claims are not yet ripe.  *See* Opp. at 15–18.  Again, the Administration is wrong.

2                    **1.    The County is suffering real and immediate injury-in-fact.**

3            As an initial matter, because the County is suffering irreparable harm, *see* Part II.C, *supra*,

4    it has necessarily established Article III standing as a matter of law.  *See Shell Offshore, Inc. v.*

5    *Greenpeace, Inc.*, 709 F.3d 1281, 1286–87 (9th Cir. 2013); *Coalition for Econ. Equity v. Wilson*,

6    1996 WL 691962, at *2 n.4 (N.D. Cal. Nov. 27, 1996).  In any event, directly applicable

7    precedent confirms that the Executive Order is causing the County concrete, particularized, and

8    immediate injury.

9            As the Fifth Circuit held in *Texas v. United States*, "being pressured to change state law

10   constitutes an injury" sufficient to confer standing.  787 F.3d at 749; *see also Texas*, 201 F. Supp.

11   3d at 820–21.  That analysis applies here.  The Executive Order's express purpose is to coerce the

12   County to comply with unconstitutional directives regarding federal immigration enforcement, or

13   else forfeit approximately $1.7 billion in federal funds.  *See* EO § 2(a), (c).

14           Neither must the County wait for defunding to sue.  In *Susan B. Anthony List v. Driehaus*,

15   which the County cited and the Administration ignores, the Supreme Court reaffirmed that when

16   a plaintiff is threatened under a law, "enforcement action is not a prerequisite to challenging the

17   law."  134 S. Ct. 2334, 2342 (2014).  Rather, "where threatened action by government is

18   concerned," a plaintiff need not "expose himself to liability before bringing suit to challenge the

19   basis for the threat."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).  All the

20   County must show is "a credible threat of prosecution" under the Executive Order.  *Susan B.*

21   *Anthony List*, 134 S. Ct. at 2342.  Indeed, the "substantial contingent liability" created by the

22   Executive Order confers standing by itself, because it "immediately and directly affects the

23   borrowing power, financial strength, and fiscal planning" of the affected entity.  *See Clinton v.*

24   *City of New York*, 524 U.S. 417, 430–31 (1998).  The Ninth Circuit has likewise held that the

25   potential "loss of funds promised under federal law" is a quintessential injury that "satisfies

26   Article III's standing requirement," even where the government has not yet defunded.  *See*

27   *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015) (en banc).

28           Given the language of the Executive Order, the County's policies regarding ICE detainers

and federal immigration assistance, and the myriad statements of coercive intent by the President, there can be no doubt that the County has a "credible threat" of being targeted for defunding under the Order.  *See* Mot. at 5–8.  The Administration has "not suggested that the newly enacted [Order] will not be enforced, and [the County has] no reason to assume otherwise."  *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).  This establishes injury-in-fact for purposes of both Article III standing **and** constitutional ripeness.  *See California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003) (stating the rule that "the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry").[7]

### 2.      The County's claims are prudentially ripe.

Next, the Administration argues that the prudential (as opposed to constitutional) ripeness factors of "fitness of the issues for judicial decision" and "hardship to the parties of withholding court consideration" weigh against an injunction.  *See* Opp. at 16–18.  But the Administration again fails to address *Susan B. Anthony List*, where the Supreme Court questioned the "continuing vitality of the prudential ripeness doctrine" in light of courts' "virtually unflagging" obligation to "decide cases within [their] jurisdiction."  134 S. Ct. at 2347.

In any event, the County satisfies these two prudential ripeness factors.  First, the issues in this case are fit for judicial decision.  The Executive Order is final, the Administration has refused to disclaim its intent to enforce the Executive Order against the County or any other jurisdiction, and the County's challenge primarily presents legal issues that "will not be clarified by further factual development."  *Id.* (quotations omitted).  Second, requiring the County to "proceed without knowing whether the [Executive Order] is valid would impose a palpable and considerable hardship" on the County.  *Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 581 (1985); *see also Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100-01 (D.C. Cir. 1995) (dispute is ripe where executive order "confront[ed] employers with the difficult choice between surrendering their right to hire permanent replacements and risking the loss of current and future government contracts").  Delaying adjudication would force the County to choose between

---

[7]   Challenging only injury-in-fact, the Administration concedes that the County has established causation and redressability.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–62 (1992).

1    buckling to unconstitutional immigration directives, slashing essential programs and services, or

2    continuing to spend millions of dollars that the Order places at risk.  None of these options is

3    viable; the County requires relief now.  *See* J. Smith Decl. ¶¶ 6–11; Márquez Decl. ¶¶ 4, 11–21.

4        Although the Administration rests its case primarily on *Abbott Labs. v. Gardner*, 387 U.S.

5    136 (1967), that opinion supports the County.  There, the Supreme Court held that a pre-

6    enforcement challenge to an FDA labeling requirement was ripe, because the requirement forced

7    the plaintiffs into a position where they either "must comply" with it, or else "follow their present

8    course and risk prosecution." *Id.* at 151–54.  Likewise here.  The "mere existence" of the

9    Executive Order forces the County to choose "between taking immediate action to [its] detriment

10   and risking substantial future penalties for non-compliance." *Reich*, 57 F.3d at 1100–01.

