1    DECHERT LLP
     NATHAN M. MCCLELLAN (SBN 291435)
2    FRED T. MAGAZINER
     CHRISTOPHER S. BURRICHTER
3    Email:        nathan.mcclellan@dechert.com
     Email:        fred.magaziner@dechert.com
4    Email:        christopher.burrichter@dechert.com
     US Bank Tower
5    633 West 5th Street
     37th Floor
6    Los Angeles, California  90071-2013
     Telephone:    +1  213  808  5700
7    Facsimile:    +1  213  808  5760

8    Attorneys for *Amicus Curiae*
     Southern Poverty Law Center
9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                    SAN FRANCISCO DIVISION

13

14   COUNTY OF SANTA CLARA,                  Case No.  17-cv-00574 WHO

15              Plaintiff,                    **BRIEF OF *AMICUS CURIAE* SOUTHERN
                                              POVERTY LAW CENTER AND OTHER
16   v.                                       *AMICI* IN SUPPORT OF COUNTY OF
                                              SANTA CLARA AND CITY AND COUNTY
17   DONALD J. TRUMP, President of the        OF SAN FRANCISCO'S MOTIONS FOR
     United States of America, JOHN F.        PRELIMINARY INJUNCTION**
18   KELLY, in his official capacity as
     Secretary of the United States Department   Date:      April 5, 2017
19   of Homeland Security, JEFFERSON B.       Time:      2:00 p.m.
     SESSIONS, in his official capacity as    Dept.:     Courtroom 2
20   Attorney General of the United States,   Judge:     Hon. William H. Orrick
     JOHN MICHAEL "MICK" MULVANEY,
21   in his official capacity as Director of the   Date Filed:  February 3, 2017
     Office of Management and Budget, and
22   DOES 1-50,                               Trial Date:  Not Yet Set

23              Defendants.

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.   Turning Local Police Into Federal Immigration Agents Encourages Racial Profiling and Other Law Enforcement Abuses. ................................................................................ 2

II.  Turning Local Police Into Federal Immigration Agents Degrades Trust Between the Police and the Community. ....................................................................................... 5

III. Turning Local Police Into Federal Immigration Agents Can Result in Private Actors Exploiting and Abusing Immigrant Populations. ......................................................... 9

IV.  The Executive Order Will Jeopardize Local Governments' Access To Federal Funding Due To The Risk Of Violating Title VI. .................................................................. 10

V.   The Executive Order Will Force Local Governments to Choose Between Losing Federal Funding and Being Exposed to Substantial Civil Liability. ......................................... 11

CONCLUSION ..................................................................................................................... 12

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

-i-

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Jimenez-Moreno v. Napolitano*,
 No. 1:11-cv-05452 (N.D. Ill. Sept. 30, 2016) ...........................................................................12

*Melendres v. Arpaio*,
 989 F. Supp. 2d 822 (D. Ariz. 2013), *adhered to*, No. CV-07-02513-PHX-
 GMS, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part*,
 784 F.3d 1254 (9th Cir. 2015), *and aff'd*, 784 F.3d 1254 (9th Cir. 2015) .........................10, 11

*Miranda-Olivares v. Clackamas County*,
 No. 3:12-cv-02317 (D. Or. April 11, 2014) ...............................................................................12

*Montano-Pérez, et al. v. Durrett Cheese Sales, Inc., et al.*,
 Case No. 3:08-cv-1015 (M.D. Tenn.) ..........................................................................................9

*U.S. v. East Haven*,
 No. 12-1652 (D. Conn. filed Nov. 20, 2012) ...............................................................................4

*Villars v. Kubiatowski*,
 45 F. Supp. 3d 791, 807 (N.D. Ill. 2014) ...................................................................................12

*Whren v. United States*,
 517 U.S. 806 (1996) ......................................................................................................................3

**Other Authorities**

ACLU of Georgia, Georgia Latino Alliance for Human Rights, National
 Day Laborer Organizing Network & Immigrant Rights Clinic at NYU
 Law School, Prejudice, Policing, and Public Safety: The Impact of
 Immigration Hyper-Enforcement in Georgia 10 (July 2014) available at
 http://www.law.nyu.edu/sites/default/files/upload_documents/Prejudice_Polici
 ng_Public%20Safety.pdf...........................................................................................................4, 5

Advancement Project & Georgia Latino Alliance for Human Rights,
 Manufacturing Felonies: How Driving Became a Felony for People of
 Color in Georgia 3 (Mar. 2016) *available at*
 http://b.3cdn.net/advancement/a23a889905f33b63a2_lim6bsbhf.pdf. ........................................6

American Immigration Council, The Criminalization of Immigration in
 the United States (July 2015) *available at*:
 https://www.americanimmigrationcouncil.org/ research/criminalization-
 immigration-united-states (last visited Mar. 21, 2017)................................................................2

Dechert LLP
Attorneys At Law
Los Angeles

-ii-

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

AMERICAN IMMIGRATION COUNCIL, SECURE COMMUNITIES: A FACT SHEET, *available at* https://www.americanimmigrationcouncil.org/research/secure-communities-fact-sheet (last visited Mar. 20, 2017) ...................................................3

Jaques Billeaud, *Taxpayer costs of Sheriff Joe Arpaio's profiling case: Another $13M on top of $41M*, THE ARIZONA REPUBLIC (May 12, 2016), *available at* http://www.azcentral.com/story/news/local/phoenix/2016/05/12/taxpayer-costs-sheriff-joe-arpaios-profiling-case-another-13m-top-41m/84293950/ ...........................11

