*County of Santa Clara v. Donald J. Trump, et al.*,
No. 3:17-cv-00574-WHO (N.D. Cal.)

Defendants' Motion for Leave to File a Motion for
Reconsideration of the Court's
Order of April 25, 2017

Attachment 2

Defendants' Notice of Motion and Motion for
Reconsideration or, in the Alternative, Clarification
of the Court's Order of April 25, 2017;
Memorandum of Points and Authorities

CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
JOHN R. TYLER
Assistant Director
STEPHEN J. BUCKINGHAM (Md. Bar)
Special Counsel
W. SCOTT SIMPSON (Va. Bar #27487)
Senior Trial Counsel
Department of Justice, Room 7210
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, D.C.  20044
Telephone:     (202) 514-3495
Facsimile:     (202) 616-8470
E-mail:          scott.simpson@usdoj.gov
COUNSEL FOR DEFENDANTS
DONALD J. TRUMP, President of the
United States; JOHN F. KELLY, Secretary of
Homeland Security; JEFFERSON B.
SESSIONS, III, Attorney General of
the United States; MICK MULVANEY,
Director of the Office of Management and
Budget

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br><br>    Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, *et al*.,<br><br>    Defendants. | No. 3:17-cv-00574-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR RECONSIDERA-TION OR, IN THE ALTERNATIVE, CLARIFICATION OF THE COURT'S ORDER OF APRIL 25, 2017; MEMORANDUM OF POINTS AND AUTHORITIES** |

1

## TABLE OF CONTENTS

2

NOTICE OF MOTION ........................................................................................................... 1

3

4

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

5

INTRODUCTION ................................................................................................................... 1

6

7

ISSUES PRESENTED............................................................................................................. 2

8

BACKGROUND .................................................................................................................... 3

9

10

ARGUMENT ......................................................................................................................... 7

11

    I.      The AG Memorandum Provides a Basis for the Court
           to Reconsider Its Justiciability Determination ....................................................... 8

12

    II.     The AG Memorandum Provides a Basis for the Court to Reconsider
           Its Determination that the Plaintiff is Likely to Succeed

13

           on the Merits of Its Claims....................................................................................... 12

14

          A.     The AG Memorandum Alleviates the Court's Separation

15

                 of Powers Concerns .................................................................................... 13

16

          B.     The AG Memorandum Alleviates the Court's Spending
                 Clause Concerns.......................................................................................... 14

17

          C.     The AG Memorandum Alleviates the Court's Tenth

18

                 Amendment Concerns................................................................................. 16

19

          D.     The AG Memorandum Alleviates the Court's Vagueness Concerns........ 17

20

          E.     The AG Memorandum Alleviates the Court's Due Process
                 Clause Concerns.......................................................................................... 19

21

    III.    The Injunction Should Not Restrict Defendants' Independent

22

           Authority to Impose Conditions on Grant Programming.................................... 20

23

CONCLUSION ....................................................................................................................... 21

24

25

26

27

28

1

<u>TABLE OF AUTHORITIES</u>

2

3    <u>CASES</u>

4    *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28
     (D.C. Cir. 2002) ......................................................................................... 4, 9, 14, 18

5    *De La Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105 (N.D. Cal. 2014) ......................................... 7

6    *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275 (D.C. Cir. 1989)................................................. 6, 13

7    *Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006) ...................................................... 15

8    *Gaynard v. City of Rockford*, 408 U.S. 104 (1972) ...................................................... 18

9    *Morton v. Ruiz*, 415 U.S. 199 (1974) .......................................................................... 6

10   *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) ...................................... 15

11   *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255 (9th Cir. 1993) ................. 7

12   *S. Dakota v. Dole*, 483 U.S. 203 (1987)................................................................. 11, 17

13   *Thornton v. City of Helens*, 425 F.3d 1158 (9th Cir. 2005) ........................................ 19

14

15   <u>STATUTES</u>

16   8 U.S.C. § 1103(c)(1)................................................................................................ 5

17   8 U.S.C. § 1373 ............................................................................................... passim

18   42 U.S.C. § 3712(a) ........................................................................................... 7

19   42 U.S.C. § 3712(a)(6) ........................................................................................ 6

20   42 U.S.C. § 3752(a)(5)(D) .................................................................................... 6

21

22   <u>REGULATIONS</u>

23   2 C.F.R. § 200.207(a)........................................................................................... 7

24   2 C.F.R. § 2800.101 ........................................................................................... 7

     28 C.F.R. § 0.5(c)............................................................................................... 5

25

26   <u>EXECUTIVE ORDERS</u>

27   Exec. Order 13,536, 76 Fed. Reg. 3,821 (Jan. 18, 2011) ............................................ 10

28

Defs' Motion for Reconsideration
No. 3:17-cv-00574-WHO

Exec. Order No. 13,768, 82 Fed. Reg. 8,799 (Jan. 30, 2017) .................................................. passim

Exec. Order No. 13,768, § 9, 82 Fed. Reg. 8,799 (Jan. 30, 2017) ......................................... passim

Exec. Order No. 13,768, § 10(a), 82 Fed. Reg. 8,799 (Jan. 30, 2017)............................................ 9

OTHER AUTHORITIES

*2015 COPS Hiring Program Fact Sheet*, DOJ Community Oriented Policing Services .............. 13

*2016 COPS Hiring Program Fact Sheet*, DOJ Community Oriented Policing Services .............. 13

Ltr. from Peter J. Kadzik, Asst. Att'y Gen. U.S. Dep't of Justice, to Hon.
John A. Culberson, Chairman for the Subcomm. on Commerce, Justice,
Sci. & Related Agencies (Jul. 7, 2016) ................................................................................. 7

Mem. from DHS Sec'y Jeh Johnson to Acting Dir. U.S. Immigration &
Customs Enforcement Thomas Winkowski, et al.  (Nov. 20, 2014) ............................................ 9

Mem. from the Attorney General for All Department Grant-Making
Components (May 22, 2017) .................................................................................................. passim

Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from
the Office of Legal Counsel*, 52 Admin. L. Rev. 1303 (2000) ........................................................ 5

iv

<u>NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OR, IN THE</u>
<u>ALTERNATIVE, FOR CLARIFICATION</u>

PLEASE TAKE NOTICE that defendants hereby move for reconsideration or, in the alternative, for clarification of the Court's Order of April 25, 2017, granting plaintiff's motion for preliminary injunction (Doc. 98).  This motion is based on the following Memorandum of Points and Authorities, the evidence and records on file in this action, and any other written or oral evidence or argument that may be presented at or before the time this motion is heard.

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

<u>INTRODUCTION</u>

On May 22, 2017, the Attorney General issued a Memorandum ("AG Memorandum") concerning the implementation of Executive Order 13,768.  *See* AG Mem. at 1 (Attachment 1 hereto); Exec. Order No. 13,768 ("Executive Order"), 82 Fed. Reg. 8,799-8,803 (Jan. 30, 2017).  The AG Memorandum sets forth the Attorney General's conclusive interpretation of the scope of the grant-eligibility provision in Section 9(a) of the Executive Order.  The Memorandum provides (1) that the grant-eligibility provision applies "solely to federal grants administered by the Department of Justice or the Department of Homeland Security ["DHS"], and not to other sources of federal funding[,]" (2) that the Department of Justice ("DOJ") will require jurisdictions applying for certain DOJ-administered grants "to certify their compliance with federal law, including 8 U.S.C. § 1373," and (3) that only "jurisdiction[s] that fail[] to certify compliance with section 1373 will be ineligible to receive [an] award[]."  AG Mem. at 1-2.  The AG Memorandum provides the decisive interpretation of the administration, and it reaffirms the representations made by government counsel at oral argument that the grant-eligibility provision applies only to federal grant programs administered by DOJ or DHS that contain terms that expressly obligate a grant applicant or recipient to certify of compliance with 8 U.S.C. § 1373.  *See* Tr. of Oral Arg. at 24:4-6, *County of Santa Clara v. Trump*, No. 3:17-cv-00574 (N.D. Cal. Apr. 14, 2017).

