1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7      COUNTY OF SANTA CLARA,                Case No.  17-cv-00574-WHO

8                  Plaintiff,

9          v.

10     DONALD J. TRUMP, et al.,

11                 Defendants.

12     CITY AND COUNTY OF SAN                 Case No.  17-cv-00485-WHO
       FRANCISCO,

13                 Plaintiff,                 **ORDER GRANTING MOTION FOR**
                                              **SUMMARY JUDGMENT**
14         v.

15     DONALD J. TRUMP, et al.,

16                 Defendants.

17

18                                    **INTRODUCTION**

19         On April 25, 2017, I entered a preliminary injunction against Section 9(a) of Executive

20     Order 13768, "Enhancing Public Safety in the Interior of the United States,", 82 Fed. Reg. 8799

21     (Jan. 25, 2017) (the "Executive Order").  Preliminary Injunction Order ("PI Order")(SF Dkt. No.

22     82), (SC Dkt. No. 98).  I concluded that the County of Santa Clara and the City and County of San

23     Francisco had pre-enforcement standing to protect hundreds of millions of dollars of federal grants

24     from the unconstitutionally broad sweep of the Executive Order.  The federal government argued

25     for the first time at the hearing for the preliminary injunction that the Executive Order was meant

26     to be far more narrow than I interpreted it, a mere directive to the Department of Homeland

27     Security ("DHS") and the Department of Justice ("DOJ") that does not seek to place any new

28

conditions on federal funds.  I concluded that this interpretation was not legally plausible in light of the Executive Order's plain language, as confirmed by the administration's many statements indicating the Executive Order's expansive scope.  PI Order at 14.

A month later, the Attorney General issued a two page memorandum memorializing the DOJ's interpretation (the "AG Memorandum") and asked me to reconsider the injunction. Because the AG's Memorandum does not amend the Executive Order, is not binding on the Executive Branch and suggests an implausible interpretation of Section 9(a), I denied the federal government's motion on July 20, 2017.  Order Denying Reconsideration (SF Dkt. No. 146), (SC Dkt. no. 145).

Now on summary judgment, the parties have shown that there are no material facts in dispute concerning the Executive Order.  This Order plows no new ground: for the reasons summarized below, and as further described in my earlier Orders, I GRANT the Counties' motions for summary judgment on the Executive Order and permanently enjoin Section 9(a).[1]

## SUMMARY

The Executive Order, in addition to outlining a number of immigration enforcement policies, purports to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law" and to establish a procedure to make "sanctuary jurisdictions" ineligible to receive federal grants.  In two related actions, the County of Santa Clara and the City and County of San Francisco challenge Section 9 of the Executive Order as facially unconstitutional and have brought motions seeking summary judgment.  *See Cty. of Santa Clara v. Trump*, No. 17-cv-0574-WHO; *City & Cty. of San Francisco v. Trump*, 17-cv-0485-WHO.  San Francisco also seeks a declaration that its laws comply with Section 1373.

The Counties argue that Section 9(a) violates the separation of powers doctrine enshrined in the Constitution because it improperly seeks to wield congressional spending powers.  It is so

---

[1] This Order addresses San Francisco's motion only with respect to Count Three of its Complaint. Counts One and Two relate to San Francisco's claims regarding with 8 U.S.C. § 1373 ("Section 1373") and its compliance with it, which are better addressed at the time I consider upcoming motions in related litigation.  *City & Cty. of San Francisco v. Sessions*, No. 17-cv-4642-WHO; *California v. Sessions*, No. 17-cv-4701-WHO ("the related litigation").

1   overbroad and coercive that even if the President had spending powers, the Executive Order would

2   clearly exceed them and violate the Tenth Amendment's prohibition against commandeering local

3   jurisdictions.  It is so vague and standardless that it violates the Fifth Amendment's Due Process

4   Clause and is void for vagueness.  And because it seeks to deprive local jurisdictions of

5   congressionally allocated funds without any notice or opportunity to be heard, it violates the

6   procedural due process requirements of the Fifth Amendment.

7         The federal government responds that the Counties' cannot demonstrate that Section 9 of

8   the Executive Order is invalid under all circumstances, which the federal government contends is

9   the proper standard for a facial challenge.  It also claims that the grant eligibility provision in

10  Section 9(a) is consistent with the Constitution's separation of powers; that it is a valid exercise of

11  the Spending Power because it is not overly coercive, does not force the Counties to take

12  unconstitutional actions to receive the funds, and the funds bear a relationship to immigration; that

13  the AG Memorandum clarifies the meaning of Section 9(a), eliminating its vagueness (and

14  alternatively, the Counties' vagueness challenge impermissibly relies on speculation); and, finally,

15  in light of the AG Memorandum, Section 9(a) does not apply to funding in which the County

16  might have a constitutionally protectable interest (and alternatively that the federal government

17  will apply the applicable procedures).

18        Section 9(a), by its plain language, attempts to reach all federal grants, not merely the three

19  grants listed in the AG's Memorandum.  The rest of the Executive Order is broader still,

20  addressing all federal funding.  And if there was doubt about the scope of the Executive Order, the

21  President and Attorney General erased it with their public comments.  The President has called it

22  "a weapon" to use against jurisdictions that disagree with his preferred policies of immigration

23  enforcement, and his press secretary reiterated that the President intends to ensure that "counties

24  and other institutions that remain sanctuary cites don't get federal government funding in

25  compliance with the executive order."  The Attorney General has warned that jurisdictions that do

26  not comply with Section 1373 would suffer "withholding grants, termination of grants, and

27  disbarment or ineligibility for future grants," and the "claw back" of any funds previously

28  awarded.  The AG Memorandum not only provides an implausible interpretation of Section 9 (a)

3

but is functionally an "illusory promise" because it does not amend Section 9(a) and does not bind the Executive branch. It does not change the plain meaning of the Executive Order.

The Constitution vests the spending powers in Congress, not the President, so the Executive Order cannot constitutionally place new conditions on federal funds. Further, the Tenth Amendment requires that conditions on federal funds be unambiguous and timely made; that they bear some relation to the funds at issue; and that they not be unduly coercive. Federal funding that bears no meaningful relationship to immigration enforcement cannot be threatened merely because a jurisdiction chooses an immigration enforcement strategy of which the President disapproves. Because the Executive Order violates the separation of powers doctrine and deprives the Counties of their Tenth and Fifth Amendment rights, I GRANT the Counties' motions for summary judgment and permanently enjoin the defunding and enforcement provisions of Section 9(a). [2]

## BACKGROUND

### I.     THE EXECUTIVE ORDER

On January 25, 2017, President Donald J. Trump issued Executive Order 13768, "Enhancing Public Safety in the Interior of the United States." *See* RJN, Ex. J ("EO") (SC Dkt. No. 161-10). In outlining the Executive Order's purpose, Section 1 reads, in part, "Sanctuary jurisdictions across the United States willfully violate Federal law in an attempt to shield aliens from removal from the United States." EO § 1. Section 2 states that the policy of the executive branch is to "[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law." *Id.* § 2(c).