11       **F.    The President should be enjoined.**

12       The Administration argues that no injunction may issue against President Trump directly.

13   Opp. at 19.  Not so.  The recent TRO blocking President Trump's first travel ban order issued

14   against the President directly, *see Washington v. Trump*, 2017 WL 462040 (W.D. Wash. Feb. 3,

15   2017), and the Ninth Circuit left that order undisturbed.  *See Trump*, 847 F.3d 1151, 1156 (9th

16   Cir. 2017).  District courts in Hawai'i and Maryland recently did the same with respect to the

17   President's second travel ban order.  *See Hawai'i*, 2017 WL 1101673, at *1 n.2, *17; *Int'l*

18   *Refugee Assistance Project*, No. TDC-17-0361 (D. Md. Mar. 15, 2017) (Dkt. No. 150).  These

19   orders are in keeping with the Supreme Court's guidance that district courts should "evaluate[ ]

20   whether injunctive relief against the President [i]s available" on a case-by-case basis.  *Franklin v.*

21   *Massachusetts*, 505 U.S. 788, 803 (1992).[8]  Indeed, *Youngstown* supports the County's request.

22   As the D.C. Circuit has pointed out, that opinion "made it clear that the Court understood its

23   affirmance effectively to restrain the President," and the result would have been the same "if

24   President Truman rather than Secretary Sawyer had been the named party." *Nixon v. Sirica*, 487

25   F.2d 700, 709 (D.C. Cir. 1973).  The Court may, and should, enjoin the President.

26

27   _____

[8]   Injunctive relief against the President may be particularly appropriate when the duty at issue is
28   "ministerial and not discretionary." *See Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).
     The role of the President in spending money duly authorized by Congress is a ministerial one.

PLAINTIFF COUNTY OF SANTA CLARA'S REPLY BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1154051

**G.      The Court should enter a nationwide preliminary injunction.**

Finally, the Administration asks the Court to limit any injunction to the County.  Opp. at 19–20.  But an unconstitutional Executive Order that applies to every state and local government cannot be enforced anywhere in the nation.  The Supreme Court has long explained that "the scope of injunctive relief is dictated" not by geography, but rather "by the extent of the violation established."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980) (nationwide injunction is appropriate against a facially unconstitutional federal law).  The Ninth Circuit has held that, in cases concerning a federal law's interpretation, nationwide "relief may be appropriate even in an individual action."  *Bresgal v. Brock*, 843 F.2d 1163, 1171 (9th Cir. 1987) (holding that, given the nationwide scope of the claim at issue, "the district court could hardly" have issued an injunction "on anything other than a nationwide basis"); *see also Trump*, 847 F.3d at 1166–67 (declining to "limit the geographic scope" of injunction against travel ban given the need for uniform nationwide guidance); *Texas*, 809 F.3d 134, *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (affirming nationwide injunction of presidential immigration directive).

Here, the Executive Order applies to every state and local jurisdiction in the nation, even those that may try to comply with it.  A city could honor ICE detainers without question, only to find that the county or state on which it relies for pass-through federal funding has been declared ineligible under section 9(a).  Caving to the President's coercion also carries its own legal risks.  After Miami's mayor announced that his city would begin honoring ICE detainer requests, *see* Patricia Mazzei, *Miami-Dade Mayor Orders Jails to Comply with Trump Crackdown on 'Sanctuary' Counties*, Miami Herald, Jan. 26, 2017, a Florida state court held that incarcerating individuals solely on ICE's request violates the Tenth Amendment, ordering the detainee released.  *See Lacroix v. Junior*, 2017 WL 837477, at *5 (Fla. Cir. Ct. Mar. 1, 2017).  Miami's whipsaw experience vividly illustrates the dilemma local governments across the nation face, and why a nationwide injunction is necessary.

**III.      CONCLUSION**

For the foregoing reasons, the Court should enter the requested preliminary injunction.

15

1
                                               Respectfully submitted,

2
Dated:  March 16, 2017                   OFFICE OF THE COUNTY COUNSEL,
                                           COUNTY OF SANTA CLARA

3
                            By:   */s/ James R. Williams*

4
                                       JAMES R. WILLIAMS, County Counsel

5
                                       Attorneys for Plaintiff COUNTY OF
                                       SANTA CLARA

6

7
Dated:  March 16, 2017                   KEKER, VAN NEST & PETERS LLP

8
                          By:   */s/ John W. Keker*
                                       JOHN W. KEKER

9

10
                                       Attorneys for Plaintiff COUNTY OF
                                       SANTA CLARA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF COUNTY OF SANTA CLARA'S REPLY BRIEF IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION
Case No. 17-cv-00574-WHO

1154051

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I, John W. Keker, am the ECF user whose identification and password are being used to file this document. Pursuant to Rule 5-1(i)(3), I hereby attest that the other above named signatories concur in this filing.

*/s/ John W. Keker*
JOHN W. KEKER

17

1154051