*Court Places Limits On Sheriff Arpaio To Prevent Future Racial Profiling Of Latinos In Arizona*, ACLU (Oct. 2, 2013), *available at* https://www.aclu.org/news/court-places-limits-sheriff-arpaio-prevent-future-racial-profiling-latinos-arizona .................................................................................11

DEPARTMENT OF JUSTICE, INVESTIGATION OF THE NEW ORLEANS POLICE DEPARTMENT 63 (Mar. 16, 2011) available at https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf. ...................................................................................................................6

Lawrence Downes, *Joe Arpaio's American Dream*, THE NEW YORK TIMES: TAKING NOTE (Jul. 24, 2015), *available* at https://takingnote.blogs.nytimes.com/2012/07/24/joe-arpaios-american-dream/....................10

TREVOR GARDNER II AND AARTI KOHLI, THE C.A.P. EFFECT: RACIAL PROFILING IN THE ICE Criminal Alien Program (Sept. 2009), available at https://www.law.berkeley.edu/files/policybrief_irving_0909_v9.pdf. ......................................3

Joe Hagan, *The Long, Lawless Ride of Sheriff Joe Arpaio*, ROLLING STONE (Aug. 2, 2012), *available at* http://www.rollingstone.com/culture/news/the-long-lawless-ride-of-sheriff-joe-arpaio-20120802 ........................................................10

IMMIGRANT LEGAL RESOURCE CENTER, SEARCHING FOR SANCTUARY: AN ANALYSIS OF AMERICA'S COUNTIES AND THEIR VOLUNTARY ASSISTANCE WITH DEPORTATIONS (Dec. 2016), *available at* https://www.ilrc.org/sites/default/files/resources/sanctuary_report_final _1-min.pdf ........................................................................................................................9

AARTI KOHLI, PETER L. MARKOWITZ & LISA CHAVEZ, SECURE COMMUNITIES BY THE NUMBERS: AN ANALYSIS OF DEMOGRAPHICS AND DUE PROCESS 5 (Oct. 2011), *available at* https://www.law.berkeley.edu/files/Secure_Communities_by_the_Numbers.pdf....................3

A. ELENA LACAYO, NATIONAL COUNCIL OF LA RAZA, THE IMPACT OF SECTION 287(G) OF THE IMMIGRATION AND NATIONALITY ACT ON THE LATINO COMMUNITY 18 (2010), *available at* http://publications.nclr.org/bitstream/handle/123456789/1067/287g_issuebrief _pubstore.pdf?sequence=1&isAllowed=y. ...............................................................7

Michael E. Miller, "This company is making millions from America's broken
immigration system," WASHINGTON POST (Mar. 9, 2017), *available at*
https://www.washingtonpost.com/local/this-company-is-making-millions-
from-americas-broken-immigration-system/2017/03/08/43abce9e-f881-11e6-
be05-1a3817ac21a5_story.html?utm_term=.1befd42af7f2. .................................................8

MAI THI NGUYEN & HANNAH GILL, THE 287(G) PROGRAM: THE COSTS AND
CONSEQUENCES OF LOCAL IMMIGRATION ENFORCEMENT IN NORTH CAROLINA
COMMUNITIES 33 (Feb. 2010) *available at*
*https://isa.unc.edu/files/2012/06/287g_report_final.pdf*..........................................4

PEW RESEARCH CENTER, A NATION OF IMMIGRANTS (2013) *available at*
http://www.pewhispanic.org/2013/01/29/a-nation-of-immigrants ...........................6

SOUTHERN POVERTY LAW CENTER, UNDER SIEGE: LIFE FOR LOW-INCOME LATINOS
IN THE SOUTH (Apr. 2009) at 11, *available at*
https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/Under
Siege.pdf. ...............................................................................................................9

TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION & CRIMINAL JUSTICE
PLANNING, CITATIONS/WARRANTS FOR NO DRIVER'S LICENSE BY ETHNICITY
AND RACE:  COMPARING THE YEAR PRIOR TO 287(G) AND THE YEAR
FOLLOWING 287(G) (2007) *available at* http://static1.1.
sqspcdn.com/static/f/373699/7070512/1274810470237/No_Drivers_License_1
_year_overview+6-2008.pdf?token=CjxGyjZITqFgFmsjkDf0vECPSk0%3D
(last visited Mar. 21, 2017). .......................................................................................3

NIK THEODORE, INSECURE COMMUNITIES: LATINO PERCEPTIONS OF POLICE
INVOLVEMENT IN IMMIGRATION ENFORCEMENT (May 2013) (hereafter
INSECURE COMMUNITIES) *available at*
http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_R
EPORT_FINAL.PDF..........................................................................................4, 5, 6

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- iv -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

## INTRODUCTION

This litigation involves the Constitutionality of Executive Order 13768, 82 Fed. Reg. 8799, issued by President Donald J. Trump on January 25, 2017 (the "Executive Order").  The Executive Order plainly states that any state or local government that the Attorney General and Secretary of Homeland Security declare to be a "sanctuary jurisdiction" will lose federal funding. The Executive Order does not define "sanctuary jurisdiction," but the term seems to apply at least to any jurisdiction that refuses to comply with 8 U.S.C. § 1373 or declines to comply with civil detainer requests from Immigration and Customs Enforcement ("ICE"), *i.e.,* any state or local government that refuses to allow ICE to commandeer the local police force to round up or detain immigrants.