The authoritative position set forth in the AG Memorandum squarely contradicts the Court's determination, which was based in part on non-binding press statements and public speeches, that the grant-eligibility provision "attempts to reach all federal grants[.]"  Order of

1   Apr. 25, 2017 at 2-3 (Doc. 98).  That finding, in turn, served as the foundation for the Court's

2   analysis of the justiciability of plaintiff's claims and the Court's conclusions regarding the

3   constitutional infirmity of the Executive Order.  However, because the Attorney General has now

4   issued binding guidance that undermines many of the factual bases supporting the Court's

5   opinion, including the Court's interpretation of press statements and public speeches, defendants

6   respectfully request that the Court reconsider its holding in light of the recently-issued

7   Memorandum.

8         Should the Court determine that an injunction remains appropriate despite the issuance of

9   the AG Memorandum, defendants respectfully seek clarification regarding the scope of the

10  injunction.  The Court's Order provides that defendants may "use lawful means to enforce

11  *existing* conditions of federal grants or 8 U.S.C. 1373."  *Id.* at 49 (emphasis added).  Defendants

12  do not interpret the Court's Order as prohibiting defendants from imposing additional conditions

13  on grant programming for future federal grant awards pursuant to the direction contained in

14  Section 9(a), where defendants are legally authorized to do so under authority that exists

15  independent of the Executive Order.  Nevertheless, out of an abundance of caution, in the event

16  the Court determines to maintain the injunction currently in place in this matter, defendants

17  respectfully seek confirmation that DOJ and DHS are not enjoined from imposing conditions on

18  grant programs administered by those agencies where such conditions are permissible under

19  independent legal authority.

20                              ISSUES PRESENTED

21      1.  Whether the Court should reconsider its entry of injunctive relief in light of recently

22  issued authority concerning the scope of the Executive Order.

23      2.  Whether, in the event the Court determines that injunctive relief remains appropriate,

24  the Court should nevertheless clarify the scope of its Order to specify that DOJ and DHS are not

25  enjoined from including conditions on DOJ and DHS-administered grant programs pursuant to

26  legal authority that exists independent of the Executive Order.

27

28                                              2

BACKGROUND

On February 23, 2017, the County of Santa Clara ("County") moved for a preliminary injunction to prevent the implementation of Section 9(a) of the Executive Order (Doc. 26). Section 9(a) provides, in relevant part, that the Attorney General and the Secretary of Homeland Security ("Secretary"), "in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 . . . are not eligible to receive Federal grants[.]"  Exec. Order 13,768, § 9(a).  Despite the fact that the grant-eligibility provision of Section 9(a) is directed solely to the Attorney General and the Secretary, the County had urged an expansive reading of that provision, arguing that it applied to the entirety of the Executive Branch.  Specifically, plaintiff contended that the Order "must" be interpreted as applying to "all federal funds, whatever their source" (Doc. 26 at 4 n.4).

At oral argument on the motion for preliminary injunction, the government stated that, because the grant-eligibility provision of Section 9(a) directs action only by the Department of Justice or the Department of Homeland Security, that provision only applied to grants adminis- tered by DOJ or DHS.  The government further stated that, consistent with governing authority and past practice, DHS or DOJ would only take adverse action against a grant recipient for failure to comply with Section 1373 where the terms of the grant program expressly required such compliance.  *See* Tr. of Oral Arg. at 24:4-6; *see also* Order of Apr. 25, 2017 at 13 (summarizing the government's position).  The government further stated that only three grant programs, all of which are administered by DOJ, currently identify Section 1373 as an applicable federal law with which grantees are required to comply.  *See, e.g.*, Tr. of Oral Arg. at 35:2-9.  The government acknowledged, however, that "[g]oing forward . . . DOJ and, potentially, DHS" may choose to include similar conditions in their grant-eligibility terms, where authorized to do so, and that, in all cases, those conditions "will be known to the [grantee]" in advance of the grantee's decision to participate in the grant program.  *Id.* at 25:14-16.

On April 25, 2017, the Court granted plaintiff's motion and enjoined the defendants (other than the President) "from enforcing Section 9(a) of the Executive Order against jurisdictions they

3

Defs' Mot. for Leave: Reconsid.
No. 3:17-cv-00574-WHO

deem as sanctuary jurisdictions." Order of Apr. 25, 2017 at 49. The Court made clear, however, that defendants may "use lawful means to enforce existing conditions of federal grants or 8 U.S.C. 1373." *Id.*[1] The Court found injunctive relief appropriate because, like the plaintiff, it interpreted the grant-eligibility provision of Section 9(a) as referring to "*all* federal grants[.]" *Id.* at 3 (emphasis added). In reaching that interpretation, the Court relied heavily on public comments by the President, the White House Press Secretary, and the Attorney General to conclude that "Section 9(a) is not reasonably susceptible to the new, narrow interpretation offered at the hearing." *Id.* Based on its broad interpretation of Section 9(a), the Court held that the County's claims were justiciable and that the provisions of Section 9(a) violated a variety of constitutional doctrines. *See generally id.* at 49.

The AG Memorandum sets forth in a formal, conclusive manner the administration's interpretation of the scope of the grant-eligibility provision of Section 9(a). The Memorandum specifies that the Executive Order does not "purport to expand the existing statutory or constitutional authority of the Attorney General and the Secretary of Homeland Security in any respect," but rather instructs those officials to take certain action, "to the extent consistent with the law." AG Mem. at 2; *see Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (noting that the President is merely wielding his "supervisory authority over the Executive Branch" where he "directs his subordinates" to take certain action "but only '[t]o the extent permitted by law'"). The AG Memorandum further clarifies that the grant-eligibility provision is limited "solely to federal grants administered by [DOJ] or [DHS]," and to grants requiring the applicant to "certify . . . compliance with federal law, including 8 U.S.C. § 1373, as a condition for receiving an award." AG Mem. at 1, 2. Only "jurisdiction[s] that fail[] to certify compliance with [8 U.S.C. § 1373] will be ineligible to receive [an] award[]" pursuant to the

---

[1]As mentioned, the Court has only enjoined defendants (other than the President) from "enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions." Order of Apr. 25, 2017 at 49. It has not limited defendants' ability to use "lawful means [of] enforc[ing]" federal law, *id.*, and defendants do not understand the Court's Order as precluding their ability to utilize legal authority independent of the Executive Order to initiate legal proceedings or advance defendants' law enforcement priorities.

Defs' Mot. for Leave: Reconsid.
No. 3:17-cv-00574-WHO

grant-eligibility provision.  *Id.*  In other words, the provision applies only in instances in which an applicant or grant recipient has had the choice either to certify compliance with 8 U.S.C. § 1373 as an express condition of eligibility to participate in a certain grant program, or to refuse to certify compliance and thereby render itself ineligible to participate in the grant program.  The AG Memorandum also makes clear that, with respect to Section 1373 compliance conditions, DOJ and DHS may impose such conditions only pursuant to the exercise of "existing statutory or constitutional authority," and only where "grantees will receive notice of their obligation to comply with section 1373."  AG Mem. at 2.

The interpretation set forth in the AG Memorandum is conclusive here.  Section 9(a) of the Executive Order directs only two officials, the Attorney General and the Secretary of Homeland Security, to implement its provisions, and the Attorney General has now clarified that he does not interpret the challenged portion of the Executive Order as applying to grant programs administered by agencies other than DOJ and DHS.  Moreover, by longstanding tradition and practice, the Attorney General's legal opinions are treated as authoritative by the heads of executive agencies.  *See, e.g.*, *Tenaska Washington Partners II, L.P. v. United States*, 34 Fed. Cl. 434, 439 (1995); Randolph D. Moss, *Executive Branch Legal Interpretation: A Perspective from the Office of Legal Counsel*, 52 Admin. L. Rev. 1303, 1319-20 (2000).  The Attorney General has a statutory duty to advise executive department heads on "questions of law," 28 U.S.C. § 512, and furnishes formal legal opinions to executive agencies, 28 C.F.R. § 0.5(c).  And although the Secretary of Homeland Security principally administers the immigration laws, the Immigration and Nationality Act provides that a "determination and ruling by the Attorney General with respect to all questions of law shall be controlling."  8 U.S.C. § 1103(c)(1).  The AG Memorandum thus conclusively establishes that section 9(a) is limited to grant programs administered by DOJ or DHS.  Moreover, the AG Memorandum sets forth clear and consistent guidance for the applicable components of DOJ as to the parameters of the grant-eligibility provision.