Section 9, titled "Sanctuary Jurisdictions," lays out this policy in more detail. It reads:

> Sec. 9.  Sanctuary Jurisdictions.  It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.
>
> (a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement

---

[2] The motions for leave to file amicus briefs at SF Dkt. Nos. 174, 175, 176, 180, 181; and SC Dkt. Nos. 169, 172, 173, 174, 175 are GRANTED.

> purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.
>
> (b) To better inform the public regarding the public safety threats associated with sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.
>
> (c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

*Id.* § 9.

Section 3 of the Executive Order, titled "Definitions," incorporates the definitions listed in 8 U.S.C. § 1101. *Id.* § 3. Section 1101 does not define "sanctuary jurisdiction." The term is not defined anywhere in the Executive Order. Similarly, neither section 1101 nor the Executive Order defines what it means for a jurisdiction to "willfully refuse to comply" with Section 1373 or for a policy to "prevent[] or hinder[] the enforcement of Federal law." *Id.* § 9(a).

## II.     SECTION 1373

Section 1373, to which Section 9 refers, prohibits local governments from restricting government officials or entities from communicating immigration status information to ICE. It states in relevant part:

> (a) In General. Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
>
> (b) Additional Authority of Government Entities. Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
> > (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization

5

Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. 1373.

In July, 2016, the U.S. Department of Justice issued guidance linking two federal grant programs, the State Criminal Alien Assistance Program ("SCAAP") and Edward Byrne Memorial Justice Assistance Grant ("JAG"), to compliance with Section 1373.[3] This guidance states that all applicants for these two grant programs are required to "assure and certify compliance with all applicable federal statutes, including Section 1373, as well as all applicable federal regulations, policies, guidelines, and requirements." *Id.* The DOJ has indicated that the Community Oriented Policing Services Grant ("COPS") is also conditioned on compliance with Section 1373.

## III. THE AG MEMORANDUM

On May 22, 2017, Attorney General Sessions issued the AG Memorandum, putting forward the DOJ's "conclusive" interpretation of the Executive Order. *See* Oppo. Attachment 1 ("AG Memorandum") (SC Dkt. No. 168-1). The AG Memorandum states that the Executive Order does not "purport to expand the existing statutory or constitutional authority of the Attorney General and the Secretary of Homeland Security in any respect" and instead instructs those officials to take action "to the extent consistent with the law." *Id.* at 2. It also states that the defunding provision in section 9(a) will be applied "solely to federal grants administered by [DOJ] or [DHS]" and to grants that require the applicant to "certify . . . compliance with federal law, including 8 U.S.C. section 1373, as a condition for receiving an award." *Id.* at 1-2. The AG Memorandum also states that DHS and DOJ may only impose these conditions pursuant to "existing statutory or constitutional authority," and only where "grantees will receive notice of their obligation to comply with section 1373." *Id.* at 2.

---

[3] *See* Letter from Peter J. Kadzik, Asst. Att'y Gen. U.S. Dep't of Justice, to Hon John A. Culberson, Chairman of the Subcomm. On Commerce, Justice, Sci & Related Agencies, (Jul. 7, 2016), http://culberson.house.gov/uploadedfiles/2016-7-7_section_1373-_doj_letter_to_culberson.pdf. I take judicial notice of Peter Kadzik's letter as courts may judicially notice information and official documents contained on official federal government websites. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-999 (9th Cir. 2010).

The AG Memorandum purports to clarify the scope of the Executive Order to a more narrow interpretation than what its plain meaning allows. To fix the constitutional problems I have identified, the Executive Order itself would need to be amended. I have concluded that the AG Memorandum amounts to "nothing more than an illusory promise to enforce the Executive Order narrowly." *See Cty. of Santa Clara v. Trump*, No. 17–cv–00574, 2017 WL 3086064, at *1 (N.D. Cal. July 20, 2017).

## IV.    CIVIL DETAINER REQUESTS

An ICE civil detainer request asks a local law enforcement agency to continue to hold an inmate who is in local jail because of actual or suspected violations of state criminal laws for up to 48 hours after his or her scheduled release so that ICE can determine if it wants to take that individual into custody. *See* 8 C.F.R. § 287.7; Marquez Decl., Ex. C at 3 (SC Dkt. No. 160-3). ICE civil detainer requests are voluntary and local governments are not required to honor them. *See* 8 C.F.R. § 287.7(a); *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) ("[S]ettled constitutional law clearly establishes that [immigration detainers] must be deemed requests" because any other interpretation would render them unconstitutional under the Tenth Amendment).

Several courts have held that it is a violation of the Fourth Amendment for local jurisdictions to hold suspected or actual removable aliens subject to civil detainer requests because those requests are often not supported by an individualized determination of probable cause that a crime has been committed. *See Morales v. Chadbourne*, 793 F.3d 208, 215-217 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cty.*, No. 3:12-cv-02317-ST, 2014 WL 1414305, at *9-11 (D. Or. Apr. 11, 2014). ICE does not reimburse local jurisdictions for the cost of detaining individuals in response to a civil detainer request and does not indemnify local jurisdictions for potential liability they could face for related Fourth Amendment violations. *See* 8 C.F.R. § 287.7(e); Marquez Decl. ¶¶ 24-27 & Exs. C-E.

## V.    THE COUNTIES' POLICIES

### A.    Santa Clara's Policies

Santa Clara asserts that its local policies and practices with regard to federal immigration

1   enforcement are at odds with the Executive Order's provisions regarding Section 1373.  SC Mot.

2   at 6.  (SC Dkt. No. 151).  In 2010, the Santa Clara County Board of Supervisors adopted a

3   Resolution prohibiting Santa Clara employees from using County resources to transmit any

4   information to ICE that was collected in the course of providing critical services or benefits.