Plaintiffs Santa Clara County ("Santa Clara") and the City and County of San Francisco ("San Francisco"), in separate lawsuits, have challenged the constitutionality of the Executive Order.  The Southern Poverty Law Center ("SPLC") and other *amici*[1] submit this amicus brief in support of Santa Clara and San Francisco, not to supplement the legal arguments that Santa Clara and San Francisco have made but to inform the Court of what has happened in the South and other parts of the country, where many local governments *voluntarily* comply with the kind of ICE civil detainer requests[2] to which the Executive Order seeks to *force* Santa Clara, San

---

[1] *See* Motion For Leave To File *Amicus Curiae* Brief Of Southern Poverty Law Center And Other *Amici* In Support Of County Of Santa Clara and City and County of San Francisco's Motions For Preliminary Injunction, at Exhibit 1 (additional *amici* include Adelante Alabama Worker Center, Alabama Coalition for Immigrant Justice (ACIJ), American Federation of Teachers, Americans for Immigrant Justice, Asian American Legal Defense and Education Fund, Asian Americans Advancing Justice (Asian Law Caucus, Los Angeles, AAJC, and Atlanta), Coalition for Humane Immigrant Rights (CHIRLA), Equal Rights Advocates, Florida Immigrant Coalition, Inc. (FLIC), Florida Legal Services, Inc., Greater Birmingham Ministries, Greater Rochester Coalition for Immigration Justice, Illinois Coalition for Immigrant and Refugee Rights, Immigrant Legal Resource Center (ILRC), Jobs With Justice, Justice in Motion, Latin American Legal Defense and Education Fund, LatinoJustice PRLDEF, National Employment Law Project, National Immigration Law Center, New Orleans Workers' Center for Racial Justice, Northwest Forest Worker Center, Refugee and Immigrant Center for Education and Legal Services (RAICES), Safe Horizon, Southeast Immigrant Rights Network (SEIRN), St. Louis Workers Education Society, Tennessee Immigrant and Refugee Rights Coalition, We Belong Together, Worker Justice Center of New York, Inc., Workers Defense Project, and Worksafe).
[2] These local governments may also have 287(g) agreements with the federal government.  For more information on 287(g) agreements, which delegate immigration enforcement authority to local law enforcement agencies pursuant to Memoranda of Understanding with ICE, see https://www.ice.gov/factsheets/287g (last visited Mar. 14, 2017).

Dechert LLP
Attorneys At Law
Los Angeles

-1-

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

Francisco, and every other state and local jurisdiction in the country to accede.

ICE has been pushing for years to increase its access to local jurisdictions' law enforcement resources.[3] When local jurisdictions have turned their police into *de facto* federal immigration agents, lasting harm has followed—to immigrant and non-immigrant residents, to local law enforcement, and to the community as a whole.  First, when local police become federal immigration agents, it places them on a risky path toward racial profiling and other discriminatory and abusive police conduct.  Second, when local police become federal immigration agents, it degrades trust between the police and the communities they serve; community trust is a crucial to effective law enforcement, and its absence inflicts serious and lasting harm on both the community and the local police. Third, when local police become federal immigration agents, it allows private actors to intimidate and exploit immigrant populations.  Fourth, an Executive Order forcing local jurisdictions to allow federal immigration agents to commandeer their local police forces puts those local jurisdictions in the untenable position of choosing between flouting the Executive Order, on the one hand, or violating the legally protected civil and constitutional rights of their residents, on the other.

**ARGUMENT**

**I.     Turning Local Police Into Federal Immigration Agents Encourages Racial Profiling and Other Law Enforcement Abuses.**

The SPLC and other *amici* recognize that police officers have a difficult job, and that most of them want to discharge their responsibilities appropriately.  Nevertheless, it is also true that some police officers and departments have engaged in racial profiling and other racially discriminatory or abusive behavior.  *Amici*'s experience is that turning local police into federal immigration agents encourages such racial profiling or abusive conduct, and can increase the difficulty of uncovering and correcting such discriminatory or abusive conduct.

Local police who are determined to enforce immigration laws sometimes use racial

---

[3] *See generally* AMERICAN IMMIGRATION COUNCIL, THE CRIMINALIZATION OF IMMIGRATION IN THE UNITED STATES (July 2015) *available at*: https://www.americanimmigrationcouncil.org/ research/criminalization-immigration-united-states (last visited Mar. 21, 2017).

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

profiling to decide whom to target and how to treat those individuals.  For instance, local law

enforcement officials may stop Latinos[4] for purported traffic violations as a pretext for

investigating their immigration paperwork or status.  A study of arrest data in Davidson County,

Tenn. shows that the arrest rates for Hispanic defendants driving without a license more than

doubled in the year after the county entered a 287(g) agreement to enforce immigration law.[5]  In

Irving, Texas, following the police department's agreement to partner with ICE, arrest data reveal

an "immediate" and "dramatic" increase in "discretionary arrests of Hispanics for petty offenses –

particularly minor traffic offenses" consistent with "racial profiling of Hispanics in order to filter

them through the [federal immigration enforcement program's] screening system."[6]  Similar

conclusions resulted from analysis of data on individuals arrested nationwide under the "Secure

Communities" program that sends the fingerprints of individuals arrested by local law

enforcement to the Department of Homeland Security.[7]  These data showed that Latinos were

93% of individuals arrested through Secure Communities although they are only 77% of the

undocumented population.[8]

Such racial profiling is wholly unconstitutional.  *See Whren v. United States*, 517 U.S.