In addition to setting forth the authoritative interpretation of the grant-eligibility provision of section 9(a), the Attorney General also recognized that, "[s]eparate and apart from the

5

Executive Order, statutes may authorize the Department to tailor grants or to impose additional conditions on grantees to advance the Department's law enforcement priorities."  AG Mem. at 2. Pursuant to those authorities, administrations have historically focused federal resources on addressing concerns of high priority, such as homeland security, violent crime, domestic violence, or immigration.  As this Court recognized in its Order, "Congress can delegate some discretion to the President to decide how to spend appropriated funds" so long as any such "delegation and discretion is cabined" by relevant constitutional boundaries.  *See* Order of Apr. 25, 2017 at 36; *see* Tr. of Oral Arg. at 34:4-8; *see also DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding conditions on spending imposed by the Executive where the underlying statute unambiguously authorized the Executive to set certain "terms and conditions as he may determine").

Many of the spending statutes governing DOJ or DHS, including those that authorize particular grant programs or that otherwise govern the spending powers of the agency, allow for those agencies to impose certain conditions on certain federal grant programs they administer. *See, e.g.*, 42 U.S.C. § 3712(a)(6) (authorizing certain DOJ officials to place "special conditions" on particular grants); *Morton v. Ruiz*, 415 U.S. 199, 230 (1974) (finding that, in certain instances, such as where a congressional appropriation is insufficient to carry out its purpose, the agency administering the program is deemed authorized "to create reasonable classifications and eligibility requirements in order to allocate the limited funds available").  For example, the statute authorizing the Edward Byrne Memorial Justice Assistance Grant program ("JAG"), which is administered by DOJ's Office of Justice Programs ("OJP"), requires grant applicants to certify to the Attorney General that they "comply with all provisions of this part and all other applicable Federal laws."  42 U.S.C. § 3752(a)(5)(D).  That statutory provision allows the Attorney General the discretion to determine whether a particular federal law is "applicable" to the receipt of a JAG award.  Additionally, a provision of OJP's organic statute authorizes the head of OJP to "exercise such other powers and functions as may be vested in [him or her] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants*, and

Defs' Mot. for Leave: Reconsid.
No. 3:17-cv-00574-WHO

determining priority purposes for formula grants." *Id*. § 3712(a) (emphasis added).[2]  Pursuant to

those statutory authorities, since 2016, DOJ has identified Section 1373 as federal law applicable

to the JAG program.   *See generally* Order of Apr. 25, 2017 at 6 (citing Ltr. from Peter J. Kadzik,

Asst. Att'y Gen. U.S. Dep't of Justice, to Hon. John A. Culberson, Chairman for the Subcomm.

on Commerce, Justice, Sci. & Related Agencies (Jul. 7, 2016)); *see also* Declaration of Ralph

Martin ¶ 17 (Attachment 2 hereto).  Thus, consistent with the Court's Order, the AG

Memorandum acknowledges, as defendants' counsel did at oral argument, that going forward,

where legally authorized, defendants "may seek to tailor grants to promote a lawful system of

immigration."  AG Mem. at 2.

<u>ARGUMENT</u>

"A district court has inherent jurisdiction to modify, alter, or revoke a prior order."  *De La*

*Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1105, 1107 (N.D. Cal. 2014).  The Ninth Circuit has held

that "[r]econsideration is appropriate if the district court (1) is presented with newly discovered

evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is

an intervening change in controlling law."  *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS,*

*Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  Under this Court's Civil Local Rule 7-9(b), a motion for

reconsideration may be proper where, for example, "a material difference in fact or law exists

from that which was presented to the Court before entry of the interlocutory order for which

reconsideration is sought."  The AG Memorandum constitutes a material difference in controlling

authority.  As explained in more detail below, that Memorandum eliminates many of the

conclusions that served as the foundation for the Court's decision to grant plaintiff's motion for

preliminary injunction.  Accordingly, defendants respectfully request that the Court reconsider its

decision in light of the guidance contained in the AG Memorandum.

---

[2] Similarly, DOJ regulations provide for the imposition of "additional specific award conditions" under certain circumstances, such as where "an applicant or recipient has a history of failure to comply with the general or specific terms and conditions of a Federal award."  *See* 2 C.F.R. § 2800.101 (adopting, *inter alia*, 2 C.F.R. § 200.207(a)).

7

Defs' Mot. for Leave: Reconsid.
No. 3:17-cv-00574-WHO

1
2

I.      The AG Memorandum Provides a Basis for the Court to
        Reconsider Its Justiciability Determination

3      The AG Memorandum expressly contradicts many of the conclusions underlying the

4   Court's decision regarding the justiciability of plaintiff's claims.  Contrary to those conclusions,

5   the Memorandum makes clear that the grant-eligibility provision in Section 9(a) of the Executive

6   Order applies only to grant programs administered by DOJ or DHS and, with respect to DOJ

7   grants, only to those programs where explicit terms condition eligibility on certification of

8   compliance with 8 U.S.C. § 1373.  *See* AG Mem. at 1-2.  Because the AG Memorandum's

9   clarification of the scope of the grant-eligibility provision conflicts with several bases essential to

10  the Court's justiciability determination, the Court should reconsider that determination in light of

11  the position set forth in the Memorandum, which are binding on the relevant Executive Branch

12  officials.

13     In determining that the County had established the justiciability of its claims, the Court

14  first found that the grant-eligibility provision of Section 9(a) improperly attempted to effectuate a

15  change in the law because that provision "purport[ed] to delegate to the Attorney General and the

16  Secretary the authority to place a new condition on federal grants," in contravention of the

17  Constitution, and because the Order did not explicitly limit its scope to grants administered by

18  DHS or DOJ.  Order of Apr. 25, 2017 at 14-15.  The Court reasoned that a contrary reading of the

19  Executive Order – one that simply required the Attorney General and the Secretary to use their

20  existing statutory authority to enforce the President's policies – rendered the Order "legally

21  meaningless" and was thus "clearly inconsistent with the Order's broad intent."  *Id.* at 15.

22     The AG Memorandum contradicts those determinations.  As the Memorandum makes

23  clear, for example, the purpose of the Executive Order was to "establish[] immigration enforce-

24  ment as a priority for this Administration," not to direct the Attorney General or the Secretary to

25  act *ultra vires*.  *See* AG Mem. at 1.  Far from being "legally meaningless," the Executive Order

26  represents a dramatic departure from the prior administration's policy of non-enforcement of

27  certain immigration programs.  *Compare, e.g.*, Mem. from DHS Sec'y Jeh Johnson to Acting Dir.

28

8

U.S. Immigration & Customs Enforcement Thomas Winkowski, *et al.* (Nov. 20, 2014) (explaining that the "Secure Communities" program will be discontinued), *available at* https://www.dhs.gov/ sites/ default/ files/ publications/14_1120_memo_secure_communities.pdf, *with* Exec. Order 13,768, § 10(a) ("The Secretary shall immediately take all appropriate action to terminate the Priority Enforcement Program (PEP) described in the memorandum issued by the Secretary on November 20, 2014, and to reinstitute the immigration program known as "Secure Communities."). The Executive Order thus "ensure[s] that our Nation's immigration laws are faithfully executed," *see* Exec. Order 13,768 at 1, and directs the appropriate executive officials to prioritize, to the fullest extent of the law, means for achieving that priority. Those means may include, for example, more aggressive enforcement of existing grant conditions, or, as the AG Memorandum suggests, tailoring future grant awards in a manner that promotes the administration's law enforcement priorities. *See* AG Mem. at 2.