5   Marquez Decl. ¶ 28 (SC Dkt. No. 160) & Ex. G (SC Dkt. No. 160-7); Neusel Decl. ¶ 8 (SC Dkt.

6   No. 153); L. Smith Decl. ¶ 7 (SC Dkt. No. 156).  The Resolution also prohibits employees from

7   initiating an inquiry or enforcement action based solely on the individual's actual or suspected

8   immigration status, national origin, race or ethnicity, or English-speaking ability, or from using

9   County resources to pursue an individual solely because of an actual or suspected violation of

10  immigration law.  Marquez Decl. ¶ 28 & Ex. G; Neusel Decl. ¶ 8; L. Smith Decl. ¶ 7.

11      Santa Clara also asserts that its policies with regard to ICE civil detainer requests are

12  inconsistent with the Executive Order and the President's stated immigration enforcement agenda.

13  Prior to late 2011, Santa Clara responded to and honored ICE civil detainer requests, housing an

14  average of 135 additional inmates each day at a daily cost of approximately $159 per inmate.

15  Neusel Decl. ¶ 10-11.  When the County raised concerns about the costs associated with

16  complying with detainer requests and potential civil liability, ICE confirmed that it would not

17  reimburse the County or indemnify it for the associated costs and liabilities.  Marquez Decl. ¶¶ 22-

18  26 & Exs. C-E.

19      Santa Clara subsequently convened a task force and adopted a new policy where the

20  County agreed to honor requests for individuals with serious or violent felony convictions, but

21  only if ICE would reimburse the County for the cost of holding those individuals.  Neusel Decl.

22  ¶¶ 5-6; Marquez Decl. ¶ 27 & Ex. G.  ICE has never agreed to reimburse the County for any costs,

23  so since November 2011 the County has declined to honor all ICE detainer requests.  Neusel Decl.

24  ¶¶ 5-6; Marquez Decl. ¶ 27 & Ex. G.

25      **B.    San Francisco's Policies**

26      San Francisco's sanctuary city policies are contained in Chapters 12H and 12I of its

27  Administrative Code.  *See* S.F. Admin Code § 12.  The stated purpose of these laws is "to foster

28  respect and trust between law enforcement and residents, to protect limited local resources, to

encourage cooperation between residents and City officials, including especially law enforcement and public health officers and employees, and to ensure community security, and due process for all." S.F. Admin Code § 12I.1.

As relevant to Section 1373, Chapter 12H prohibits San Francisco departments, agencies, commissions, officers, and employees from using San Francisco funds or resources to assist in enforcing federal immigration law or gathering or disseminating information regarding an individual's release status, or other confidential identifying information (which as defined does not include immigration status), unless such assistance is required by federal or state law. *Id.* § 12H.2. Although Chapter 12H previously prohibited city employees from sharing information regarding individuals' immigration status, the San Francisco Board of Supervisors removed this restriction in July 2016 due to concerns that the provision violated Section 1373.

With regard to civil detainer requests, Chapter 12I prohibits San Francisco law enforcement from detaining an individual, otherwise eligible for release from custody, solely on the basis of a civil immigration detainer request. *Id.* § 12I.3. It also prohibits local law enforcement from providing ICE with advanced notice that an individual will be released from custody, unless the individual meets certain criteria. *Id.* Chapter 12I.3.(e) provides that a "[l]aw enforcement official shall not arrest or detain an individual, or provide any individual's personal information to a federal immigration officer, on the basis of an administrative warrant, prior deportation order, or other civil immigration document based solely on alleged violations of the civil provisions of immigration laws." *Id.* § 12I.3.(e). San Francisco explains that it adopted these policies due to concerns that holding people in response to civil detainers would violate the Fourth Amendment and require it to dedicate scarce law enforcement personnel and resources to holding these individuals. Hennessy Decl. ¶¶ 13-14 (SF Dkt. No. 160).

## VI. THE COUNTIES' FEDERAL FUNDING

### A. Santa Clara's Federal Funding

In the 2015-2016 fiscal year, Santa Clara received approximately $1.7 billion in federal and federally dependent funds, making up roughly 35% of the County's total revenues. J. Smith Decl. ¶ 6 (SC Dkt. No. 155); Marquez Decl. ¶ 8. This figure includes federal funds provided

9

through entitlement programs.

Most of the County's federal funds are used to provide essential services to its residents. Marquez Decl. ¶¶ 5-8. In support of its motion, the County includes a number of declarations outlining how a loss of any substantial amount of federal funding would force it to make substantial cut backs to safety-net programs and essential services and would require it to lay off thousands of employees. It highlights that the County's Valley Medical Center, the only public safety-net healthcare provider in the County, relies on $1 billion in federal funds each year, which covers up to 70% of its total annual costs. Lorenz Decl. ¶ 6 (SC Dkt. No. 157). A loss of all federal funds would shut down Valley Medical Center and cut off the only healthcare option for thousands of poor, elderly, and vulnerable people in the County. *Id.* ¶ 8. It further highlights that Santa Clara's Social Services Agency, which provides various services to vulnerable residents, including child welfare and protection, aid to needy families, and support for disabled children, adults and the elderly, receives roughly 40% of its budget, $300 million, from federal funds. Menicocci Decl. ¶ 6 (SC Dkt. No. 158). The County's Public Health Department receives 40% of its budget and $38 million in federal funds. And the County's Office of Emergency Services, whose job is to prepare for and respond to disasters such as earthquakes and terrorism, receives more than two-thirds of its budget from federal funds. Reed Decl. ¶ 8 (SC Dkt. No. 154)

In the 2014-2015 fiscal year, the County received over $565 million in non-entitlement federal grants. *See* Marquez Decl. Ex. A at 11-12 (SC Dkt. No. 160-1) (showing $338 million in federal grants subject to OMB auditing requirements and an additional $227 million in federal grants through the Department of Housing and Urban Development). This represents approximately 11% of the County's budget.

B.       **San Francisco's Federal Funding**

San Francisco's yearly budget is approximately $9.6 billion; it receives approximately $1.2 billion of this from the federal government. Rosenfield Decl. ¶ 10 (SF Dkt. No. 159). San Francisco uses these federal funds to provide vital services such as medical care, social services, and meals to vulnerable residents, to maintain and upgrade roads and public transportation, and to make needed seismic upgrades. Whitehouse Decl. ¶15 (SF Dkt. No. 167). Losing all, or a

substantial amount, of federal funds would have significant effects on core San Francisco programs. Rosenfield Decl. ¶ 42. Federal funds make up 30% of the budget for San Francisco's Department of Emergency Management, *id.* ¶¶ 28-31; 33% of the budget for San Francisco's Human Services Agency, *id.* ¶¶ 16-21; and 40% of the budget for San Francisco's Department of Public Health, *id.* ¶¶ 22-27.