806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on

considerations such as race.").  Racial profiling violates the Fourteenth Amendment's Equal

Protection Clause, the Fourth Amendment's ban on unreasonable searches and seizures, and Title

---

[4] This brief uses the terms "Latinos" and "Hispanics" interchangeably depending on the term used in the underlying source.  Where ethnicity is not specified, the brief refers to immigrants of all ethnicities.

[5] TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION & CRIMINAL JUSTICE PLANNING, CITATIONS/WARRANTS FOR NO DRIVER'S LICENSE BY ETHNICITY AND RACE:  COMPARING THE YEAR PRIOR TO 287(G) AND THE YEAR FOLLOWING 287(G) (2007) *available at* http://static1.1. sqspcdn.com/static/f/373699/7070512/1274810470237/No_Drivers_License_1_year_overview+6 -2008.pdf?token=CjxGyjZITqFgFmsjkDf0vECPSk0%3D (last visited Mar. 21, 2017).

[6] TREVOR GARDNER II AND AARTI KOHLI, THE C.A.P. EFFECT: RACIAL PROFILING IN THE ICE Criminal Alien Program (Sept. 2009), available at https://www.law.berkeley.edu/files/policybrief_irving_0909_v9.pdf.

[7] AMERICAN IMMIGRATION COUNCIL, SECURE COMMUNITIES: A FACT SHEET, *available at* https://www.americanimmigrationcouncil.org/research/secure-communities-fact-sheet (last visited Mar. 20, 2017).

[8] AARTI KOHLI, PETER L. MARKOWITZ & LISA CHAVEZ, SECURE COMMUNITIES BY THE NUMBERS: AN ANALYSIS OF DEMOGRAPHICS AND DUE PROCESS 5 (Oct. 2011), *available at* https://www.law.berkeley.edu/files/Secure_Communities_by_the_Numbers.pdf.

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

1   VI of the Civil Rights Act of 1964, which bars law enforcement agencies that receive federal

2   funds from discriminating on the basis of race, color, or national origin. Beyond their

3   unconstitutionality, these pretextual stops are also a waste of local police resources and taxpayer

4   dollars.[9]

5          Perhaps more importantly, racial profiling threatens the legitimacy of local police

6   departments within their own communities.  A study of Latinos perceptions of police involvement

7   in immigration enforcement found that 62% of Latinos—including citizens and documented and

8   undocumented immigrant respondents—said that police officers stop Latinos without good reason

9   or cause very or somewhat often.[10]  It is unsurprising that cooperation with the police drops when

10  people fear that the police will treat them differently because of the color of their skin or their

11  ethnic origin.[11]

12         Police racial profiling of people of color is nothing new, but ICE's willingness to deport

13  immigrants wrongfully seized complicates and magnifies the problem.  A study of ICE arrests in

14  Georgia pursuant to immigration detainers revealed a dramatic increase in enforcement against

15  immigrants of color facilitated by a growing collaboration between local law enforcement and

16  ICE.  The number of detainers issued in Georgia increased by at least *17,169%* between FY 2007

17  and June FY 2013.[12]  In FY 2007, 66.7% of individuals subject to ICE detainers were defined by

18

19  [9] *See, e.g.*, MAI THI NGUYEN & HANNAH GILL, THE 287(G) PROGRAM: THE COSTS AND CONSEQUENCES OF LOCAL IMMIGRATION ENFORCEMENT IN NORTH CAROLINA COMMUNITIES 33

20  (Feb. 2010) *available at https://isa.unc.edu/files/2012/06/287g_report_final.pdf* (finding that the first year of operating the 287(g) program in Mecklenburg County, North Carolina., cost $5.3 million, and the first year of operation in Alamance County, North Carolina, cost taxpayers $4.8

21  million).

22  [10] NIK THEODORE, INSECURE COMMUNITIES: LATINO PERCEPTIONS OF POLICE INVOLVEMENT IN IMMIGRATION ENFORCEMENT at 16 (May 2013) (hereafter INSECURE COMMUNITIES) *available at*

23  http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.

24  [11] *See, e.g.,* INSECURE COMMUNITIES at 5-6; *see also U.S. v. East Haven*, No. 12-1652 (D. Conn. filed Nov. 20, 2012) (complaint and settlement agreement arising from East Haven Police Department engaging discriminatory policing against Latinos, including by targeting Latinos for

25  discriminatory traffic enforcement, treating Latino drivers more harshly than non-Latino drivers after a traffic stop, and by contacting ICE agents to investigate the immigration status of Latino

26  drivers.)

27  [12] ACLU OF GEORGIA, GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS, NATIONAL DAY LABORER ORGANIZING NETWORK & IMMIGRANT RIGHTS CLINIC AT NYU LAW SCHOOL,

28  PREJUDICE, POLICING, AND PUBLIC SAFETY:  THE IMPACT OF IMMIGRATION HYPER-ENFORCEMENT IN GEORGIA 10 (July 2014) available at http://www.law.nyu.edu/sites/default/files/

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

1  ICE as having dark or medium complexion. In FY 2013 (through June 2013), 96.4% of

2  individuals subject to ICE detainers were defined by ICE as having dark or medium

3  complexion.[13]

4       But racial profiling is not the only evil that can result from turning local police into federal

5  immigration agents; such federal commandeering of local police can also lead to covering up

6  violent police abuse of community members.