What is more, as the AG Memorandum recognizes, the Executive Order itself provides that the Attorney General and the Secretary are only to enforce the Order "to the extent permitted by law." Exec. Order 13,768, § 9(a). In this respect, the Order is analogous to orders issued by past administrations that set forth specific executive priorities and directed the manner in which federal agencies might implement those priorities, "to the extent permitted by law." In *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), for example, the President had issued an executive order providing that, "[t]o the extent permitted by law," no federal agency or entity receiving federal assistance for a construction project could require contractors to enter into a project labor agreement or prohibit them from doing so. *Id*. at 30. Plaintiffs challenged the facial validity of the order. The district court enjoined its enforcement, finding that it was beyond the President's authority and violated the National Labor Relations Act. *Id*. at 31. The D.C. Circuit reversed, holding that, in the "faithful execution of the laws," the President may "provide guidance and supervision to his subordinates" and may instruct his subordinates to follow that guidance only "to the extent permitted by law." *Id*. at 32-33. "Thus," the court observed, "if an executive agency … may lawfully implement the Executive

9

1    Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing

2    the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id*.

3    at 33; *see* Exec. Order 13,536, 76 Fed. Reg. 3,821-3,823 (Jan. 18, 2011) (reaffirming as a policy

4    priority certain principles of contemporary regulatory review and directing agencies "to the extent

5    permitted by law" to take steps to promote those principles).

6            Consistent with this framework, the AG Memorandum makes clear that the grant-

7    eligibility provision of Section 9(a) "applie[s] *solely* to federal grants administered by [DOJ] or

8    [DHS], and not to other sources of federal funding." *See* AG Mem. at 1 (emphasis added).  It

9    further clarifies that, where DOJ imposes obligations on a grant program, such as the requirement

10   that an applicant certify compliance with 8 U.S.C. § 1373, those obligations have been or will be

11   imposed where legally authorized and only where grantees are given "notice of their

12   obligation[s]." *Id*. at 2.  Thus, the AG Memorandum provides a basis for the Court to reconsider

13   its conclusion that the grant-eligibility provision of the Executive Order extends beyond DOJ and

14   DHS grants, and that the provision purports to delegate new authority from the President to

15   agency heads regarding the imposition of conditions on federal grants.

16           In its justiciability analysis, the Court also determined that the grant-eligibility provision

17   of the Executive Order attempted to render state and local jurisdictions that declined to comply

18   with federal civil detainer requests ineligible to receive federal grants.  Order of Apr. 25, 2017 at

19   23-27.  The Court reached this determination by relying on public comments made by the

20   President, the White House Press Secretary, and the Attorney General.  *Id.*  That determination

21   served as the primary basis for the Court's conclusion that the County, which had adopted a

22   policy of noncompliance with federal civil detainer requests, showed a likelihood of enforcement

23   under the grant-eligibility provision of Section 9(a).  *Id.*

24           Unlike public comments, however, the AG Memorandum constitutes formal and binding

25   guidance.  The Memorandum clarifies that the grant-eligibility provision applies only to grant

26   programs administered by DOJ or DHS that have grant terms explicitly requiring certification of

27   compliance with Section 1373 as a condition on the receipt of funding.  *See, e.g.*, AG Mem. at 1-

28

10

2.  Contrary to this Court's findings, the AG Memorandum concludes that "jurisdiction[s] that fail[] to certify compliance with section 1373 will be ineligible to receive [an] award[]."  AG Mem. at 2.  The Memorandum does not mention detainer requests.  Rather, it confirms that defendants may impose conditions on grant programming only under "existing statutory or constitutional authority" and only where "grantees . . . receive notice of their obligation to comply" with specific eligibility conditions.  AG Mem. at 2.  Because one of the primary bases for this Court's ruling – namely, non-binding press statements – has been supplanted, the Court should reconsider its holding.

The Court also relied on its conclusion regarding forced compliance with federal civil detainer requests in holding that the County could show justiciable harm.  Specifically, the Court held that the purported requirement to comply with detainer requests compromised plaintiff's Tenth Amendment rights by effectively forcing the County "to enforce the Federal government's immigration laws[.]"  Order of Apr. 25, 2017 at 28.  The Court should reconsider that position for two reasons.  First, conditioning the receipt of federal funds on whether a State takes a particular action does not alone raise Tenth Amendment concerns, so long as the "State could . . . adopt the simple expedient of not yielding to what she urges is federal coercion."  *See S. Dakota v. Dole*, 483 U.S. 203, 210 (1987) (internal quotation marks omitted).  But in any event, as explained above, the AG Memorandum clarifies that the grant-eligibility provision does not create a retroactive grant condition requiring compliance with federal civil detainer requests.  AG Mem. at 2.  Accordingly, the Court should reconsider its holding that the grant-eligibility provision forces local jurisdictions "to enforce the Federal government's immigration laws" in a manner that violates the Tenth Amendment.  Order of Apr. 25, 2017 at 23-28.

In addressing the justiciability of plaintiff's claims, the Court also held – based on its broad interpretation of the grant-eligibility provision – that the County had established justiciable harm because the provision purportedly jeopardized *all* federal grant funding received by the County, not just grants administered by DOJ and DHS.  Order of Apr. 25, 2017 at 29-32.  Based on the presumption that the grant-eligibility provision encompassed all federal grant programs,

11

including those funded through reimbursement structures, the Court concluded that the County faced budgetary uncertainty and potentially grave financial harm. *Id.* at 30.

Again, the AG Memorandum contradicts the Court's interpretation of the scope of the grant-eligibility provision, and consequently undermines plaintiff's ability to establish justiciable harm. As noted, the AG Memorandum confirms the limited scope of the grant-eligibility provision: that provision applies only to grants administered by DHS or DOJ, and, with respect to DOJ grants, only where the recipient fails to comply with an express obligation to certify compliance with 8 U.S.C. § 1373. *See* AG Mem. at 1-2. Only with respect to three grant programs, all of which are administered by DOJ, have defendants identified Section 1373 as an applicable federal law with which grantees are required to comply. *See, e.g.*, Tr. of Oral Arg. at 35:2-9. At no point has Santa Clara County averred that this limited construction of the grant-eligibility provision would cause the severe, concrete financial harm contemplated in the Court's Order. Moreover, the AG Memorandum mitigates the County's claims of budgetary uncertainty by clarifying the specific grant programs currently subject to the provision, and by confirming that grant applicants or recipients will have prior notice of any conditions that might be placed in the future on DOJ or DHS-administered grant programs. AG Mem. at 1-2.

Because the AG Memorandum's clarification of the scope of the grant-eligibility provision of Section 9(a) supplants many of the fundamental bases underlying the Court's determinations regarding justiciability, defendants respectfully request that the Court reconsider those determinations in light of the conclusive position articulated in the Memorandum.

II.    The AG Memorandum Provides a Basis for the Court to
       Reconsider Its Determination that the Plaintiff is Likely to
       Succeed on the Merits of Its Claims

Many of the Court's determinations regarding plaintiff's likelihood of success on the merits are based on a reading of the Executive Order that is inconsistent with the position set forth in the AG Memorandum. Under the conclusive interpretation of the Executive Order set forth in the Memorandum, plaintiff cannot establish a likelihood of success on any of its claims.

12

1    Accordingly, the Court should reconsider its previous determinations with respect to the merits of

2    plaintiff's constitutional claims.

3        A.  The AG Memorandum Alleviates the Court's Separation of Powers Concerns

4        The AG Memorandum provides grounds for the Court to reconsider its conclusion that

5    "Section 9 [of the Executive Order] purports to give the Attorney General and the Secretary the

6    power to place a new condition on federal funds . . . not provided for by Congress."  Order of

7    Apr. 25, 2017 at 36.  Based on that interpretation of the grant-eligibility provision, the Court

8    reasoned that the provision constituted an attempt by the President to "wield Congress's exclusive

9    spending power," in a manner that violated the constitutional separation of powers.  *Id.* at 37.