Approximately 20% of the federal funds, or $240 million, are from federal grants. *Id.* ¶ 43. San Francisco also receives $800 million each year in federal multi-year grants, primarily for public infrastructure projects. Whiteside Decl. ¶ 13.

San Francisco must adopt a balanced budget for each fiscal year beginning on July 1. Whitehouse Decl. ¶16. Under local law, the Mayor must submit a balanced budget to the Board of Supervisors by June 1 and make fundamental budget decisions by May 15, including whether to create a budget reserve to account for the potential loss of significant funds. *Id.* ¶¶ 5, 9. Any money placed in the budget reserve would not be available to be used for other programs or services in the coming fiscal year. *Id.* ¶ 9.

**DISCUSSION**

## I.    JUSTICIABILITY

The federal government argues that the Counties' claims against the Executive Order are not justiciable because the Counties cannot establish standing and because their claims are not ripe for review. It also contends that the claims are non-justiciable because the Executive Order is merely an internal directive that does not directly affect the Counties. These principles of justiciability go to whether this court has jurisdiction to hear the Counties' claims. I conclude that the Executive Order carries the weight of the law, the Counties have demonstrated Article III standing to challenge the Executive Order, and their claims are ripe for review.

The federal government raises three primary arguments against the justiciability of the Counties' claims. First, it asserts that the Counties have not established a concrete risk of losing any funds under Section 9(a). Second, it argues that the Counties cannot establish the "concrete" injury necessary for standing nor "concrete" impact necessary for ripeness because neither the President nor the Secretary of DHS has disagreed with the "plan" set forth by the Attorney

General in the AG Memorandum.  Lastly, the federal government argues that because the Executive Order is merely a "internal directive," it does not affect the Counties.

The federal government's arguments are nearly identical to those I have rejected before.  It does not identify any change in the law or alternative explanation that would change my prior analysis in the PI Order and Order Denying Reconsideration.  I address its arguments in turn, repeating my previous conclusions.  All of the Counties' claims are justiciable.

### A.    The Counties Establish a Concrete Risk of Losing Funds

The federal government repeatedly indicated its intent to enforce the Executive Order in its public statements and through its actions.  Although the defunding provision was not enforced against any jurisdiction prior to the nationwide injunction, the President and other members of the administration have made numerous statements reaffirming the federal government's intent to enforce the Executive Order and to use the threat of withholding federal funds as a tool to coerce states and local jurisdictions to change their policies.

For example, on February 5, 2017, after signing the Executive Order, President Trump confirmed that he was willing and able to use "defunding" as a "weapon" so that sanctuary cities would change their policies.  *See* RJN Ex. H (Tr. of Feb. 5, 2017 Bill O'Reilly Interview with President Donald J. Trump) at 4 (SF Dkt. No. 163-9) ("I don't want to defund anybody.  I want to give them the money they need to properly operate as a city or a state.  If they're going to have sanctuary cities, we may have to do that.  Certainly that would be a weapon.").[4] Attorney General Sessions confirmed the federal government's intent to enforce the defunding provisions, stating that if jurisdictions do not comply with Section 1373, such violations would result in "withholding grants, termination of grants, and disbarment or ineligibility for future grants," and that the federal government would seek to "claw back any funds awarded to a jurisdiction that willfully violates 1373."  *See* RJN, Ex. I ("Sessions Press Conference") at 2 (SF Dkt. No. 163-9).

The statements of the President and the Attorney General repeatedly indicated an intent to

---

[4] I take judicial notice of President Trump's interview statements as the veracity of these statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. § 201 (b)(2).

defund sanctuary jurisdictions in compliance with the Executive Order. Though such explicit statements have been scant since I entered the preliminary injunction, the Counties' concerns that the federal government will enforce the defunding provision are well supported by the federal government's public statements and actions, all of which are consistent with enforcing the Executive Order.[5]

In addition to demonstrating that the federal government is likely to enforce the Executive Order, the Counties have shown that the federal government is particularly likely to target them and the funds on which they rely. In the February 5, 2017 interview, President Trump specifically threatened to defund California, stating: "I'm very much opposed to sanctuary cities. They breed crime. There's a lot of problems. If we have to we'll defund, we give tremendous amounts of money to California . . . California in many ways is out of control." *See* RJN, Ex. H at 4. The Counties have established that they both receive large percentages of their federal funding through the State of California and that they would suffer injury if California was "defunded." ICE has identified California, Santa Clara County, and San Francisco as jurisdictions with policies that "Restrict Cooperation with ICE" and has identified Santa Clara County Main Jail and San Francisco County Jail as two of eleven detention centers with the "highest volume of detainers issued" that "do not comply with detainers on a routine basis." RJN, Ex. D (SF Dkt. No. 163-3).[6]

The President and the Attorney General have also repeatedly held up San Francisco as an example of how sanctuary policies threaten public safety. In an op-ed recently published in the San Francisco Chronicle, the Attorney General wrote that "Kathryn Steinle might be alive today if she had not lived in a 'sanctuary city'" and implored "San Francisco and other cities to re-evaluate

---

[5] I take judicial notice under Fed. R. Evid. § 201 (b)(2) that the DOJ notified the Counties on November 15, 2017 that they "have preliminarily been found to have laws, policies, or practices that violate 8 U.S.C. 1373." Second Supplement al Request for Judicial Notice in Support of the County of Santa Clara's Motion for Summary Judgment, Exh. C, Dkt. No. 181. This underscores the concrete risk and injury faced by the Counties.

[6] I take judicial notice of ICE's identification of California, Santa Clara County, and San Francisco as jurisdictions with policies that "Restrict Cooperation with ICE" as matters of public record. *See Interstate Nat. Gas. Co. v. S. Cal. Gas. Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (judicially noticing federal government agency records and reports).

these policies." RJN, Ex. R (SF Dkt. No. 163-18).[7]  In his statements to federal, state, and local law enforcement on July 12, 2017, Attorney General Sessions referenced the tragic death of Ms. Steinle and noted that her killer "admitted that one reason he was in San Francisco that day was that he knew the city had these policies in place" RJN, Ex. T ("Sessions Press Release") at 2 (Dkt. No. 163-20). These statements indicate not only the belief that San Francisco is a "sanctuary jurisdiction" but that its policies are particularly dangerous and in need of change.  They also reveal a choice by the administration to hold up San Francisco as an exemplar of a sanctuary jurisdiction.