7       Consider the experience of Angel Francisco Castro-Torres ("Castro"), a former client of

8  SPLC.  On the afternoon of March 26, 2010, Castro was riding his bicycle in in Smyrna, Georgia,

9  a place where local police act as federal immigration agents.  Two police officers began to follow

10  Castro and signaled him to stop riding for no reason other than his being Latino.  After

11  demanding Castro's immigration documents, the officers beat him, breaking his eye socket and

12  cheek bone.  The officers then attempted to cover up their attack by taking Castro to the Cobb

13  County Jail, which maintains a 287(g) agreement with the Department of Homeland Security.

14  The officers knew that from this jail, Castro could be placed into ICE detention and possibly

15  deported, making it highly unlikely that the officers' abusive behavior would have ever come to

16  light.  Castro's experience demonstrates how local law enforcement can be corrupted when

17  officers are told to enforce federal immigration laws.

18
19       **II.      Turning Local Police Into Federal Immigration Agents Degrades Trust
            Between the Police and the Community.**

20       Effective law enforcement requires some degree of trust between police (and other law

21  enforcement officials) and the communities they serve.  The necessary trust between police and

22  the community is jeopardized when local police act as federal immigration agents.  Many people

23  are reluctant to interact with local police when the police are providing information to ICE to

24  assist in deportations, holding local residents on civil detainers for ICE, or otherwise enforcing

25  federal immigration policy.  A 2012 study found that 44% of Latinos were less likely to contact

26  the police if they were victims of crime due to the fear that the police would ask about their

27
28  upload_documents/Prejudice_Policing_Public%20Safety.pdf.
    [13] *Id.* at 14.

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

immigration status or that of people they know.[14]

This fear holds both for people who are concerned about their own immigration status and those concerned for their families or friends.[15]  Twenty nine percent of Latino citizens reported they are less likely to voluntarily offer information about crimes they know have been committed, and 26 percent said they are less likely to report a crime, due to fear that police will ask about their family or friends' immigration status.[16]  With more than nine million people living in mixed status families that include documented and undocumented members,[17] it should be unsurprising that fear transcends documentation status when police refuse to draw clear boundaries between crime control and immigration enforcement.  An undocumented woman in a physically abusive relationship, for example, may be afraid to seek help from the police; a U.S citizen may fear that if he provides information to the police about gang activity, it will expose his undocumented mother to police attention.

A Department of Justice ("DOJ") finding of discriminatory policing by the New Orleans Police Department ("NOPD") found that "members of the Latino immigrant worker community, who are frequently victimized  . . . reported a deep reluctance to report crime – either as victims or witnesses . . .[because] NOPD officers questioned them about their immigration status."[18]  In 2008, a year after the Davidson County, Tennessee sheriff entered into a 287(g) agreement, the National Council of La Raza and the Tennessee Immigrant and Refugee Rights Coalition surveyed community members' trust of police.  The survey compared the willingness of Latinos

---

[14] *See, e.g.,* INSECURE COMMUNITIES) at 5-6; *see also* ADVANCEMENT PROJECT & GEORGIA LATINO ALLIANCE FOR HUMAN RIGHTS, MANUFACTURING FELONIES:  HOW DRIVING BECAME A FELONY FOR PEOPLE OF COLOR IN GEORGIA 3 (Mar. 2016) (finding that "[i]mmigrant communities are increasingly wary of local police officers during traffic stops, desperately seeking to avoid all possible interactions with police, even if and when they are in danger" and "[w]here immigration is concerned, federal law enforcement cooperation with local police often leads to the unjust detention and deportation of law-abiding immigrants and impacting families.") *available at* http://b.3cdn.net/advancement/a23a889905f33b63a2_lim6bsbhf.pdf.
[15] *See, e.g.*, INSECURE COMMUNITIES at 6.
[16] *Id.*
[17] PEW RESEARCH CENTER, A NATION OF IMMIGRANTS (2013) *available at* http://www.pewhispanic.org/2013/01/29/a-nation-of-immigrants.
[18] DEPARTMENT OF JUSTICE, INVESTIGATION OF THE NEW ORLEANS POLICE DEPARTMENT 63 (Mar. 16, 2011) available at https://www.justice.gov/sites/default/files/crt/legacy/2011/03/17/nopd_report.pdf.

1   and Blacks to contact the sheriff's office.  While both communities expressed deep discomfort

2   with interacting with police, 42% of Latinos knew of a crime that had not been reported to police,

3   compared to 4% of Blacks.  This community mistrust of approaching the police in a 287(g)

4   county extended to future crimes; 54% of Latinos said they would not report a future crime,

5   compared to 27% of Blacks.[19]

6            The story of Oscar and Jessica Ramirez[20] illustrates what happens when local police

7   engage in immigration enforcement, leaving broken trust between the police and the immigrant

8   communities they are supposed to serve. Jessica Ramirez is an undocumented immigrant who

9   was born in Guatemala and has lived in the United States for a dozen years, since she was twelve.

10  Oscar Ramirez is an undocumented immigrant who was born in Mexico.  Oscar and Jessica

11  Ramirez and their four children (all of whom are U.S. citizens) live in an area of Alabama where

12  the local police have been eagerly acting as federal immigration agents.

13           On a foggy morning in October 2014, Oscar Ramirez was involved in a car accident.

14  Nobody was hurt, but Ramirez was so afraid of interacting with the local police that he fled the

15  scene of the accident.  He was arrested at his home two days later.  While Jessica Ramirez

16  attempted to secure her husband's release, Oscar was transferred to ICE custody, where he

17  remained for three months.  Oscar Ramirez has now been released, but is likely to be convicted

18  on felony criminal charges and deported to Mexico.