10       The AG Memorandum, however, refutes the Court's interpretation of the grant-eligibility

11   provision, and consequently undermines the Court's separation of powers analysis.  As the Court

12   recognized, "Congress can delegate some discretion to the President to decide how to spend

13   appropriated funds" so long as "any delegation and discretion is cabined by [relevant] constitu-

14   tional boundaries."  *Id.* at 36; *see DKT Mem'l Fund Ltd.*, 887 F.2d at 280-81.  Indeed, executive

15   agencies like DOJ have frequently utilized their congressionally delegated authority to tailor

16   grants to advance agency priorities.  *See, e.g.*, *2016 COPS Hiring Program Fact Sheet*, DOJ

17   Community Oriented Policing Services, https://cops.usdoj.gov/ pdf/ 2016AwardDocs/ chp/

18   2016_CHP_FactSheet_v3.pdf  (last visited May 22, 2017) ("Applicants that choose 'Homicide'

19   and 'Gun Violence' as a problem area in their 2016 [COPS Hiring Program] application will

20   receive additional consideration for funding."); *2015 COPS Hiring Program Fact Sheet*, DOJ

21   Community Oriented Policing Services, https://cops.usdoj.gov/ pdf/ 2015AwardDocs/

22   chp/2015_CHP_PostAward_FactSheet.pdf (last visited May 22, 2017) (noting priority for

23   applicants whose applications focused on "school-based policing through School Resource

24   Officers").

25       The AG Memorandum makes clear that the grant-eligibility provision is not an attempt by

26   the President to unilaterally impose new conditions on federal grants.  Rather, just as administra-

27   tions have in the past, the Executive Order "declare[s] the policy of the executive branch."  Exec.

28

13

Order 13,768 at 1.  The grant-eligibility provision furthers the implementation of that policy by directing the Secretary and the Attorney General to use lawful means to ensure compliance with Section 1373.  With respect to the imposition of conditions on federal grant programming, the AG Memorandum confirms that such conditions would not be imposed pursuant to a purported unilateral executive authority, but rather where "existing statutory or constitutional authority" permits the imposition of such conditions.  *See* AG Mem. at 2; *see also Allbaugh*, 295 F.3d at 33.

### B.   The AG Memorandum Alleviates the Court's Spending Clause Concerns

The AG Memorandum also provides grounds for the Court to reconsider its conclusion that the grant-eligibility provision violates constitutional Spending Clause restrictions.  *See* Order of Apr. 25, 2017 at 37-39.  The Court relied on its broad interpretation of the grant-eligibility provision in concluding that plaintiff established a likely violation of three specific Spending Clause limitations: "(1) conditions must be unambiguous and cannot be imposed after funds have already been accepted; (2) there must be a nexus between the federal funds at issue and the federal program's purpose; and (3) the financial inducement cannot be coercive."  *Id.* at 37.

With respect to its ambiguity concerns, the Court found that because the Executive Order purported to "*retroactively* condition all 'federal grants' on compliance with Section 1373," and because the grant-eligibility provision lacked clarity as to the specific "Federal grants" that fell within its scope, the Executive Order deprived plaintiff of the ability to "voluntarily and knowingly choose to accept conditions on those funds."  *Id.* at 38 (emphasis added).  The AG Memorandum makes clear, however, that the grant-eligibility provision applies only to grant programs administered by DOJ or DHS; that, in relation to DOJ grants, any conditions imposed pursuant to the directives contained in the Executive Order will apply "to *future* grants"; and that grant recipients or applicants "will receive notice" of their obligations.  AG Mem. at 2 (emphasis added).  In other words, the grant-eligibility provision does not create retroactive conditions on federal grants.  The position set forth in the AG Memorandum is thus consistent with the Supreme Court's oft-repeated presumption against retroactivity.  *See generally Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).

14

1    The interpretation of the scope of the Executive Order provided in the AG Memorandum

2    also alleviates the Court's concerns regarding the existence of a nexus between the federal funds

3    at issue and the federal program's purpose.  Relying on its interpretation of the term "Federal

4    grants" as applying to *all* federal funding, the Court found that a sufficient nexus could not exist

5    between compliance with Section 1373 and federal programs unrelated to law enforcement, such

6    as child welfare programs or vaccination programs.  *See* Order of Apr. 25, 2017 at 38.  But, as the

7    AG Memorandum establishes, the term "Federal grants" is not so broad.  AG Mem. at 2.  Rather,

8    it applies only to DHS or DOJ administered grant programs, and, with respect to DOJ grants, only

9    those programs that contain grant-eligibility terms that explicitly require compliance with Section

10   1373 as a condition of grant-eligibility.  *Id*.  Indeed, as the AG Memorandum explicitly

11   acknowledges, because "Section 9(a) expressly requires enforcement 'to the extent consistent

12   with law,' [it] does not call for the imposition of grant conditions that would violate any

13   applicable constitutional or statutory limitation," *id*. at 1-2, which would include the "nexus"

14   requirement.

15   The position set forth in the AG Memorandum also mitigates the Court's concern that the

16   grant-eligibility provision creates an unconstitutionally coercive financial inducement.  As the

17   Court acknowledged, recent Supreme Court precedent on the Spending Clause's coercion

18   limitation has held that the threat of denying federal funding that amounts to ten percent of a

19   state's overall budget may be sufficiently severe to constitute unconstitutional coercion.  Order of

20   Apr. 25, 2017 at 39 (citing *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2604 (2012)).

21   Because the Court determined that the grant-eligibility provision of Section 9(a) threatens

22   defunding of "all federal grants" to the County, amounting in the "hundreds of millions of

23   dollars," it held that the provision was unconstitutionally coercive.  *Id.*

24   Again, the AG Memorandum contravenes this determination.  In confirming that the term

25   "Federal grants" is limited to grant programs administered by DHS or DOJ that have grant terms

26   requiring compliance with Section 1373, the AG Memorandum drastically reduces the potential

27   coercive effect of the grant-eligibility provision.  As mentioned, only three grant programs

28

15

Defs' Mot. for Leave: Reconsid.
No. 3:17-cv-00574-WHO

1  currently fall within the scope of the provision, and plaintiff has put forth *no evidence* demon-

2  strating that the funding levels encompassed by those programs are so significant as to constitute

3  unconstitutional coercion.

4  Accordingly, because the AG Memorandum directly addresses and alleviates the

5  Spending Clause concerns that the Court articulated, defendants respectfully request that the

6  Court reconsider its analysis on those points.

7  C.  The AG Memorandum Alleviates the Court's Tenth Amendment Concerns

8  In analyzing plaintiff's likelihood of success on the merits of its Tenth Amendment

9  claims, the Court held that the Executive Order "equates 'sanctuary jurisdictions' with 'any

10  jurisdiction that ignored or otherwise failed to honor any [federal civil] detainer[] [requests]' and

11  therefore places such jurisdictions at risk of losing all federal grants."  Order of Apr. 25, 2017 at

12  40.  As a result of that interpretation, the Court found that the grant-eligibility provision of

13  Section 9(a) was likely unconstitutional under the Tenth Amendment because it effectively

14  sought "to compel the states and local jurisdictions to enforce a federal regulatory program

15  through coercion."  *Id.*  The Court also found that the separate provision of Section 9(a)

16  instructing the Attorney General to "take appropriate enforcement action against any entity that

17  violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders

18  the enforcement of Federal law," should be interpreted as an attempt to force state and local

19  jurisdictions to comply with civil detainer requests.  *Id.*  The Court relied on that interpretation as

20  additional support for the conclusion that the County was likely to succeed in its Tenth

21  Amendment challenge.

22  The AG Memorandum, however, undermines this conclusion.[3]  As an initial matter, the

23  Memorandum provides a definition of "sanctuary jurisdiction" that is untethered to compliance

24  with federal civil detainer requests.  *See* AG Mem. at 2 (stating that, "for purposes of enforcing

25  _____

26  [3] Indeed, even if compliance with federal civil detainer requests were an explicit condition on the receipt of a federal grant award, the mere existence of such a condition would not alone violate Spending Clause or Tenth Amendment principles.  *See Dole,* 483 U.S. at 210 (holding that

27  a condition that might otherwise be deemed as infringing on State sovereignty does not violate that sovereignty where the State can "adopt the simple expedient" of rejecting the funding).