The federal government's specific criticisms of San Francisco, Santa Clara, and California support a well-founded fear that San Francisco and Santa Clara will face enforcement directly under the Executive Order, or could be subject to defunding indirectly through enforcement against California.  San Francisco and Santa Clara have shown that their current practices and policies are targeted by the Executive Order.  They have demonstrated that the federal government has repeatedly indicated its intent to enforce it.  And they have established that the federal government has specifically highlighted Santa Clara and San Francisco as jurisdictions with sanctuary policies.  On these facts, Santa Clara and San Francisco have demonstrated that the "threat of enforcement [is] credible, not simply imaginary or speculative."  *Id.* (internal quotation marks omitted).  Because the enforcement of Section 9(a) involves defunding, this establishes the Counties' concrete risk of losing funds.

B.     **The Counties Show Concrete Injury and Concrete Impact**

The Counties assert that the Executive Order threatens to penalize them for failing to comply with Section 1373 and for failing to honor detainer requests by withholding all federal funds, or at least all federal grants.  Section 9(a) does not threaten all federal funding, but it does include all federal grants, which make up a significant part of the Counties' budgets.  This threatened injury meets Article III's standing requirements.  A "loss of funds promised under

---

[7] I take judicial notice of Attorney General Sessions's statements in his op-ed as the veracity of these statements "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. § 201 (b)(2).

14

federal law [] satisfies Article III's standing requirement." *Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015).

The Counties explained that the need to mitigate a potential sudden loss of federal funds wreaked havoc with their budgeting processes prior to issuance of the preliminary injunction. They could not make informed decisions about whether to keep spending federal funds on needed services for which they may not be reimbursed; they were forced to make contingency plans to deal with a potential loss of funds, including placing funds in a budget reserve in lieu of spending that money on needed programs; and the obligation to mitigate potential harm to their residents and drastic cuts to services could ultimately compel them to change their local policies to comply with what they believe to be an unconstitutional Executive Order. The potential loss of all federal grants creates a contingent liability large enough to have real and concrete impacts on the Counties' ability to budget and plan for the future. As discussed in more detail below, the Counties demonstrated that they are suffering a present "injury [] inflicted by the mere existence and threatened enforcement of the [Executive Order]." *Village of Euclid*, 272 U.S. at 385. Along with the threatened loss of funds, this may also establish Article III standing.

A sudden loss of grant funding would have another effect. The Counties receive large portions of their federal grants through reimbursement structures; the Counties first spend their own money on particular services and then receive reimbursements from the federal government based on the actual services provided. Marquez Decl. ¶ 16. Because these funds are spent on an ongoing basis, at all times the Counties are expecting, and relying on, millions of dollars in federal reimbursements for services already provided. A sudden cut to funding, including a cut to these reimbursements, could place them immediately in significant debt. A sudden and unanticipated cut mid-fiscal year would substantially increase the injury to the Counties by forcing them to make even more drastic cuts to absorb the loss of funds during a truncated period in order to stay on budget. Whitehouse Decl. ¶ 15.

San Francisco explains that a mid-year loss of only $120 million in federal funding would: require the City to make significant cuts to critical services and would result in reductions in the numbers of first responders, such as police officers, firefighters, and paramedics; require severe

15

cuts to the City's MUNI transportation system; threaten the Mayor's program to end chronic veterans' homelessness by 2018; and likely require cuts to social services, such as senior meals, safety net services for low-income children, and domestic violence prevention services. *Id.* ¶ 10. Because federal grants support key services, San Francisco asserts that, without clarity about the funds the Executive Order could withhold or claw back, it would have needed to allocate millions of dollars to a budget reserve on May 15, 2017 to prepare for the potential loss of significant funds during the 2017 fiscal year. *Id.* ¶ 6, 12. Any funds placed in a reserve fund would not be available to fund other City programs and services for the 2017 fiscal year, which would have resulted in a dollar-for-dollar reduction in services the City is able to provide its residents. *Id.* ¶¶ 8-10.

Santa Clara asserts that the budgetary uncertainty put it in an "untenable position." Marquez Decl. ¶ 4. It explained that Santa Clara's budget for the fiscal year is in place and was developed based on careful weighing of various factors, including anticipated revenues, specific service needs, salary and benefits for the County's 19,000 employees, and the County's fiscal priorities. *Id.* ¶ 13. Because Santa Clara operates federally funded programs on a daily basis, and incurs costs in anticipation that it will be reimbursed, its ability to provide these services depends on the County having some confidence that it will continue to receive the federal reimbursements and funds on which it depends. With the Executive Order's unclear and broad language threatening a significant cut to funding, the County did not know "whether to (1) continue incurring hundreds of millions of dollars in costs that may never be reimbursed by the federal government, (2) discontinue basic safety-net services delivered to its most vulnerable residents, or (3) in an attempt to avoid either of these outcomes, be effectively conscripted into using local law enforcement and other resources to assist the federal government in its immigration enforcement efforts." *Id.* ¶ 12.

The potential loss of funds also impacts the Counties' potential borrowing power and financial strength; San Francisco noted that it had received inquiries from credit rating agencies about the Executive Order and its impact on San Francisco's finances. Rosenfield Decl. ¶ 46-47. This budget uncertainty is not abstract. It has caused the Counties real and tangible harms. They have adequately demonstrated that budgetary uncertainty of the type threatened by the Executive

Order constitutes a sufficiently concrete injury and demonstrates a sufficiently concrete impact for purposes of justiciability.

### C.    The Executive Order is Not an Internal Directive

The federal government argues that the Executive Order does not change the law, but merely directs the Attorney General and Secretary to enforce existing law.  It cites *Chen v. Schiltgen*, No. C-94-4094-MHP, 1995 WL 317023, at *5 (N.D. Cal. May 29, 1995), for the proposition that the Executive Order "direct[s] the exercise of powers statutorily delegated to executive branch officials."  Oppo. at 8.  But the Executive Order is not readily susceptible to the federal government's narrow interpretation.  Indeed, "[t]o read [the Executive Order] as the federal government desires requires rewriting, not just reinterpretation." *U.S. v. Stevens*, 559 U.S. 460, 481 (2010).

The federal government attempts to read out all of Section 9(a)'s unconstitutional directives to render it an ominous, misleading, and ultimately toothless threat.  It urges that all it does is direct the Attorney General and Secretary to enforce existing grant conditions "consistent with law."  But in reality, the defunding provision instructs the Attorney General and the Secretary to do something that only Congress has the authority to do – place new conditions on federal funds.  If Section 9(a) does not direct the Attorney General and Secretary to place new conditions on federal funds, then it only authorizes them to do something they already have the power to do, which is to enforce existing grant requirements; effectively, the federal government argues that Section 9(a) is "valid" and does not raise constitutional issues as long as it does nothing at all.  But a construction so narrow that it renders a legal action legally meaningless cannot possibly be reasonable and is clearly inconsistent with the Executive Order's broad intent.