19           Because Oscar Ramirez's fear of the police led him to flee, everyone is worse off.  Most

20  obviously, Oscar has suffered; instead of sorting out the consequences of a minor car accident in

21  which nobody was hurt, Oscar now risks a felony conviction and deportation to Mexico, he lost

22  his job as a carpenter—he now works as a landscaper, making much less—and he is saddled with

23  monthly payments to a bond company.[21]  These financial consequences will continue to affect

24
_____

25  [19] A. ELENA LACAYO, NATIONAL COUNCIL OF LA RAZA, THE IMPACT OF SECTION 287(G) OF THE
    IMMIGRATION AND NATIONALITY ACT ON THE LATINO COMMUNITY 18 (2010), *available at*
    http://publications.nclr.org/bitstream/handle/123456789/1067/287g_issuebrief_pubstore.pdf?sequ

26  ence=1&isAllowed=y.
    [20] Pseudonyms.  Jessica is a member of *amicus* Alabama Coalition for Immigrant Justice.  She

27  shared her and her husband's story with the SPLC for purposes of inclusion in this brief.
    [21] This bond company, Libre by Nexus, has been sued for fraud by other immigrants who were

28  required to sign documents in English that they did not understand and were not told of the

- 7 -

1    Oscar Ramirez even in the unlikely event that he is not ultimately convicted and deported.

2         Jessica Ramirez and the Ramirez children (none of whom were in the car at the time of the

3    accident) have also been harmed.  Jessica was five months pregnant at the time of the accident,

4    and she was forced to raise her children and deal with her pregnancy on her own while her

5    husband was held in ICE detention facilities.  She struggles to care for her family because Oscar's

6    income has shrunk, because the family has had to make bond payments, and because the family

7    has had to devote its scarce resources to Oscar's criminal and immigration issues.

8         And most critically, if Oscar Ramirez is deported, his family will face a tragic choice.  If

9    Jessica Ramirez stays in the United States, where her children are citizens, she will have to raise

10   the children on her own and without their father, she herself will face the threat of deportation,

11   and the family will lose its primary income-earner; if Jessica moves to Mexico with Oscar, a

12   country where she has never lived, she will leave behind all of her and her children's friends and

13   sources of community support and she will deprive her children of the opportunity to grow up in

14   the United States and receive an education in U.S. schools, even though they are citizens.

15        It is not only the Ramirez family who has been harmed—local law enforcement has been

16   harmed as well.  Instead of making (at most) a routine stop to assist in resolving a minor car

17   accident, the police were required to conduct an investigation, develop evidence, and make an

18   arrest, wasting resources that could have been put to better use elsewhere, and local prosecutors

19   now must prosecute a case that would never have arisen in the first place if Oscar Ramirez felt

20   that he could trust the police.

21        The Ramirez family's situation provides only one illustration of the consequences of

22   eroding trust between local police and the communities they serve.  That lack of trust undermines

23   effective law enforcement, wastes community resources, and creates serious problems out of

24

25

26   company's requirement that they wear and pay for the cost of ankle monitors.  See Michael E.
     Miller, "This company is making millions from America's broken immigration system,"
27   WASHINGTON POST (Mar. 9, 2017), *available at* https://www.washingtonpost.com/local/this-
     company-is-making-millions-from-americas-broken-immigration-system/2017/03/08/43abce9e-
28   f881-11e6-be05-1a3817ac21a5_story.html?utm_term=.1befd42af7f2.

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

1    issues that could have been resolved with appropriate early intervention.[22]

2        **III.    Turning Local Police Into Federal Immigration Agents Can Result in Private**
         **Actors Exploiting and Abusing Immigrant Populations.**

3        Even when local police behave in accordance with the highest standards of integrity and

4    decency, turning them into immigration agents can create huge problems.  When local police are

5    charged with enforcing immigration laws, it creates an opportunity for unscrupulous private

6    actors to intimidate or exploit immigrant neighbors or employees; a resident or organization with

7    a grievance against an immigrant person or community can credibly wield the threat of a phone

8    call to local police, which might lead to deportation.

9        One example of this abuse occurred at the Durrett Cheese plant ("Durrett") in Coffee

10   County, Tennessee.[23]  Durrett recruited a large number of undocumented and impoverished

11   Mixteco (an indigenous Mexican population) immigrants to work at the plant.[24]  These

12   immigrants spoke Spanish or Mixteco, and barely any English.  Durrett proceeded to mistreat

13   these employees, referring to them as "stupid Indians" and "donkeys," and often refusing to pay

14   them minimum wage, or pay them at all.  This abuse continued for over a year.