28

16

the Executive Order, the term 'sanctuary jurisdiction' will refer only to jurisdictions that 'willfully refuse to comply with 8 U.S.C. 1373'").  The AG Memorandum further clarifies that Section 1373 compliance obligations (as well as any other grant programming obligations) may be imposed only pursuant to "existing statutory or constitutional authority," and that "grantees will receive notice of their obligation to comply with section 1373."  AG Mem. at 2.

The Court also held that mandating compliance with federal civil detainer requests in a coercive manner or compelling compliance through enforcement actions "violates the Tenth Amendment's provisions against conscription."  Order of Apr. 25, 2017 at 40.  Despite acknowledging that noncompliance with federal civil detainer requests frustrates federal enforcement of immigration laws, the Attorney General has not, to date, taken any enforcement action against any jurisdiction for noncompliance with such requests, and the Attorney General is prohibited from compelling compliance with federal civil detainer requests in a constitutionally impermissible manner.  Moreover, the government has recently confirmed its position that federal civil detainer requests "are voluntary . . . rather than mandatory commands."  *See* Br. of the United States as Amicus Curiae at 22, *Mass. v. Lunn*, No. SJC-12276, 2017 WL 1240651 at *22 (Mass. Mar. 27, 2017).  To the extent the plaintiff is concerned that the Attorney General might one day engage in an enforcement action that the County believes is unconstitutional, it will undoubtedly have an opportunity to assert its challenges in response to that hypothetical action, if it occurs.

Accordingly, because the AG Memorandum establishes that compliance with federal civil detainer requests is not a precondition to the receipt of all federal grant funding, defendants respectfully request that the Court reconsider its holding that the plaintiff has established a likelihood of success on the merits of its Tenth Amendment claims.

D.  The AG Memorandum Alleviates the Court's Vagueness Concerns

Much of the Court's vagueness analysis is predicated on the presumption that Section 9(a) of the Executive Order effectively renders state and local jurisdictions that fail to comply with Section 1373 automatically ineligible to receive any federal grants.  *See* Order of Apr. 25, 2017 at 41-43.  The Court found that, because the Order does not define the terms "sanctuary jurisdiction"

17

1    or "compliance with Section 1373," federal grant recipients "do not know how to avoid the

2    Order's defunding penalty," thereby implicating constitutional vagueness concerns. *Id.* at 42.

3        Contrary to the Court's interpretation, however, the AG Memorandum specifies that the

4    grant-eligibility provision does not create a self-effectuating defunding penalty. *See, e.g.*,

5    *Allbaugh*, 295 F.3d at 33 (noting that an executive order that required action "to the extent

6    consistent with law" was "not selfexecuting").  Section 9(a) of the Executive Order does not

7    impose retroactive conditions on all federal grants, nor does it attempt to alter the existing

8    requirements of Section 1373 (or any other federal law).  *See* AG Mem. at 1-2.  Rather, the AG

9    Memorandum specifies that the grant-eligibility provision applies only to DOJ or DHS grants

10   and, with respect to DOJ grants, only to those that contain grant terms requiring certification of

11   compliance with Section 1373.  *Id.*  Moreover, the Memorandum confirms that jurisdictions will

12   have notice of Section 1373 compliance obligations prior to the imposition of those obligations.

13   *Id.*  Thus, the AG Memorandum "provide[s] explicit standards" governing the scope of the grant-

14   eligibility provision, thereby mitigating the Court's vagueness concerns with that provision.  *See*

15   *Gaynard v. City of Rockford*, 408 U.S. 104, 108 (1972).

16       The Court also identified vagueness concerns regarding the separate provision of Section

17   9(a) that directs the Attorney General to take appropriate enforcement action against jurisdictions

18   that hinder enforcement of federal law (the "appropriate enforcement provision").  Although the

19   AG Memorandum does not directly address the appropriate enforcement provision of Section

20   9(a), the provision itself limits the Attorney General to taking "appropriate" action; the Attorney

21   General has taken no action whatsoever against Santa Clara County pursuant to the provision;

22   and, in any event, any jurisdiction subject to an enforcement action under that provision would

23   undoubtedly have the opportunity to challenge such action once it occurs.  More importantly,

24   because the AG Memorandum sets forth the parameters of the grant-eligibility provision, and

25   because the harm identified by the County consists primarily of the potential loss of federal

26   funding and resultant budgetary uncertainty, the AG Memorandum mitigates any harm that the

27

28

18

plaintiff might assert as a result of the alleged vagueness contained in the appropriate

enforcement provision of Section 9(a).

Accordingly, defendants respectfully request that the Court reconsider its conclusion

under the Fifth Amendment vagueness doctrine in light of the guidance provided in the AG

Memorandum.

E. The AG Memorandum Alleviates the Court's Due Process Concerns

The position set forth in the AG Memorandum also contradicts the Court's procedural due

process analysis. As the Court explained, to state a procedural due process claim, a litigant must

identify "a legally protectable property interest and that he has suffered or will suffer a deprava-

tion of that property without adequate process." Order of Apr. 25, 2017 at 43 (citing *Thornton v.*

*City of Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005)). Here, the Court found that the plaintiff has

a legally protectable property interest "in federal funds that Congress has already appropriated

and that the [plaintiffs] have accepted." Order of Apr. 25, 2017 at 43. The Court further held that

the grant-eligibility provision of Section 9(a) purported to render the County ineligible to receive

those funds without appropriate process. *Id.*

The AG Memorandum undermines those determinations. As an initial matter, the AG

Memorandum makes clear that the grant-eligibility provision does not encompass all "funds that

Congress has already appropriated and that the [plaintiffs] have accepted." *Id.* Rather, the

provision encompasses only grant programs administered by DHS or DOJ and only where the

grant-eligibility terms explicitly require compliance with Section 1373. *See* AG Mem. at 1-2.

Moreover, the grant-eligibility provision does not purport to create an automatic defunding

mechanism that would effectively terminate federal funding to the County with no process of law.

Rather, only those jurisdictions "that fail[] to certify compliance with section 1373 will be

ineligible receive [an] award[]" under the specific grant programs that fall within the scope of the

provision. *See* AG Mem. at 2. Thus, based on the conclusive guidance contained in the AG

Memorandum, the County cannot establish that it is likely to succeed on its claim that the

19

Executive Order deprives it of a legally protected property interest without sufficient process of law.

Accordingly, defendants respectfully request that the Court reconsider its Fifth Amendment procedural due process analysis.

III.   The Injunction Should Not Restrict Defendants' Independent
        Authority to Impose Conditions on Grant Programming

Although defendants believe the Court should lift the injunction in this matter for the above-stated reasons, should the Court determine that an injunction remains appropriate, defendants respectfully seek clarification regarding the scope of the injunction's prohibitions. The Court has made clear that defendants may "use lawful means to enforce existing conditions of federal grants or 8 U.S.C. 1373." Order of Apr. 25, 2017 at 49. Defendants respectfully request confirmation, however, that DOJ or DHS are not enjoined from exercising legal authority independent of the Executive Order to impose conditions on grant programming for future DOJ or DHS-administered grants.

As detailed above and in the accompanying declaration from the Office of Justice Programs, with respect to certain grant programs, DOJ and DHS are legally authorized, independent of Section 9(a) of the Executive Order, to impose certain conditions in grant programming. *See* Declaration of Ralph Martin ¶¶ 5-11 (Attachment 2 hereto); *see also* Order of Apr. 25, 2017 at 36 (acknowledging that executive agencies may have "some discretion . . . to decide how to spend appropriated funds"). For example, prior to the issuance of the Executive Order, DOJ had identified Section 1373 as an applicable federal law with which grantees are required to comply in the JAG program, as well as under two other DOJ-administered grant programs. *See, e.g.*, Tr. of Oral Arg. at 35:2-9; Martin Decl. ¶ 17. Moreover, as the government indicated at oral argument, "[g]oing forward . . . DOJ and, potentially, DHS" may choose to impose similar conditions, where authorized to do so. *See* Tr. of Oral Arg. at 25:14-16; *see also* AG Mem. at 2 (providing that, where legally authorized, defendants "may seek to tailor grants to promote a lawful system of immigration"). To ensure that DHS and DOJ retain their ability to

20

1  exercise that previously existing authority, which is independent of the Executive Order,

2  defendants respectfully request that, should the Court decline to lift the injunction in this matter, it

3  clarify that the injunction does not prohibit defendants from utilizing grant-related legal

4  authorities that exist independent of the Executive Order.