The federal government's construction requires a complete rewriting of the Executive Order's language and does not retain any of Section 9(a)'s legal effect.  The Executive Order, as written, is not merely an internal directive but an order intended to have the full force of the law.

## II.    CONSTITUTIONALITY OF THE EXECUTIVE ORDER

### A.    The Executive Order Violates the Separation of Powers

The Counties argue that the Executive Order is unconstitutional because it seeks to wield

powers that belong exclusively to Congress, the spending powers. The federal government contends that (i) the grant eligibility provision in Section 9(a) is consistent with separation of powers; (ii) authority to impose at least some conditions is inherent in the statutory authority to administer a grant program; and (iii) the Counties have failed to establish that the Executive Order would be unconstitutional in all its applications.

The parties disagree about the standard for a facial challenge. Relying on *United States v. Salerno*, 481 U.S. 739, 745 (1987), the federal government argues that the Counties must demonstrate that Section 9(a) is invalid under all circumstances. SC Oppo. at 11 (SC Dkt. No. 168); SF Oppo. at 21 (SF Dkt. No. 165). Santa Clara asserts, and I agree, that a proper facial challenge can be brought when the challenged law cannot be narrowly construed by the courts or narrowly interpreted as to avoid constitutional questions. *Jackson v. City & Cty. Of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014). I have found that the Executive Order cannot be narrowly interpreted or construed to avoid constitutional questions, and the federal government makes no argument regarding the separation of powers principles other than its misguided assertion regarding the standard for a facial challenge. The Executive Order violates the Constitution's separation of powers principles.

The constitutional principle at issue is pretty basic. Article I of the Constitution grants Congress the federal spending powers. *See* U.S. Const. art. I, § 8, cl. 1. "Incident to this power, *Congress* may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citing *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980) (emphasis added). While the President may veto a Congressional enactment under the Presentment Clause, he must "either 'approve all the parts of a Bill, or reject it in total.'" *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (quoting 33 Writings of George Washington 96 (J. Fitzpatrick ed., 1940)). He cannot "repeal[] or amend[] parts of duly enacted statues" after they become law. *Id.* at 439.

This is true even if Congress has attempted to expressly delegate such power to the

President. *Id.* In *City of New York*, the Supreme Court concluded that the Line Item Veto Act, which sought to grant the President the power to cancel particular direct spending and tax benefit provisions in bills, was unconstitutional because it ran afoul of the " 'finely wrought' procedures commanded by the Constitution" for enacting laws. *Id.* at 448 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). While Congress can delegate some discretion to the President to decide how to spend appropriated funds, any delegation and discretion is cabined by these constitutional boundaries.

After a bill becomes law, the President is required to "take Care that the Law be faithfully executed." *See* U.S. Const. art. II, § 3, cl. 5. Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so. *See City of New York*, 524 U.S. at 439; U.S. Const. art. I, § 8, cl. 1. Further, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Congress has intentionally limited the ability of the President to withhold or "impound" appropriated funds and has provided that the President may only do so after following particular procedures and after receiving Congress's express permission. *See* Impoundment Control Act of 1974, 2 U.S.C. §§ 683 *et seq.*

The Executive Order runs afoul of this fundamental constitutional structure. The President does not have the power to place conditions on federal funds and, obviously, cannot delegate this power. But that is what Section 9(a) purports to do, to give the Attorney General and the Secretary the power to place a new condition on federal funds (compliance with Section 1373) not authorized by Congress.

Section 9(a) is particularly problematic because Congress has repeatedly declined to broadly condition federal funds or grants on compliance with Section 1373 or other federal immigration laws as the Executive Order purports to do. *See, e.g.*, Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016); Stop Sanctuary

Policies and Protect Americans Act, S. 2146, 114th Cong. (2016). This puts the President's power "at its lowest ebb." *Youngstown*, 343 U.S. at 637. The Executive Order's attempt to place new conditions on federal funds is an improper attempt to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles.

### B.    The Counties' Spending Clause Claims

The Counties also argue that, even if the President had the spending power, the Executive Order would be unconstitutional under the Tenth Amendment because it exceeds those powers. Relying largely on the language in the AG Memorandum, the federal government counters that: (i) the Counties do not demonstrate that Section 9(a) is clearly coercive; (ii) Section 9(a) does not induce the Counties to violate any applicable constitutional or statutory limitation; (iii) the AG Memorandum eliminated the possibility of Section 9(a) being applied in arenas unrelated to immigration; and (iv) the AG Memorandum clarifies how the provisions of Section 9(a) will be applied. As I explained in the Order Denying Reconsideration, the AG Memorandum does not resolve the Executive Order's constitutional issues or alter the constitutional analysis, and there is no need to discuss further those latter two arguments.

Regarding the first two arguments, Congress has significant authority to encourage policy through its spending power. The Supreme Court, however, has articulated a number of limitations to the conditions Congress can place on federal funds. The Executive Order likely violates at least three of these restrictions: (1) conditions must be unambiguous and cannot be imposed after funds have already been accepted; (2) there must be a nexus between the federal funds at issue and the federal program's purpose; and (3) the financial inducement cannot be coercive.

### 1.    Unambiguous Requirement

When Congress places conditions on federal funds, "it must do so unambiguously" so that state and local jurisdictions contemplating whether to accept such funds can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 203 (internal quotation marks omitted). Because states must opt-in to a federal program willingly, fully aware of the associated conditions, Congress cannot implement new conditions after-the-fact. *See Nat'l Fed. of Indep. Bus. v. Sebelius ("NFIB")*, 132 S. Ct. 2566, 2602-04 (2012). "The legitimacy of

Congress's exercise of the spending power thus rests on whether the state voluntarily and knowingly accepts the terms of the contract" at the time Congress offers the money. *Id.* at 2602.

The Executive Order purports retroactively to condition all "federal grants" on compliance with Section 1373. As this condition was not an unambiguous condition that the states and local jurisdictions voluntarily and knowingly accepted at the time Congress appropriated these funds, it cannot be imposed now by the Executive Order. Moreover, the Executive Order's language refers to all federal grants but the DOJ says it only applies to three grants issued through the Departments of Justice and Homeland Security. If the funds at stake are not clear, the Counties cannot voluntarily and knowingly choose to accept the conditions on such funds.