15       Eventually, the workers organized and demanded that Durrett pay them their overdue

16   and/or withheld wages.  In response, Durrett called the Coffee County Sheriff's Department

17   ("CCSD") and had its own employees arrested for "trespassing" and turned over to ICE.  Durrett

18   even provided paperwork to the CCSD to assist the Sheriff in reporting the Latino employees to

19   ICE.  Here, the claimed ground for the arrests—"trespassing"—was entirely pretextual.  Durrett's

20   true motivation in having its employees arrested was to exploit local law enforcement's

21   cooperation with federal immigration authorities.  By turning its own workers over for

22   deportation proceedings, Durrett sought to avoid paying those workers the wages they were fairly

23

24   ───────────────────
     [22] *See generally* IMMIGRANT LEGAL RESOURCE CENTER, SEARCHING FOR SANCTUARY: AN
25   ANALYSIS OF AMERICA'S COUNTIES AND THEIR VOLUNTARY ASSISTANCE WITH DEPORTATIONS
     (Dec. 2016), *available at* https://www.ilrc.org/sites/default/files/resources/sanctuary_report_final
26   _1-min.pdf.
     [23] SOUTHERN POVERTY LAW CENTER, UNDER SIEGE: LIFE FOR LOW-INCOME LATINOS IN THE
27   SOUTH (Apr. 2009) at 11, *available at*
     https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/UnderSiege.pdf
28   [24] SPLC later represented many of these workers in their lawsuit against Durrett. *See Montano-*
     *Pérez, et al. v. Durrett Cheese Sales, Inc., et al.*, Case No. 3:08-cv-1015 (M.D. Tenn.).

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

due, and to deter any other undocumented workers, whether at Durrett or elsewhere, who found themselves underpaid, discriminated against, or otherwise abused.  It is hard enough for an individual to stand up to an employer and risk being fired; it is much harder when doing so would also cause that individual to risk deportation.

## IV.   The Executive Order Will Jeopardize Local Governments' Access To Federal Funding Due To The Risk Of Violating Title VI.

Racial discrimination can quickly spread throughout a local police force charged with implementing federal immigration law, whether intentionally or simply as an unintended consequence of immigration enforcement.  When it does, such discrimination places counties directly in conflict with Title VI of the Civil Rights Act of 1964 ("Title VI").  Cities that receive federal financial assistance are obligated to comply with Title VI, which outlaws discrimination on the basis of race, color, or national origin.  When local police enter into immigration enforcement agreements with ICE, those agreements are sometimes enforced in a manner that directly violates Title VI.

One of the most notorious examples of this occurred outside the South, but is indicative of what can happen when local police dedicate themselves to enforcing immigration law.  The Maricopa County, Arizona Sheriff's Office ("MCSO"), under the direction of former Sheriff Joe Arpaio, decided that its highest priority was to enforce federal immigration laws. Sheriff Arpaio and the MCSO had earned a reputation for cruelty against Latino residents, with Sheriff Arpaio explaining that his local police enforced a "pure program to go after the illegals and not the crime first."[25]  The DOJ filed suit against the MCSO and the sheriff in 2012, arguing in part that the MCSO's treatment of the county's Latino residents—including its discriminatory traffic stops and cruel conditions of confinement for Latino inmates—violated Title VI.  A federal judge in 2013 determined that Sheriff Arpaio had engaged in rampant civil rights abuses, including the racial profiling of Latinos.  *See Melendres v. Arpaio*, 989 F. Supp. 2d 822 (D. Ariz. 2013), *adhered to*,

---

[25] Lawrence Downes, *Joe Arpaio's American Dream*, THE NEW YORK TIMES: TAKING NOTE (Jul. 24, 2015), *available* at https://takingnote.blogs.nytimes.com/2012/07/24/joe-arpaios-american-dream/; Joe Hagan, *The Long, Lawless Ride of Sheriff Joe Arpaio*, ROLLING STONE (Aug. 2, 2012), *available at* http://www.rollingstone.com/culture/news/the-long-lawless-ride-of-sheriff-joe-arpaio-20120802.

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

No. CV-07-02513-PHX-GMS, 2013 WL 5498218 (D. Ariz. Oct. 2, 2013), *aff'd in part, vacated in part*, 784 F.3d 1254 (9th Cir. 2015), *and aff'd*, 784 F.3d 1254 (9th Cir. 2015). In issuing an injunction to compel reforms in the MCSO, the judge found that Sheriff Arpaio and his department had intentionally targeted and discriminated against Latinos in violation of the Constitution, while making cosmetic changes to their policies in an attempt to make them appear race-neutral.[26] 989 F. Supp. 2d at 902.

Investigations and discrimination lawsuits against local police forces carry a serious financial cost for cities. By way of example, Sheriff Arpaio's policies already cost Maricopa County more than $50 million dollars in legal fees.[27] The Executive Order thus creates a catch-22 for America's sanctuary cities: they must either (1) comply with the Executive Order and risk losing federal funding due to Title VI violations, or (2) ignore the Executive Order and risk losing federal funding under the terms of the Executive Order. Santa Clara, San Francisco, and every other state and local jurisdiction in the country should not be put in the position of potentially losing their federal funding for either complying or not complying with the Executive Order.

**V.      The Executive Order Will Force Local Governments to Choose Between Losing Federal Funding and Being Exposed to Substantial Civil Liability.**

Section 9(b) of the Executive Order threatens de-funding for any jurisdiction that "ignore[s] or otherwise fail[s] to honor any detainers with respect to such aliens." If the Executive Order is permitted to stand, Santa Clara, San Francisco, and every other state and local jurisdiction in the country would risk losing federal funding if they ever failed to comply with any ICE detainer request. This provision of the Executive Order would also put the local governments in another untenable catch-22. Federal courts have found that ICE detainer requests can violate the probable cause requirement of the Fourth Amendment of the Constitution, and can

---

[26] *See also Court Places Limits On Sheriff Arpaio To Prevent Future Racial Profiling Of Latinos In Arizona*, ACLU (Oct. 2, 2013), *available at* https://www.aclu.org/news/court-places-limits-sheriff-arpaio-prevent-future-racial-profiling-latinos-arizona. Sheriff Arpaio was eventually voted out of office after separately being held in contempt of court. The DOJ withdrew the MCSO's 287(g) agreement in 2011 in light of the abusive conditions in Sheriff Arpaio's jails.
[27] Jaques Billeaud, *Taxpayer costs of Sheriff Joe Arpaio's profiling case: Another $13M on top of $41M*, THE ARIZONA REPUBLIC (May 12, 2016), *available at* http://www.azcentral.com/story/news/local/phoenix/2016/05/12/taxpayer-costs-sheriff-joe-arpaios-profiling-case-another-13m-top-41m/84293950/.