5  <u>CONCLUSION</u>

6  For the foregoing reasons, defendants respectfully request that the Court reconsider its entry of

7  preliminary injunctive relief in light of the binding guidance articulated in the AG Memorandum.

8  Alternatively, defendants request that the Court clarify the scope of its Order to specify that

9  defendants are not enjoined from exercising their independent, constitutionally permissible

10  authority to impose conditions on certain grant programs they administer.

11  Dated:  May 22, 2017

12  Respectfully submitted,

13  CHAD A. READLER
14  Acting Assistant Attorney General

15  BRIAN STRETCH
16  United States Attorney

17  JOHN R. TYLER
   Assistant Director

18  STEPHEN J. BUCKINGHAM
19  Special Counsel

20  /s/ W. Scott Simpson

21  _____
   W. SCOTT SIMPSON (Va. Bar #27487)
22  Senior Trial Counsel

23  Attorneys, Department of Justice
   Civil Division, Room 7210
24  Federal Programs Branch
   Post Office Box 883
25  Washington, D.C. 20044
   Telephone:   (202) 514-3495
26  Facsimile:   (202) 616-8470
27  E-mail:       scott.simpson@usdoj.gov

28

21

Defs' Mot. for Leave: Reconsid.
No. 3:17-cv-00574-WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNSEL FOR DEFENDANTS
DONALD J. TRUMP, President of the
United States; JOHN F. KELLY, Secretary of
Homeland Security; JEFFERSON B.
SESSIONS, III, Attorney General of
the United States; MICK MULVANEY,
Director of the Office of Management and
Budget

22

*County of Santa Clara v. Donald J. Trump, et al.*,
No. 3:17-cv-00574-WHO (N.D. Cal.)

Defendants' Motion for Reconsideration or, in the
Alternative, Clarification of the Court's
Order of April 25, 2017

Attachment 1

Memorandum from the Attorney General
for All Department Grant-Making
Components (May 22, 2017)



**Office of the Attorney General**
**Washington, D.C. 20530**
May 22, 2017

MEMORANDUM FOR ALL DEPARTMENT GRANT-MAKING COMPONENTS

FROM:                    THE ATTORNEY GENERAL

SUBJECT:                 Implementation of Executive Order 13768,
                         "Enhancing Public Safety in the Interior of the United States"

   Federal law provides a process for foreign citizens to lawfully enter the country. Circumventing that process and crossing our borders unlawfully is a federal crime. It is the role of federal agencies, including the Department of Justice, to enforce our immigration laws, prosecute violations, and secure our borders.

   The President has established immigration enforcement as a priority for this Administration and, in furtherance of that priority, issued Executive Order 13768, "Enhancing Public Safety in the Interior of the United States," on January 25, 2017. The Executive Order makes clear that "[i]t is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373." To accomplish this policy, section 9(a) of the Executive Order provides, in part:

   > [T]he Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction.

Section 1373 provides in part that state and local jurisdictions "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officers] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).

   In accordance with my duties as Attorney General, I have determined that section 9(a) of the Executive Order, which is directed to the Attorney General and the Secretary of Homeland Security, will be applied solely to federal grants administered by the Department of Justice or the Department of Homeland Security, and not to other sources of federal funding. Section 9(a) expressly requires enforcement "to the extent consistent with law," and therefore does not call for the imposition of grant conditions that would violate any applicable constitutional or

Memorandum for All Department Grant-Making Components                              Page 2
Subject:  Implementation of Executive Order 13768,
            "Enhancing Public Safety in the Interior of the United States"

statutory limitation.  Nor does the Executive Order purport to expand the existing statutory or
constitutional authority of the Attorney General and the Secretary of Homeland Security in any
respect.  Indeed, apart from the Executive Order, the Department of Justice and the Department
of Homeland Security, in certain circumstances, may lawfully exercise discretion over grants that
they administer.  Section 9(a) directs the Attorney General and the Secretary of Homeland
Security to exercise, as appropriate, their lawful discretion to ensure that jurisdictions that
willfully refuse to comply with section 1373 are not eligible to receive Department of Justice or
Department of Homeland Security grants.

        Consistent with the Executive Order, statutory authority, and past practice, the
Department of Justice will require jurisdictions applying for certain Department grants to certify
their compliance with federal law, including 8 U.S.C. § 1373, as a condition for receiving an
award.  Any jurisdiction that fails to certify compliance with section 1373 will be ineligible to
receive such awards.  This certification requirement will apply to any existing grant administered
by the Office of Justice Programs and the Office of Community Oriented Policing Services that
expressly contains this certification condition and to future grants for which the Department is
statutorily authorized to impose such a condition.  All grantees will receive notice of their
obligation to comply with section 1373.  The Department will administer this certification
requirement in accordance with the law and will comply with any binding court order.

        After consultation with the Secretary of Homeland Security, I have determined that, for
purposes of enforcing the Executive Order, the term "sanctuary jurisdiction" will refer only to
jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." A jurisdiction that does not
willfully refuse to comply with section 1373 is not a "sanctuary jurisdiction" as that term is used
in section 9(a).  While the Executive Order's definition of "sanctuary jurisdiction" is narrow,
nothing in the Executive Order limits the Department's ability to point out ways that state and
local jurisdictions are undermining our lawful system of immigration or to take enforcement
action where state or local practices violate federal laws, regulations, or grant conditions.

        The provisions of the Executive Order quoted above address only 8 U.S.C. § 1373.
Separate and apart from the Executive Order, statutes may authorize the Department to tailor
grants or to impose additional conditions on grantees to advance the Department's law
enforcement priorities.  Consistent with this authority, over the years, the Department has
tailored grants to focus on, among other things, homeland security, violent crime (including drug
and gang activity), and domestic violence.  Going forward, the Department, where authorized,
may seek to tailor grants to promote a lawful system of immigration.

*County of Santa Clara v. Donald J. Trump, et al.*,
No. 3:17-cv-00574-WHO (N.D. Cal.)

Defendants' Motion for Reconsideration or, in the
Alternative, Clarification of the Court's
Order of April 25, 2017

Attachment 2

Declaration of Ralph Martin
Office of Justice Programs
U.S. Department of Justice

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>                    Plaintiff,<br><br>         v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>                    Defendants. | No. 3:17-cv-00485-WHO |

**DECLARATION OF RALPH MARTIN**

I, Ralph Martin, do hereby state and declare the following:

1. I am Director of Office of Audit, Assessment, and Management ("OAAM") within the Office of Justice Programs ("OJP") at the United States Department of Justice ("DOJ"). I submit this declaration to describe and, and put into context, the effect – on awards OJP awards makes in the future, and on recipient requirements and conditions associated with those future awards – of the Attorney General's recent memorandum (dated May 22, 2017) concerning his various determinations regarding Executive Order 13768, which I have today reviewed.

2. In addition to over two decades of military service, I have served in the federal government for approximately 15 years, in various capacities, at the Environmental Protection Agency, the Department of Commerce, and DOJ. I am a member of the career "senior executive

service." Prior to being named Director of OJP's OAAM in February 2015, I was OJP's Deputy

Chief Financial Officer for four years. Before that, I was OJP's Budget Officer for over five

years. Among other things, OJP's OAAM is charged by statute to "take actions to ensure

compliance with the terms of … grants" made by OJP and by the Community Oriented Policing

Services Office (the "COPS" Office), another grant-making office within DOJ. I hold a master's

degree in business administration. The statements made in this declaration are based upon my

personal knowledge gained in my current and previous positions within OJP, and on information

available to me in my official capacity.