Finally, as discussed below in Section II.D., the Executive Order's vague language does not make clear what conduct it proscribes or give jurisdictions a reasonable opportunity to avoid its penalties. The unclear and untimely conditions in the Executive Order fail the "unambiguous" restriction because the Executive Order does not make clear to states and local governments what funds are at issue and what conditions apply to those funds, making it impossible for them to "voluntarily and knowingly accept[] the terms of the contract." *NFIB*, 132 S. Ct. at 2602.

### 2.    Nexus Requirement

The conditions placed on congressional spending must have some nexus with the purpose of the implicated funds. "Congress may condition grants under the spending power only in ways reasonably related to the purpose of the federal program." *Dole*, 483 U.S. at 213. This means that funds conditioned on compliance with Section 1373 must have some nexus to immigration enforcement.

The Executive Order's attempt to condition all federal grants on compliance with Section 1373 clearly runs afoul of the nexus requirement: there is no nexus between Section 1373 and most categories of federal funding, such as funding related to Medicare, Medicaid, transportation, child welfare services, immunization and vaccination programs, and emergency preparedness. The Executive Order inverts the nexus requirement, directing the Attorney General and Secretary to cut off all federal grants to "sanctuary jurisdictions" but giving them discretion to allow "sanctuary jurisdictions" to receive grants "deemed necessary for law enforcement purposes." EO

§ 9(a). As the subset of grants "deemed necessary for law enforcement purposes" likely includes any federal funds related to immigration enforcement, the Executive Order expressly targets for defunding grants with no nexus to immigration enforcement at all. This is the precise opposite of what the nexus test requires.

### 3. Not Coercive Requirement

Finally, Congress cannot use the spending power in a way that compels local jurisdictions to adopt certain policies. Congress cannot offer "financial inducement . . . so coercive as to pass the point at which pressure turns to compulsion." *Dole*, 483 U.S. at 211 (internal quotation marks omitted). Legislation that "coerces a State to adopt a federal regulatory system as its own" "runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602. States must have a "legitimate choice whether to accept the federal conditions in exchange for federal funds." *Id.* at 2602-03.

In *NFIB*, the Supreme Court concluded that the Affordable Care Act's threat of denying Medicaid funds, which constituted over 10 percent of the State's overall budget, was unconstitutionally coercive and represented a "gun to the head." *Id.* at 2604. The Executive Order threatens to deny sanctuary jurisdictions all federal grants, hundreds of millions of dollars on which the Counties rely. The threat is unconstitutionally coercive.

### C. The Counties' Tenth Amendment Claim

The Counties argue that Section 9(a) violates the Tenth Amendment because it attempts to conscript states and local jurisdictions into carrying out federal immigration law. The federal government does not specifically address the constitutional argument. Instead, it asserts that in order to successfully bring a facial challenge, San Francisco must demonstrate that the "appropriate enforcement action" provision of Section 9(a) would violate the Tenth Amendment in all of its applications. As previously discussed, this argument misinterprets the facial challenge standard.[8]

"The Federal government may not compel the States to enact or administer a federal

---

[8] This discussion of the Tenth Amendment only addresses the Executive Order's enforcement threat against all federal grants. I will consider the narrower issues presented concerning Section 1373 and specific grant programs involving San Francisco and the State of California in the related litigation.

regulatory program." *New York*, 505 U.S. at 188. "The Federal government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 132 S. Ct. at 2602.

The Counties have demonstrated that under their reasonable interpretation, the Executive Order equates "sanctuary jurisdictions" with "any jurisdiction that ignored or otherwise failed to honor any detainers" and therefore places such jurisdictions at risk of losing all federal grants. *See* EO § 9(b). The Counties have shown that losing all of their federal grant funding would have significant effects on their ability to provide services to their residents and that they may have no legitimate choice but to accept the federal government's conditions in exchange for those funds.

To the extent the Executive Order seeks to condition all federal grants on honoring civil detainer requests, it is likely unconstitutional under the Tenth Amendment because it seeks to compel the states and local jurisdictions to enforce a federal regulatory program through coercion. It directs the Attorney General to "take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law." EO § 9(a). Although the Executive Order provides no further clarification on what this "enforcement" might entail or what policies might "hinder[] the enforcement of Federal law," Attorney General Sessions, who is tasked with implementing this provision, has equated failure to honor civil detainer requests with policies that "frustrate th[e] enforcement of immigration laws." *See* Sessions Press Conference at 2. Given the Attorney General's apparent interpretation of Section 1373, the Executive Order threatens "enforcement action" against any jurisdiction that refuses to comply with detainer requests or otherwise fails to enforce federal immigration law. While this threat of "enforcement" is left vague and unexplained, "enforcement" by its own definition means to "compel[] compliance." *See* BLACK'S LAW DICTIONARY 645 (10th ed. 2014) (defining "enforcement" as "The act or process of compelling compliance with a law, mandate, command, decree, or agreement."). By seeking to

compel states and local jurisdictions to honor civil detainer requests by threatening enforcement action, the Executive Order violates the Tenth Amendment's provisions against conscription.

The Supreme Court has repeatedly held that, "The Federal government cannot compel the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992). The federal government cannot command them to adopt certain policies, *id.* at 188, command them to carry out federal programs, *Printz*, 521 U.S. at 935, or otherwise to "coerce them into adopting a federal regulatory system as their own," *NFIB*, 132 S. Ct. at 2602. The Executive Order uses coercive means in an attempt to force states and local jurisdictions to honor civil detainer requests, which are voluntary "requests" precisely because the federal government cannot command states to comply with them under the Tenth Amendment. The Executive Order attempts to use coercive methods to circumvent the Tenth Amendment's direct prohibition against conscription. While the federal government may incentivize states to adopt federal programs voluntarily, it cannot use means that are so coercive as to compel their compliance. The Executive Order's threat to pull all federal grants from jurisdictions that refuse to honor detainer requests or to bring "enforcement action" against them violates the Tenth Amendment's prohibitions against commandeering.

### D. Santa Clara's Fifth Amendment Vagueness Claim

The Counties assert that the Executive Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. The federal government responds, first, that the Executive Order is an internal directive that does not have a direct effect on Santa Clara and so Santa Clara needs no notice. SC Oppo. at 18. This argument holds no weight; as discussed before, the Executive Order is not merely an internal directive. *See* PI Order at 12-16; Reconsideration Order at 15; *infra* Section I.C. Next, it argues that the AG Memorandum "authoritatively clarifies" the terms and makes it clear which federal grants will be affected by the Executive Order. SC Oppo. at 18. As previously explained, the AG Memorandum is not authoritative and does not amend the Executive Order or bind the rest of the Executive Branch, and it does not affect the constitutional analysis.