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

1    exceed ICE's authority to make warrantless arrests and detain individuals without a neutral

2    determination regarding the likelihood of escape.  *See, e.g., Jimenez-Moreno v. Napolitano*, No.

3    1:11-cv-05452 (N.D. Ill. Sept. 30, 2016) (holding ICE detainers exceed the scope of authority

4    delegated by Congress); *Miranda-Olivares v. Clackamas County*, No. 3:12-cv-02317 (D. Or.

5    April 11, 2014) (granting summary judgment on claim of unlawful detention against county that

6    detained plaintiff pursuant to an ICE detainer)*cf. Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 807

7    (N.D. Ill. 2014) (no probable cause for a detainer request made to allow the federal government

8    time to investigate whether plaintiff had committed a crime).

9         Under the scheme contemplated by Executive Order, Santa Clara would be forced to make

10   an unacceptable choice every time it received a detainer request from ICE.  On the one hand, it

11   could refuse to comply with the request, thus risking being branded a "sanctuary jurisdiction" and

12   the concomitant risk to federal funding which that label carries.  On the other hand, it could

13   choose to comply with the request, thereby perhaps violating the constitutional rights of its

14   residents, and exposing the county to litigation and potential liability.  Santa Clara's ability to

15   receive the federal funding to which it is entitled should not be conditioned on its willingness to

16   violate the constitutional rights of its residents.

17                                      **CONCLUSION**

18        For the reasons set forth above, the SPLC and other *amici* believe that implementation of

19   the Executive Order will irreparably harm the residents of Santa Clara, San Francisco, and every

20   other state and local jurisdiction in the country by forcing these jurisdictions to engage in federal

21   immigration law enforcement activities and imposing upon them the negative consequences for

22   law enforcement officers and residents discussed in this brief.

23

24   Dated:        March 22, 2017              Dechert LLP

25                                      By: */s/ Nathan M. McClellan*

26                                          Nathan M. McClellan
                                            Fred T. Magaziner
27                                          Christopher S. Burrichter
                                            Attorneys for *Amicus Curiae*
28                                          Southern Poverty Law Center

Dechert LLP
Attorneys At Law
Los Angeles

- 12 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

1

Southern Poverty Law Center

2

3

By:  */s/ Naomi Tsu*
    Naomi Tsu

4

    GA Bar No. 507612
    1989 College Ave., NE

5

    Atlanta, GA 30317
    (t):  404-521-6700

6

    (f):  404-221-5857
    naomi.tsu@splcenter.org

7

    Attorney for proposed amici curiae
    Adelante Alabama Worker Center,

8

    Alabama Coalition for Immigrant Justice,
    American Federation of Teachers,

9

    Americans for Immigrant Justice,
    Asian American Legal Defense and

10

    Education Fund,
    Asian Americans Advancing Justice (Asian

11

    Law Caucus, Los Angeles, AAJC, and
    Atlanta),

12

    Coalition for Humane Immigrant Rights,
    Equal Rights Advocates,

13

    Florida Immigrant Coalition, Inc.,
    Florida Legal Services, Inc.,

14

    Greater Birmingham Ministries,
    Greater Rochester Coalition for

15

    Immigration Justice,
    Illinois Coalition for Immigrant and

16

    Refugee Rights,
    Immigrant Legal Resource Center,

17

    Jobs With Justice,
    Justice in Motion,

18

    Latin American Legal Defense and
    Education Fund,

19

    LatinoJustice PRLDEF,
    National Employment Law Project,

20

    National Immigration Law Center,
    New Orleans Workers' Center for Racial

21

    Justice,
    Northwest Forest Worker Center,

22

    Refugee and Immigrant Center for
    Education and Legal Services,

23

    Safe Horizon,
    Southeast Immigrant Rights Network,

24

    St. Louis Workers Education Society,
    Tennessee Immigrant and Refugee Rights

25

    Coalition,
    We Belong Together,

26

    Worker Justice Center of New York, Inc.,
    Workers Defense Project, and

27

    Worksafe

28

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO

1    The undersigned hereby attests that all signatories hereto, together with their respective

2  clients on whose behalf this filing is submitted, concur in the contents of the within BRIEF OF

3  *AMICUS CURIAE* SOUTHERN POVERTY LAW CENTER AND OTHER *AMICI* IN

4  SUPPORT OF COUNTY OF SANTA CLARA AND CITY AND COUNTY OF SAN

5  FRANCISCO'S MOTIONS FOR PRELIMINARY INJUNCTION and have authorized this

6  filing.

7

8                                          By:  */s/ Nathan M. McClellan*
                                                Nathan M. McClellan

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECHERT LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

SO. POV. LAW CTR'S BRIEF ISO SANTA
CLARA CO. MOTION FOR PRELIM. INJ.
CASE NO.  17-CV-00574 WHO