 3. I am familiar with the entire life cycle of grants awarded by OJP—solicitation of

applications (*e.g.*, preparation and electronic posting of solicitations), review of applications

(including peer review), making of award decisions within OJP, preparation of award packages

(including award documents), award acceptance by applicants, post-award monitoring and audit

of awardees, and final close-out of awards after work under an award is complete. I am familiar

with the many and varied requirements outlined in each year's solicitations for applications to

OJP's numerous grant programs. I also am familiar with OJP's automated Grants Management

System ("GMS"), which is used (among other things) to generate an OJP "award letter" and

"award document." The award document is the instrument through which OJP offers an award

to an applicant and sets out various requirements and conditions that will apply throughout the

period of the award, should the applicant accept the award; those conditions – the substance of

which is broader than (and complementary to) that of certain "standard assurances" made by

prospective recipients of OJP prior to any award – are (and must be) encompassed by an

applicant's formal acceptance of the award. I am familiar with numerous conditions OJP

includes, as appropriate, in its award documents. I also am familiar with the standard

"assurances" that must be executed (in OJP's electronic GMS) by applicants at or before the time of award acceptance.

<u>OJP Grants Generally</u>

4.  OJP is the largest of the three primary grant-making agencies within DOJ.[1]  For the past few years, appropriations for OJP's grant and reimbursement programs have been between approximately $4 billion and $4.7 billion annually (including funds made available from the Crime Victims Fund).  Over the course of a year, OJP makes thousands of awards to State and local governments, federally-recognized Indian tribes, nonprofit organizations, public and nonprofit institutions of higher education, and (less commonly) for-profit businesses and individuals.  Apart from its awards to States for victim compensation and victim assistance programs (which are made from the Crime Victims Fund), OJP's single largest program is the Edward Byrne Justice Assistance Grant Program (the "Byrne JAG" program), which makes awards to States and units of local government for a broad range of law enforcement purposes.

<u>Varying Bases for Grant Programming Requirements and Conditions</u>

5.  Some of OJP's grant and reimbursement programs are authorized by what may be called a "program" (or "authorizing") statute; the level of detail that appears in such program statutes varies a great deal.  The Byrne JAG program, for example, has a quite detailed program statute.  The requirements that appear in a program statute, however, are far from the only requirements that apply to a recipient of an OJP grant awarded pursuant to that program statute.

6.  Even as to OJP grants made under a specific program statute, such as the Byrne JAG program statute, the award document through which OJP offers the award to an applicant

---

[1]     The others are the COPS Office and the Office on Violence against Women ("OVW").

includes conditions and requirements that do not appear in the program statute itself, but are included pursuant to other authority.  A prospective recipient must execute a set of "standard assurances" concerning compliance (during the period of the award, if one is made by OJP and accepted).[2]  What follows are just a few examples of the types of conditions OJP may include in an award document, and of the types of bases for those conditions.

7.   When OJP awards grant funds pursuant to a specific program statute (such as the Byrne JAG program), throughout the period of the award, those grant funds will be subject to any prohibitions or restrictions applicable to such federal funds that appear in the pertinent appropriations act (*e.g.*, as general provisions).  For some years, OJP's practice has been to specifically identify such appropriations provisions to a prospective recipient through conditions in the award document.

8.   Apart from appropriations-related requirements, a grant that OJP awards pursuant to a specific program statute, such as the Byrne JAG program, also may include conditions (*e.g.*, in the award document) that reflect requirements or restrictions that appear in other applicable statutes i (*e.g.*, restrictions that appear in administrative provisions of title I of the Omnibus Crime Control and Safe Streets Act of 1968, which title establishes OJP and several – but not all – of its component offices).

9.   As yet another example, as a form of federal financial assistance, all OJP grants – including those made pursuant to a specific program statute – are subject to the "cross-cutting" federal statutes that apply to all such assistance.  The provisions of title VI of the Civil Rights

---

[2]     Prospective OJP grant recipients must electronically execute (in OJP's GMS) the "Standard Assurances" with respect to each OJP award, at or before the time of award acceptance.  The required "Standard Assurances" (which vary somewhat for awards to Indian tribes) include a broad assurance and certification of compliance with all applicable federal statutes and regulations, as well as specific assurances and certifications with respect to a number of other matters.

Act of 1964 are one important example. In addition, federal statutes such as the National

Environmental Policy Act of 1969 ("NEPA") and the National Historic Preservation Act of 1966

("NHPA") extend to OJP grant recipients, in that recipients must provide the information

necessary for OJP to meets its obligations under those laws.

10. Other conditions typically included in an award document include those that concern

various grants-administration-related responsibilities a prospective recipient will have throughout

the period of the grant, such as financial and programmatic reporting, reporting of performance

metrics, required audits, systems of internal controls (*e.g.*, for financial responsibility and

accountability), certain training requirements, monitoring obligations (*e.g.*, of subrecipients),

record-keeping obligations, and obligations related to reporting and appropriately addressing

conflicts of interest.

11. Many such grants-administration responsibilities and requirements are set out in the

DOJ "Part 200 Uniform Requirements" – the DOJ regulation that adopts (with certain

modifications) the "Uniform Administrative Requirements, Cost Principles, and Audit

Requirements for Federal Awards" published by the Office of Management and Budget

("OMB"). With few exceptions (*e.g.*, awards to for-profit businesses or to individuals), all

award documents require recipients of OJP grants to comply with these requirements.[3]

---

[3] The (DOJ) Part 200 Uniform Requirements apply to virtually all recipients of OJP grants awarded since the start of calendar year 2015. *See* 2 C.F.R. Part 2800, adopting 2 C.F.R Part 200 as a DOJ regulation (with certain exceptions). Generally speaking, recipients of OJP awards made prior to 2015 have similar responsibilities, governed by earlier iterations of similar rules that were set out in a set of OMB Circulars and in DOJ regulations that reflected those circulars.

In addition to directly setting out requirements and conditions applicable to DOJ grant applicants and recipients, the Part 200 Uniform Requirements also expressly contemplate that awarding agencies may place appropriate requirements and conditions on awards.

<u>OJP's Practice with respect to Grant Programming Requirements and Conditions</u>

12.  From the foregoing, it should not be surprising that – as has been the case for years – in the ordinary course, numerous requirements and conditions apply to both OJP grant applicants and OJP grant recipients.  The basis for each such requirement and condition may (and does) vary depending on such factors as the precise requirement/condition at issue, the particular grant program involved, the type of applicant/recipient, and (in some cases) the past performance of the applicant/recipient itself in connection with other federal awards.

13.  Generally speaking, application-related requirements and conditions for OJP grant programs are set out in individual program solicitations, and on associated webpages on the OJP website.  The "standard assurances" are required to be executed at or before the time of award acceptance.  And, as noted earlier, award requirements and conditions are set out in the award document sent to a prospective recipient; these requirements and conditions also may incorporate by express reference particular material set out on the OJP website.

14.  In any decision regarding whether to apply requirements and conditions related to 8 U.S.C. § 1373 to some or all OJP applicants, or to some or all OJP recipients of future awards, OJP will follow the Attorney General's just-issued determination (referred to at the beginning of this declaration) that, for purposes of Executive Order 13768 and OJP, the term "sanctuary jurisdiction" refers only to jurisdictions that "willfully refuse to comply with 8 U.S.C. 1373." Also, consistent with the Attorney General's determination, OJP understands  section 9(a) of that Executive Order *not* to call for OJP to impose grant conditions that would violate any applicable constitutional or statutory limitations, and *not* to purport to expand the existing statutory or constitutional authority of the Attorney General or DOJ.

15.  With respect to 8 U.S.C. § 1373 and the Byrne JAG program in particular, in FY

2016, prior to the making of any FY 2016 Byrne JAG awards, OJP notified (through various communications) prospective recipients under the FY 2016 program of the provisions of 8 U.S.C. § 1373, and that they were "required to assure and certify compliance with all applicable federal statu[t]es, including Section 1373, as well as all applicable regulations...." Such notification was relevant to the OJP "standard assurances" and to a specific provision in the Byrne JAG program statute that requires an application to the Byrne JAG program to include a certification on behalf of the applicant that the State or unit of local government will comply with all provisions of the Byrne JAG program statute and *all other applicable* federal laws.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of May, 2017.

Ralph Martin