A law is unconstitutionally vague and void under the Fifth Amendment if it fails to make

clear what conduct it prohibits and if it fails to lay out clear standards for enforcement. *See Gaynard v. City of Rockford*, 408 U.S. 104, 108 (1972). To satisfy due process, courts insist that laws (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and (2) "provide explicit standards for those who apply them." *Id.* The Executive Order does not meet either of these requirements.

The Executive Order does not make clear what conduct might subject a state or local jurisdiction to defunding or enforcement action, making it impossible for jurisdictions to determine how to modify their conduct, if at all, to avoid the Executive Order's penalties. The Executive Order directs the Attorney General and Secretary to ensure that jurisdictions that "willfully refuse to comply" with Section 1373, "sanctuary jurisdictions," are not eligible to receive federal grants. Past DOJ guidance and various court cases interpreting Section 1373 have not reached consistent conclusions as to what Section 1373 requires. In the face of conflicting guidance, with no clear standard from the federal government, jurisdictions do not know how to avoid the Executive Order's defunding penalty.

Further, because the Executive Order does not clearly define "sanctuary jurisdictions," the conduct that will subject a jurisdiction to defunding under the Executive Order is not fully outlined. In addition, the Executive Order directs the Attorney General to take "appropriate enforcement action" against any jurisdiction that willfully refuses to comply with Section 1373 or otherwise has a policy or practice that "hinders the enforcement of Federal law." This provision vastly expands the scope of the Executive Order. What does it mean to "hinder" the enforcement of federal law? What federal law is at issue: immigration laws? All federal laws? The Executive Order offers no clarification. Although the AG Memorandum purports to clarify these open questions, it cannot "authoritatively" do so because it does not carry the force of law. It cannot address these constitutional failings of the Executive Order.

The Executive Order also fails to provide clear standards to the Secretary and the Attorney General to prevent "arbitrary and discriminatory enforcement." *Id.* The Executive Order gives the Secretary discretion to designate jurisdictions as "sanctuary jurisdictions" to the extent consistent with law. But there are no laws, besides the Executive Order, outlining what a sanctuary

jurisdiction is, leaving the Secretary with unfettered discretion and the Executive Order's vague language to make "sanctuary jurisdiction" designations. Similarly, the Executive Order directs the Attorney General to take "appropriate enforcement action" against any jurisdiction that "hinders the enforcement of Federal law." This expansive, standardless language creates huge potential for arbitrary and discriminatory enforcement, leaving the Attorney General to figure out what "appropriate enforcement action" might entail and what policies and practices might "hinder[] the enforcement of Federal law." This language is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

The Executive Order gives the Counties no clear guidance on how to comply with its provisions or what penalties will result from non-compliance, and its standardless guidance and enforcement provisions are also likely to result in arbitrary and discriminatory enforcement. It does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Gaynard*, 408 U.S. at 108. Section 9(a) is void for vagueness under the Fifth Amendment.

### E.  Santa Clara's Fifth Amendment Procedural Due Process Claim

The Counties assert that the Executive Order fails to provide them with procedural due process in violation of the Fifth Amendment. Again relying on the AG Memorandum, the federal government argues that Section 9(a) does not apply to funding "in which the County might have a constitutionally protectable property interest." SC Oppo. at 19.

To have a legitimate property interest, a person "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). A state or local government has a legitimate claim of entitlement to congressionally appropriated funds, which are akin to funds owed on a contract. *See NFIB*, 132 S. Ct. at 2602 ("The legitimacy of Congress' power to legislate under the spending power [] rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' "). The Counties have a legitimate property interest in federal funds that Congress has already appropriated and that the Counties have accepted.

The Executive Order purports to make the Counties ineligible to receive these funds

through a discretionary and undefined process. The Executive Order directs the Attorney General and Secretary to designate various states and local jurisdictions as "sanctuary jurisdictions," ensure that such jurisdictions are "not eligible" to receive federal grants, and "take enforcement action" against them. EO § 9 (a). It does not direct the Attorney General or Secretary to provide "sanctuary jurisdictions" with any notice of an unfavorable designation or impending cut to funding. And it does not set up any administrative or judicial procedure for states and local jurisdictions to be heard, to challenge enforcement action, or to appeal any action taken against them under the Executive Order. This complete lack of process violates the Fifth Amendment's due process requirements. *Matthew v. Eldridge*, 424 U.S. 319, 349 (1976) ("The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.") (internal alterations and quotations omitted).

The Counties have demonstrated that the Executive Order has caused and will cause them constitutional injuries by violating the separation of powers doctrine and depriving them of their Tenth and Fifth Amendment rights. Accordingly, the Counties' motions for summary judgment are GRANTED with respect to Section 9(a) of the Executive Order.

### III.     SAN FRANCISCO'S 1373 CHALLENGE

San Francisco also seeks summary judgment for its claim for declaratory relief that its laws comply with Section 1373. The federal government asserts that San Francisco's claim is nonjusticiable. Further, if the claim is justiciable, the federal government argues that San Francisco's ordinances conflict with Section 1373.

San Francisco has brought a separate lawsuit against the federal government's imposition of grant conditions on the Edward Byrne Memorial Justice Assistance Grant Program. *See City & Cty. of San Francisco v. Sessions*, No. 17-cv-4642-WHO. And the State of California brings its own challenge to the federal government's interpretation of Section 1373. *See State of California v Sessions*, No. 17-cv-4701 WHO. I will consider San Francisco's motion for summary judgment on Counts One and Two when I address the related issues in the related litigation. [9]

---

[9] Given these conclusions, San Francisco's Administrative Motion to Consider Post-Hearing Developments will be considered at a later date.

**CONCLUSION**

The Counties have demonstrated that the Executive Order has caused and will cause them constitutional injuries by violating the separation of powers doctrine and depriving them of their Tenth and Fifth Amendment rights. Accordingly, the Counties' motions for summary judgment are GRANTED regarding Section 9(a). The defendants are permanently enjoined from enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions. Because Section 9(a) is unconstitutional on its face, and not simply in its application to the plaintiffs here, a nationwide injunction against the defendants other than President Trump is appropriate. See *California v. Yamasaki*, 442 U.S. 682, 702 (1979)("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff."); *Washington v. Trump*, 847 F.3d 1151, 1161-67 (9th Cir. 2017) (affirming nationwide injunction against executive travel ban order).

**IT IS SO ORDERED.**

Dated: November 20, 2017

William H. Orrick
United States District Judge