**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, *Plaintiff-Appellee*, v. DONALD J. TRUMP, President of the United States; JEFFERSON B. SESSIONS III, Attorney General, Attorney General of the United States; ELAINE C. DUKE; UNITED STATES OF AMERICA, *Defendants-Appellants.* | No. 17-17478 D.C. No. 3:17-cv-00485-WHO |

2   SAN FRANCISCO V. TRUMP

| | |
|---|---|
| COUNTY OF SANTA CLARA,<br>     *Plaintiff-Appellee*,<br><br>    v.<br><br>DONALD J. TRUMP, President of<br>the United States; JEFFERSON B.<br>SESSIONS III, Attorney General,<br>Attorney General of the United<br>States; KIRSTJEN NIELSEN,<br>Secretary of Homeland<br>Security; ELAINE C. DUKE;<br>MICK MULVANEY, Director,<br>OMB; UNITED STATES OF<br>AMERICA,<br>     *Defendants-Appellants.* | No. 17-17480<br><br>D.C. No.<br>3:17-cv-00574-WHO<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted April 11, 2018
San Francisco, California

Filed August 1, 2018

Before: Sidney R. Thomas, Chief Judge, and Ferdinand F.
Fernandez and Ronald M. Gould, Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge Fernandez

# SUMMARY[*]

## Separation of Powers/Executive Authority/Immigration

The panel (1) affirmed the district court's grant of summary judgment in favor of the City and County of San Francisco and the County of Santa Clara in an action challenging Executive Order 13,768, "Enhancing Public Safety in the Interior of the United States," which directed the withholding of federal grants to so-called sanctuary jurisdictions; (2) vacated a nationwide injunction; and (3) remanded.

The Executive Order cross-references 8 U.S.C. § 1373, which prohibits government entities from themselves prohibiting the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 9 of the Executive Order provides that the Attorney General and the Secretary of the Department of Homeland Security, "in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary."

As a preliminary matter, the panel concluded that the Counties demonstrated standing to bring their action, and that the case was ripe for review.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that, under the principle of Separation of Powers and in consideration of the Spending Clause, which vests exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization. Because Congress has not acted, the panel affirmed the district court's grant of summary judgment to the City and County of San Francisco and the County of Santa Clara. However, given the absence of specific findings underlying the nationwide application of the injunction, the panel vacated the nationwide injunction and remanded for reconsideration and further findings.

Dissenting, Judge Fernandez concluded that the case is not ripe for review. Addressing the merits because the majority did so, Judge Fernandez also wrote that the district court's failure to accord the Executive Order a fair enough reading resulted in its abusing its discretion when it issued the injunction.

**COUNSEL**

Chad Readler (argued), Acting Assistant Attorney General; Alex G. Tse, Acting United States Attorney; Mark B. Stern, Daniel Tenny, and Brad Hinshelwood, Appellate Staff; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Christine Van Aken (argued), Yvonne R. Meré, Ronald P. Flynn, Jesse C. Smith, Neha Gupta, Matthew S. Lee, Aileen M. McGrath, Sara J. Eisenberg, Mollie M. Lee, Tara M. Steeley, and Dennis J. Herrera, City Attorney; Office of the City Attorney, San Francisco, California; for Plaintiff-Appellee City and County of San Francisco.

Danielle L. Goldstein (argued), Adriana L. Benedict, Laura S. Trice, Julie Wilensky, Kavita Narayan, L. Javier Serrano, Greta S. Hansen, and James R. Williams, County Counsel; Office of the County Counsel, San Jose, California; Tejinder Singh, Sarah E. Harrington, and Kevin K. Russell, Goldstein & Russel P.C., Bethesda, Maryland; for Plaintiff-Appellee County of Santa Clara.

**OPINION**

THOMAS, Chief Judge:

This appeal presents the question of whether, in the absence of congressional authorization, the Executive Branch may withhold all federal grants from so-called "sanctuary" cities and counties. We conclude that, under the principle of Separation of Powers and in consideration of the Spending Clause, which vests exclusive power to Congress to impose conditions on federal grants, the Executive Branch may not refuse to disperse the federal grants in question without congressional authorization. Because Congress has not acted, we affirm the district court's grant of summary judgment to the City and County of San Francisco and the County of Santa Clara (collectively, the "Counties"). However, given the absence of specific findings underlying the nationwide application of the injunction, we vacate the nationwide injunction and remand for reconsideration and further findings.

I

A

The United States Constitution exclusively grants the power of the purse to Congress, not the President. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause)[1]; U.S. Const.

---

[1] "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

art. I, § 8, cl. 1 (Spending Clause).[2] As Alexander Hamilton succinctly put it, Congress "commands the purse." THE FEDERALIST, NO. 78. James Madison underscored the significance of that exclusive congressional power, stating, "[t]he power over the purse may [be] the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." THE FEDERALIST, NO. 58.

Congress's power to spend is directly linked to its power to legislate. "Incident to [the spending] power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)).

On the other hand, as the Supreme Court has observed, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress. Simply put, "the President does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). And, "the President may not decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* at 259.

---

[2] "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

The Separation of Powers was an integral part of the Founders' design. The Constitution and its history evidence the "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *I.N.S. v. Chadha*, 462 U.S. 919, 959 (1983). "The power to enact statutes may only 'be exercised in accord with a single, finely wrought and exhaustively considered, procedure.'" *Clinton*, 524 U.S. at 439–40 (quoting *Chadha*, 462 U.S. at 951). Indeed, even when Congress specifically authorized the President's action, the President's attempt to exercise authority through a line-item veto was deemed unconstitutional as antithetical to that "finely wrought" legislative process committed to Congress by the Constitution. *Id.* at 439. As Justice Kennedy has observed, if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Id.* at 451 (Kennedy, J., concurring).

### B

With these Separation of Powers principles in mind, we turn to the question at hand. At issue in this appeal is Executive Order 13,768, "Enhancing Public Safety in the Interior of the United States," which was signed by the President on January 25, 2017—five days after his inauguration. Exec. Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (hereinafter "Executive Order" or "EO"). The Executive Order's primary concern is "sanctuary jurisdictions," which, in the President's view, "willfully violate Federal law in an attempt to shield aliens from removal from the United States." EO § 1. "The purpose of this order is to direct executive departments and agencies . . .

to employ all lawful means to enforce the immigration laws of the United States." EO § 1.

Most relevant for our consideration is § 9(a) of the Executive Order, which specifically addresses the federal government's potential recourses against sanctuary jurisdictions. In its entirety, § 9 reads:

> It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.

> (a) In furtherance of this policy, the Attorney General and the Secretary [of the Department of Homeland Security ("DHS")], in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

> (b) To better inform the public regarding the public safety threats associated with

    sanctuary jurisdictions, the Secretary shall utilize the Declined Detainer Outcome Report or its equivalent and, on a weekly basis, make public a comprehensive list of criminal actions committed by aliens and any jurisdiction that ignored or otherwise failed to honor any detainers with respect to such aliens.

    (c) The Director of the Office of Management and Budget is directed to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction.

Below, under the heading "General Provisions," the Executive Order provides that it "shall be implemented consistent with applicable law and subject to the availability of appropriations." EO § 18(b). The Executive Order cross-references 8 U.S.C. § 1373, which prohibits government entities from themselves prohibiting the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a).

    In sum, by its plain terms, the Executive Order directs the agencies of the Executive Branch to withhold funds appropriated by Congress in order to further the Administration's policy objective of punishing cities and counties that adopt so-called "sanctuary" policies.

C

For us, then, the question is whether the Executive Order violates the Separation of Powers, pursuant to which the Constitution committed the Spending power to Congress.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Justice Jackson's *Youngstown* concurrence provides the operative test in this context:

> When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring).

In this instance, because Congress has the exclusive power to spend and has not delegated authority to the Executive to condition new grants on compliance with § 1373, the President's "power is at its lowest ebb." *Id.* at

637.  And when it comes to spending, the President has none of "his own constitutional powers" to "rely" upon.  *Id.*

Rather, the President has a corresponding obligation—to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.   Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations. Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the President's constitutional role.   As then-Assistant Attorney General William Rehnquist noted in 1969, "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."   Office of Legal Counsel, Memorandum Opinion on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, at 8 (Dec. 1, 1969).  And, even if the President's duty to execute appropriations laws was once unclear, Congress has affirmatively and authoritatively spoken. 2 U.S.C. §§ 681–688 (establishing congressional oversight when the Executive defers budget authority).[3]

---

[3] In enacting the cited provisions as part of 1974's Congressional Budget & Impoundment Act, Congress acted "to restore responsibility for the spending policy of the United States to the legislative branch. . . .  No matter how prudently Congress discharges its appropriations responsibility, legislative decisions have no meaning if they can be unilaterally abrogated by executive impoundments."  H.R. REP. NO. 93-658, *as reprinted in* 1974 U.S.C.C.A.N. 3462, 3463; *see also* S. REP. NO. 93-688, *as reprinted in* 1974 U.S.C.C.A.N. 3504, 3572–3575 (collecting cases "consistently den[ying]" the Executive Branch's attempts to refuse spending as a means "to achieve less than the full objectives and scope of programs enacted and funded by Congress").

Here, the Administration has not even attempted to show that Congress authorized it to withdraw federal grant moneys from jurisdictions that do not agree with the current Administration's immigration strategies. Nor could it. In fact, Congress has frequently considered and thus far rejected legislation accomplishing the goals of the Executive Order.[4] The sheer amount of failed legislation on this issue demonstrates the importance and divisiveness of the policies in play, reinforcing the Constitution's "unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process." *Chadha*, 462 U.S. at 959. Not only has the Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate.

Because the Executive Order directs Executive Branch administrative agencies to withhold funding that Congress has not tied to compliance with § 1373, there is no reasonable argument that the President has not exceeded his authority.

---

[4] *See* Ending Sanctuary Cities Act of 2016, H.R. 6252, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016); Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015); Sanctuary City All Funding Elimination Act of 2015, H.R. 3073, 114th Cong. 2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015); Improving Cooperation with States and Local Governments and Preventing the Catch and Release of Criminal Aliens Act of 2015, S. 1812, 114th Cong. (2015); Protecting American Citizens Together Act, S. 1764, 114th Cong. (2015); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015); A Bill to Prohibit Appropriated Funds from Being Used in Contravention of Section 642(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, S. 80, 114th Cong. (2015).

Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals. Because Congress did not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers. The district court properly entered summary judgment in favor of the Counties.[5]

II

The Administration argues that the Counties lack standing. Of course, our jurisdiction is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy . . . [that] limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Standing exists only where the plaintiff demonstrates "that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision

---

[5] In granting summary judgment, the district court concluded that: (1) the Executive Order violated the Separation of Powers; (2) even if the President had acted within authority delegated to him by Congress, the congressional action would violate the Spending Clause; (3) the Executive Order violated the Tenth Amendment's anti-commandeering principle; (4) the Executive Order is void for vagueness under the Fifth Amendment; and (5) the Executive Order infringed upon the Counties' procedural due process rights. Given our resolution of the merits on the basis of the Separation of Powers, it is unnecessary for us to decide the merits of the other bases of the district court's decision.

will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

### A

A "loss of funds promised under federal law[ ]satisfies Article III's standing requirement." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015). Both San Francisco and Santa Clara rely heavily on federal funding, much of which is distributed through the State of California. Approximately $1.2 billion of San Francisco's yearly budget of $9.6 billion comprises federal funds. Santa Clara received approximately $1.7 billion in federal and federally dependent funds in the 2015–2016 fiscal year, totaling about 35% of the County's total revenue.

Both counties have in place policies intended to protect immigrant communities and to encourage community policing measures. San Francisco is a self-described "City and County of Refuge." S.F. Admin. Code § 12H.1. San Francisco prohibits city and county entities and employees from

> us[ing] any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding release status of individuals or any other such [confidential, identifying information about an individual] unless such assistance is required by Federal or State statute, regulation, or court decision.

S.F. Admin. Code § 12H.2. Prior to July 2016, the San Francisco Administrative Code prohibited city employees

from sharing information about immigration status, but the restriction was removed out of concern for its potential conflict with 8 U.S.C. § 1373.

Since 2010, Santa Clara has barred its employees from using County resources to communicate with Immigrations and Customs Enforcement ("ICE") regarding any information collected in the course of providing critical services or benefits. Cty. of Santa Clara Bd. of Supervisors Resolution No. 2010-316, "Advancing Public Safety and Affirming the Separation Between County Services and the Enforcement of Federal Civil Immigration Law" (June 22, 2010). The County also prohibits employees from "initiat[ing] any inquiry or enforcement action based solely on the individual's actual or suspected immigration status, national origin, race, ethnicity, and/or inability to speak English" and from using County resources to pursue an "individual solely because of an actual or suspected civil violation of federal immigration law." *Id.*

In sum, the Counties have policies in place that arguably would qualify for grant withdrawal under the Executive Order, with potentially devastating fiscal consequences. They have demonstrated a likely "loss of funds promised under federal law." *Organized Vill. of Kake*, 795 F.3d at 965.

B

The Administration argues that there is no "imminent" injury because the Executive Order may not be enforced. *Massachusetts v. EPA*, 549 U.S. at 517. We shall discuss the threat of enforcement later. However, the possibility of non-enforcement does not mean that the Counties lack standing.

*Virginia v. American Booksellers Association* is illustrative. There, the Court was "not troubled" by the possibility that a law would not be enforced against the plaintiffs. 484 U.S. 383, 393 (1988). It was enough that, if the plaintiffs' "interpretation of the statute [was] correct," the plaintiffs would face serious repercussions in the absence of "significant and costly compliance measures." *Id.* at 392. There, as here, the parties disputed the scope of the challenged measure, with the plaintiffs anticipating its application to them and the defendants arguing for a narrower reading. *Id.* at 390. There, too, as is the case here, the defendant ostensibly conceded the measure's unconstitutionality if the plaintiffs' interpretation was given effect. *Id.* at 393.

Here, the case for standing is even stronger than in *American Booksellers*. Like the plaintiffs in *American Booksellers*, the Counties have demonstrated that, if their interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences. As we will discuss later, the Administration has consistently evinced its intent to enforce the Executive Order, and it has made clear that the Counties, and the State of California, are likely targets. There is no dispute between the parties that, provided the Counties' injuries are sufficiently "concrete" and "imminent," the Counties can satisfy causation and redressability. Because a loss of funds promised under federal law satisfies Article III's standing requirement, the Counties have met their burden to show standing.

III

The Administration also contends that this case is not ripe for review. The Administration's argument is premised entirely on our decision in *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1138 (9th Cir. 2000). In *Thomas*, we summarized three factors to be used "[i]n evaluating the genuineness of a claimed threat of prosecution": (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question"; (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute." *Id.* at 1139 (quoting *San Diego Cty. Gun Rights Comm'n v. Reno*, 98 F.3d 1121, 1126–27 (9th Cir. 1996)).

As to the first factor, as we have discussed, the Counties have demonstrated that their policies are presently in conflict with the Administration's federal immigration policy as described in the Executive Order. We therefore conclude that the Counties have "articulated . . . concrete plan[s]" to violate the law as asserted in the Executive Order. *Thomas*, 220 F.3d at 1139 (internal quotation marks omitted).

As to the second factor, there is no doubt that the prosecuting authorities "have communicated specific warning[s and] threat[s] to initiate proceedings." *Id.* The Administration quickly and repeatedly announced that the Executive Order would eradicate sanctuary policies by authorizing the wholesale defunding of cities that do not assist the Administration in enforcing its hardline immigration policy. The day that the Executive Order went into effect, then-Press Secretary Sean Spicer said at the daily White House press briefing, "We're going to strip federal

grant money from sanctuary states and cities that harbor illegal immigrants." Priscilla Alvarez, *Trump Cracks Down on Sanctuary Cities*, THE ATLANTIC (Jan. 25, 2017), http://www.theatlantic.com/politics/archive/2017/01/trump-crack-down-sanctuary-city/514427. The President echoed Press Secretary Spicer's statements the next day at the Congressional Republicans Retreat, where he discussed the Executive Order as a "first step[] in our immigration policy, . . . at long last, cracking down on sanctuary cities." C-SPAN, *President Trump's Remarks at Congressional Republican Retreat* (Jan. 26, 2017), http://www.c-span.org/video/?422829-1/president-trump-tells-congressional-republicans-now-deliver. A White House Press Release issued days later summarized the Executive Order: "President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, including halting federal funding for sanctuary cities." Press Release, White House, "President Trump's First Week of Action" (Jan. 28, 2017).

On February 1st, Press Secretary Spicer was unequivocal: "the President has been very clear through his executive order that federal funds, paid for by hardworking taxpayers, should not be used to help fund sanctuary cities." Press Briefing, White House Press Secretary Sean Spicer (Feb. 1, 2017). Days later, the President described defunding as a "weapon" to be deployed against sanctuary cities to force them to change their policies. Bill O'Reilly Interview with President Donald J. Trump (Feb. 5, 2017), transcript available at http://transcripts.cnn.com/transcripts/1702/05/cnr.05.html. The Attorney General was more specific in his public statements, stating that noncompliance with § 1373 would result in "withholding grants, termination of grants, and disbarment or ineligibility for future grants." Press Briefing,

White House Press Secretary Spicer with Attorney General Sessions (March 27, 2017).

The State of California has been a specific target of the Administration's anti-sanctuary cities policies from the Administration's beginning. In a February 5, 2017 interview with Bill O'Reilly, President Trump said, "I'm very much opposed to sanctuary cities. . . If we have to defund, we give tremendous amounts of money to California . . . . California in many ways is out of control." Bill O'Reilly Interview with President Donald J. Trump. ICE has designated California, Santa Clara, and San Francisco as jurisdictions that "Restrict Cooperation with ICE." ICE, Enforcement & Removal Operations: Weekly Declined Detainer Outcome Report for Recorded Declined Detainers Feb. 11–Feb. 17, 2017 § 3. And the Attorney General penned an op-ed holding San Francisco up as an example of a sanctuary city that ought to "re-evaluate [sanctuary] policies." Jeff Sessions, John Culberson, Dennis Herrera, & Jose Antonio Vargas, *4 Voices: Are Sanctuary Cities Good for the Community?*, SAN FRANCISCO CHRONICLE (Apr. 7, 2017). Indeed, the district court noted that California and its cities, especially San Francisco, were visible targets of the Administration's intent to defund sanctuary jurisdictions.

As to the third factor, DOJ has identified three grants historically conditioned on compliance with § 1373, all of which are law enforcement-related: the State Criminal Alien Assistance Program grant; the Edward Byrne Memorial Justice Assistance grant; and the Community Oriented Policing Services grant. Thus, the Counties have shown a "history of past prosecution or enforcement" tied to compliance with 8 U.S.C. § 1373, the statute relied upon as

authorization for the Executive Order.  *Thomas*, 220 F.3d at 1139.

In sum, the Counties have satisfied the factors we identified in *Thomas* to evaluate the genuineness of a claimed threat of prosecution.  Given the severe potential for harm and the likelihood of prosecution, the controversy is ripe for adjudication.

## IV

On the merits, the Administration argues that the Executive Order is all bluster and no bite, representing a perfectly legitimate use of the presidential "bully pulpit," without any real meaning—"gesture without motion," as T.S. Eliot put it.  Looking to its plain language, the Administration contends, the Executive Order is merely a directive to DHS and DOJ to condition a limited number of grant programs—as of now, three—on compliance with § 1373.[6] However, even if we ignore the statements made by and on behalf of the Administration outside the context of this litigation, the Administration's interpretation of the Executive Order strains credulity.   And consideration of those statements suggests that the Administration's current litigation position is grounded not in the text of the Executive Order but in a desire to avoid legal consequences.

---

[6] The Administration has been unable to identify any grant programs it may condition on compliance with § 1373 except for those programs that were so conditioned prior to issuance of the Order.

### A

Executive orders are unlike both statutes and other agency actions. In contrast to the many established principles for interpreting legislation, there appear to be few such principles to apply in interpreting executive orders. *Compare Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) ("[F]or purposes of this case we shall assume, *arguendo*, that the severability standard for statutes also applies to Executive Orders."), *and F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("We know of no precedent for applying [the canon of constitutional avoidance] to limit the scope of an authorized executive action."), *with Ex parte Mitsuye Endo*, 323 U.S. 283, 298 (1944) ("We approach the construction of Executive Order No. 9066 as we would approach the construction of legislation in this field.").

However, one interpretive principle is clear, and its application is dispositive. "As is true of interpretation of statutes, the interpretation of an Executive Order begins with its text," which "must be construed consistently with the Order's 'object and policy.'" *Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005) (quoting *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996)).

### B

Section 9(a) orders "the Attorney General and the Secretary" to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary." At minimum, regardless of the potential

ambiguity of the term "sanctuary jurisdictions" throughout the Executive Order, this particular provision threatens defunding those jurisdictions that do not comply with § 1373.

"Under the doctrine of '*inclusio unius est exclusio alterius*' (the inclusion of one is the exclusion of the other), 'when a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.'" *United States v. Terrence*, 132 F.3d 1291, 1294 (9th Cir. 1997) (alteration omitted) (quoting *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312–13 (9th Cir. 1992)). The canon applies here. By specifically excluding grants "deemed necessary for law enforcement purposes," the Executive Order directs the Attorney General and the Secretary to cut all other grant programs.

This interpretation is supported by a reading of § 9(a) in the broader context of § 9, directed toward ensuring States' and localities' compliance with § 1373. Section 9(c) directs "[t]he Director of the Office of Management and Budget . . . to obtain and provide relevant and responsive information on all Federal grant money that currently is received by any sanctuary jurisdiction." There would be little reason for the Director to perform such a comprehensive review if the Executive Order meant only that DOJ should continue to do what it has been doing all along. Moreover, the Executive Order, at minimum, addresses both DOJ and DHS grants, and the existing grant programs conditioned on compliance with § 1373 are administered solely by DOJ. All grants are in play. On its face, the Executive Order threatens to withdraw all federal grants from jurisdictions the Administration deems noncompliant with § 1373, except for those "deemed necessary for law enforcement purposes." EO § 9(a). It

would be incongruous for us to say it does not mean what it says.

### C

Additionally, the Administration raises a textual argument, solely dependent on three words: "consistent with law." The Attorney General and Secretary are directed to condition grants on compliance with § 1373 "in their discretion and to the extent consistent with law." EO § 9(a).

Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language. *See, e.g.*, *Shomberg v. United States*, 348 U.S. 540, 547–48 (1955) (refusing to "nullify" "clear legislative purpose" to give effect to a savings clause). This principle is neither controversial nor surprising: "It is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).

The Administration cites *Building & Construction Trades Department v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002), for support. In that case, the D.C. Circuit considered an executive order with a savings clause, rejecting the plaintiffs' argument that "notwithstanding the President's instruction that the Executive Order be applied only '[t]o the extent permitted by law,' a particular agency may try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute." *Allbaugh*, 295 F.3d at 33. *Allbaugh* is distinguishable. Because the Executive Order

unambiguously commands action, here there is more than a "mere possibility that some agency might make a legally suspect decision." *Id.* The Executive Order's savings clause does not and cannot override its meaning.

Further, the Administration's interpretation would simply lead us into an intellectual cul-de-sac. If "consistent with law" precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues.

The district court correctly rejected this argument.

V

The Administration also claims that an interpretation of the Executive Order by the Attorney General following the district court's entry of a preliminary injunction saves the Executive Order from constitutional infirmity.

A

The district court enjoined "[t]he defendants (other than the President) . . . from enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions." The injunction did not extend to "the Government's ability to use lawful means to enforce existing conditions of federal grants or 8 U.S.C. 1373, nor [did] it restrict the Secretary from developing regulations or preparing guidance on designating a jurisdiction a 'sanctuary jurisdiction.'" The injunction did not enjoin any action by the President himself but only by the Administration officials charged with following his commands.

About one month after the issuance of the preliminary injunction, the Attorney General issued a Memorandum ("DOJ Memorandum") interpreting the Executive Order. Memorandum, Implementation of Executive Order 13768, "Enhancing Public Safety in the Interior of the United States" (May 22, 2017). The DOJ Memorandum is directed internally, to "all department grant-making components." *Id.* Although it does not mention the preliminary injunction, the DOJ Memorandum essentially counters the district court's interpretation of the Executive Order and its analysis of the constitutional problems arising from that interpretation.

The DOJ Memorandum states that § 9(a) "is directed to the Attorney General and the Secretary of Homeland Security" and "will be applied solely to federal grants administered by the Department of Justice or the Department of Homeland Security, and not to other sources of federal funding." *Id.* The DOJ Memorandum provides that, because § 9(a) includes a savings clause, the Executive Order "does not call for the imposition of grant conditions that would violate any applicable constitutional or statutory limitation." *Id.* Rather, the DOJ Memorandum claims, the Administration will merely continue to require certification of compliance with 8 U.S.C. § 1373 as a condition for receiving "any existing grant . . . that expressly contains this certification condition and to future grants for which the Department is statutorily authorized to impose such a condition." *Id.* Moreover, the term "sanctuary jurisdiction," according to the DOJ Memorandum, "for purposes of enforcing the Executive Order, . . . will refer only to jurisdictions that 'willfully refuse to comply with 8 U.S.C. 1373.'" *Id.* Essentially, the Administration argues that the DOJ Memorandum renders the Executive Order a toothless threat.

The same day that the DOJ Memorandum was issued, the federal government filed a motion for reconsideration, relying almost entirely on the DOJ Memorandum. The district court concluded that the DOJ Memorandum did not change the controlling law, or the material facts, because the DOJ Memorandum was "functionally an 'illusory promise' to enforce the Executive Order narrowly and, as such, does not resolve the constitutional claims that the Counties have brought based on the [Executive] Order's language."

Consistent with the district court's rejection of this argument, after the preliminary injunction was issued, other statements made by and on behalf of the Administration, including statements made by the Attorney General, contradict the DOJ Memorandum. Indeed, the Attorney General himself—both before and after the district court's order—has continuously represented that localities "violate federal law" by refusing to honor detainer requests.[7] Press

---

[7] Identified in § 9(b) of the Order, detainer requests are communications from ICE to local law enforcement seeking the continued detention of state detainees after their scheduled release. 8 C.F.R. § 287.7. ICE does not reimburse local jurisdictions for the costs of continued detention, and compliance with a request is voluntary. *See Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) ("[S]ettled constitutional law clearly establishes that [immigration detainers] must be deemed requests" to avoid conflict with the Tenth Amendment.).

In addition to implicating federalism concerns, detainers create potential Fourth Amendment problems. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 413 (2012) ("Detaining individuals solely to verify their immigration status would raise constitutional concerns."); *Morales v. Chadbourne*, 793 F.3d 208, 215–17 (1st Cir. 2015) (affirming denial of qualified immunity to ICE agent and his supervisors when agent issued detainer without probable cause); *Miranda-Olivares v. Clackamas Cty.*, 2014 WL 1414305, at *9–11 (D. Or. Apr. 11, 2014) (granting summary

Briefing, White House Press Secretary Spicer with Attorney General Sessions (March 27, 2017).

Similarly, in sworn testimony before Congress specifically addressing the reach of the Executive Order, the acting director of ICE equated violation of § 1373 with policies "where [localities] don't honor detainers or allow us access to the jails." *Hearing on the ICE & CBP F.Y. 2018 Budget Before the Subcommittee on Homeland Security of the H. Comm on Appropriations*, 115th Cong., 2017 WLNR 18737622 (June 13, 2017). And the same day that the district court issued its preliminary injunction, the White House issued an official statement that "[s]anctuary cities, like San Francisco, block their jails from turning over criminal aliens" and "are engaged in the dangerous and unlawful nullification of Federal law." Statement, White House, Statement on Sanctuary Cities Ruling (Apr. 25, 2017).

### B

The Administration asks us to look beyond the Executive Order's text and the Administration's rhetoric to give controlling construction to the DOJ Memorandum. In light of the Executive Order's plain meaning and the Administration's contrary interpretations of the Executive Order, we cannot defer to the DOJ Memorandum.

---

judgment to detainee against county regarding its "custom or practice in violation of the Fourth Amendment to detain individuals over whom the County no longer has legal authority based only on an ICE detainer which provides no probable cause for detention").

1

As a general rule, we give significant weight to an agency interpretation of an executive order. Because an agency has "presumed expertise in interpreting executive orders charged to its administration," the Court generally will "review such agency interpretations with great deference." *Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981). "To be sustained, the agency's interpretation need not be the only reasonable interpretation. All that is required is that the interpretation adopted by the agency be reasonable. The agency interpretation is considered reasonable unless it is plainly erroneous or inconsistent with the order." *Id.* at 15–16 (citations and quotation marks omitted).

2

Here, the general rule does not apply, and we must respectfully decline to give deference to the DOJ Memorandum.

First, the DOJ Memorandum is not consistent with the terms of the Executive Order because the Executive Order plainly commands the Attorney General and the Secretary to withdraw essentially all federal grants. The DOJ Memorandum is not a reasonable interpretation of the Executive Order because it is "inconsistent with the order" itself. *Id.* at 15–16. As discussed above, the Executive Order plainly threatens all federal grant money except that "deemed necessary for law enforcement purposes." EO § 9(a). The DOJ Memorandum, if binding, is therefore an abdication of the Attorney General's duties under the Executive Order. And the Administration's claim that the Executive Order has

meant nothing all along is belied by the Executive Order itself and the Administration's public statements.

Second, where, as here, an agency's interpretation involves an issue of "deep 'economic and political significance,'" it may not be entitled to deference. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *Utility Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014)). This is particularly true where the agency lacks expertise and has not been expressly delegated the authority to interpret the law. *Id.* Aside from its boilerplate savings clause, the Executive Order made no mention of the significant legal issues raised within the Executive Order, and so it cannot be that analysis of those issues was expressly delegated to the Attorney General.

Third, the DOJ Memorandum has no force outside of the Department of Justice. The DOJ Memorandum is addressed to "All Department Grant-Making Components," with "Department" referring singularly to the Department of Justice. It does not bind other agencies.

Finally, the memo is a "*post hoc* justification adopted in response to litigation." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 614 (2013). The timing of the DOJ Memorandum cannot be ignored. It took months for the Administration to interpret the Executive Order narrowly, and it took a preliminary injunction for the Attorney General to issue the DOJ Memorandum.

3

If we look beyond the text of the Executive Order, the Administration's position becomes considerably weaker. The

parties have not directed us to any public statement made by or on behalf of the Administration that is consistent with the DOJ Memorandum—even after the district court entered summary judgment and a permanent injunction in favor of the Counties.

Given our command to interpret the Executive Order "consistently with its 'object and policy,'" *Bassidji*, 413 F.3d at 934, we consider the public statements made by the Administration, up to and including the President. For one thing, a president's statements guide those tasked with enforcing the Executive Order. *See Cole v. Young*, 351 U.S. 536, 556 (1956) ("[An executive order's] failure to state explicitly what determinations are required leaves no choice to the agency heads but to follow the most reasonable inferences to be drawn."). And for another, the Administration's public statements are indicative of both the object of and policy supporting the Executive Order. *Bassidji*, 413 F.3d at 934; *see also, e.g.*, *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 274–75 (1975) (considering a presidential announcement accompanying the signing of an executive order); *Bassidji*, 413 F.3d at 935 (considering letter to congressional leaders discussing an executive order); *Islamic Rep. of Iran v. Boeing Co.*, 771 F.2d 1279, 1284 (9th Cir. 1985) (considering President Reagan's explanation of an executive order to Congress).

While the Administration's statements cannot alter the plain meaning of the Executive Order, *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 329–30 (1994), here the statements confirm what we have learned from the text of the Executive Order—that the Administration intends to cripple jurisdictions that do not assist in enforcing federal

immigration policy. The President himself stated that he would use defunding as a "weapon"—and particularly against California. Bill O'Reilly Interview with President Donald J. Trump. Press Secretary Spicer, announcing the Executive Order, said that President Trump would "make sure that . . . counties and other institutions that remain sanctuary cities don't get federal government funding in compliance with the executive order." Press Briefing, White House Press Secretary Sean Spicer (Feb. 8, 2017).

### 4

For these reasons, the district court properly denied the motion for reconsideration based on the DOJ Memorandum.

### VI

We turn now to the relief granted by the district court—a permanent nationwide injunction barring Administration officials "from enforcing Section 9(a) of the Executive Order against jurisdictions they deem as sanctuary jurisdictions." The district court granted the Counties' motions for summary judgment as to the constitutionality of § 9(a) of the Executive Order, permanently enjoining its enforcement. The court's analysis largely followed its reasoning in the preliminary injunction order. The scope of the injunction is the same, applying not to the President but to Administration officials tasked with carrying it out. We agree that the Counties are entitled to injunctive relief, but we remand for reexamination of the nationwide scope of the injunction.

### A

The Counties are entitled to injunctive relief. An injunction is appropriate when the party seeking relief demonstrates that: (1) it is likely to suffer irreparable injury that cannot be redressed by an award of damages; (2) that "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (3) "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The Administration's argument as to the first and third factors is indistinguishable from its position on the Executive Order's interpretation. Because the Executive Order contemplates no illegal conduct, the argument goes, the Counties cannot be injured and the public interest is at least indifferent to the injunction. We disagree with the Administration's interpretation of the Executive Order, and we therefore disagree with its argument regarding the propriety of the injunction. A total loss of federal funding would be catastrophic, and the Counties' (and their residents') need for certainty renders damages inadequate. *Id.* And the public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services. *Id.*

Additionally, the balance of hardships tips in favor of enjoining enforcement of § 9(a) against the Counties. Indeed, the Administration has not even attempted to argue that the injunction causes it any burden at all. *See Melendres*, 695 F.3d at 1002 ("The Defendants cannot be harmed by an order enjoining an action they will not take.").

B

While we agree that the district court was correct to enjoin the Administration from enforcing § 9(a) against the Counties, the present record is not sufficient to support a nationwide injunction. We therefore vacate the injunction and remand for careful consideration by the district court.

"Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreax*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted). This is so, in part, because broad injunctions may stymie novel legal challenges and robust debate. *See Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("We have in many instances recognized that when frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court.").

In recent cases, we have upheld nationwide injunctions when "necessary to give Plaintiffs a full expression of their rights." *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) (per curiam), *rev'd on other grounds Trump v. Hawaii*, 585 U.S. ___, 2018 WL 3116337 (2018); *see also Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017) (per curiam). These exceptional cases are consistent with our general rule that "[w]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown"—"an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit . . . if such breadth is necessary to give prevailing parties the relief to which they

are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987).

Here, the Counties' tendered evidence is limited to the effect of the Order on their governments and the State of California. The record supports their claim that their budgets depend on grants awarded to themselves and to the State of California. Further, the evidence supports the conclusion that the Counties and the State of California were particular targets of the Executive Order. However, the record is not sufficiently developed on the nationwide impact of the Executive Order. *Cf. City of Chicago v. Sessions*, 888 F.3d 272, 292–93 (7th Cir. 2018) (affirming a nationwide injunction in part because the statute "interconnects" all recipients of Byrne JAG grants).

We are unpersuaded by the Administration's arguments in favor of a blanket restriction on all nationwide injunctions. And we do not wish to interfere with the district court's considerable discretion in ordering an appropriate equitable remedy. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Intern. Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). However, because the record is insufficiently developed as to the question of the national scope of the injunction, we vacate the injunction to the extent that it applies outside California and remand to the district court for a more searching inquiry into whether this case justifies the breadth of the injunction imposed.

## VII

The district court granted summary judgment to the Counties, determining that § 9(a) of Executive Order 13,768, "Enhancing Public Safety in the Interior of the United States," is unconstitutional and enjoining enforcement of that section. If it were to enforce the Executive Order, the Executive would assert a power that belongs solely to Congress by withdrawing funds in the absence of congressional authorization. We therefore affirm the grant of summary judgment. Although we agree that the Counties are entitled to an injunction as to the Executive Order's effect in California, the record as presently developed does not justify a nationwide injunction. Thus, we vacate the nationwide injunction and remand for further consideration by the district court in the first instance. We need not—and do not—reach any other issues urged by the parties.

**AFFIRMED in part; VACATED in part; and REMANDED.[8]**

Each party to bear its own costs.

---

[8] All pending motions are denied as moot.

FERNANDEZ, Circuit Judge, dissenting:

Congress has the authority to enact legislation regarding immigration and nationality.[1] That entails legislation that determines which foreign citizens are permitted to cross the borders of the United States and live within this country. Congress has done so,[2] and those determinations have duly become the laws of the United States.[3] Also, the president "shall take Care that the Laws be faithfully executed."[4] It came to the attention of President Trump that some individuals in the country did not agree with the laws duly passed in the area of immigration and nationality. Those individuals were of the opinion that they and others who agreed with their position should delay or thwart the execution of those laws. To that end they had prevailed upon local and state governmental entities in the places they resided to pass laws that were designed to at least reduce the cooperation of state or local government officials and entities with federal immigration officials and entities. For example, the City and County of San Francisco and the County of Santa Clara (hereafter "the Counties") have enacted ordinances or policies that at least etiolated the Counties' government officials' cooperation with or giving of information to federal immigration authorities when those county officials were acting in an official capacity. *See* S.F., Cal., Admin. Code §§ 12H.1–.6, 12I.1–.7; County of Santa

---

[1] *See* U.S. Const. art. I, § 8, cl. 4; *Toll v. Moreno*, 458 U.S. 1, 10, 102 S. Ct. 2977, 2982, 73 L. Ed. 2d 563 (1982).

[2] *See, e.g.*, United States Code, Title 8.

[3] *See* U.S. Const. art. I, § 7, cl. 2.

[4] U.S. Const. art. II, § 3.

Clara, Cal., Board of Supervisors Policy 3.54, Civil Immigration Detainer Requests (Oct. 18, 2011); County of Santa Clara, Cal., Board of Supervisors Resolution 2010-316, Advancing Public Safety and Affirming the Separation Between County Services and the Enforcement of Federal Civil Immigration Law (June 22, 2010). For its part, based on the animus that animated those ordinances, the State of California imposed similar restrictions upon all law enforcement officials. *See* Cal. Gov't Code §§ 7282–7282.5; *id.* §§ 7284–7284.12; *see also id.* §§ 7285.1–7285.3 (prohibiting employers' voluntary cooperation with federal immigration agents' access or entry); *id.* § 7310 (directing housing prohibitions regarding non-citizens in immigration custody); *id.* § 12532 (conducting detention facility inspections); Cal. Lab. Code § 1019.2 (prohibiting reverification of employment eligibility by an employer).

In partial response to that kind of legislation and action, the President issued an executive order,[5] which directs certain high officers of the United States government as follows:

> Sanctuary Jurisdictions. It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or political subdivision of a State, shall comply with 8 U.S.C. 1373.
>
> (a) In furtherance of this policy, the Attorney General and the Secretary [of Homeland Security], in their discretion and to the extent consistent with law, shall ensure that

---

[5] Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017) (hereafter the "Executive Order").

> jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

Executive Order § 9(a). Of course, the Executive Order does make 8 U.S.C. § 1373 the foundation of section 9(a)'s directives. Section 1373 reads as follows in pertinent part:

> (a) . . . Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

> (b) . . . Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect

to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

I note that on its face the section does not dragoon state or local officials into federal government service,[6] but, rather, merely precludes governmental entities or officials from prohibiting or restricting other governmental entities or officials from communicating with the Immigration and Naturalization Service.[7] It does not require any entity or person to communicate any information to the Service, or to do anything with information received from the Service. Besides the section's rather mild requirement, lest there be any doubt, the Attorney General has essentially declared that he will, indeed, adhere to the Executive Order's requirement

---

[6] *See Printz v. United States*, 521 U.S. 898, 928, 117 S. Ct. 2365, 2381, 138 L. Ed. 2d 914 (1997).

[7] *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, ___ U.S. ___, ___, 138 S. Ct. 1461, 1477, ___ L. Ed. 2d ___ (2018) (discussing principles behind the anticommandeering rule, none of which supports attempts to frustrate the carrying out of national programs and policies (like immigration) by prohibiting communications between national and state or local officials).

that any steps he takes must be consistent with law. *See* Memorandum for All Department Grant-Making Components from the Attorney General relating to Implementation of the Executive Order (May 22, 2017) (hereafter, "the Formal Memorandum").

Nevertheless, the Counties have facially challenged the Executive Order and asked the United States courts to enjoin United States officials from following the Executive Order, which, in effect, directed that those officials shall assure that a law of the United States shall "be faithfully executed."**[8]** Is that a proper use of the power of the United States courts in this case? One would think that to ask the question is to answer it in the negative. Alas, the district court did not agree with that answer. Alack, neither do my esteemed colleagues. I do. The reasons for my doing so follow.

(1) I do not think that this case is ripe for decision. I recognize that the concept of ripeness is very close to the concept of standing, and often is much the same as injury-in-fact inquiries in the standing area. *See Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138–39 (9th Cir. 2000) (en banc). As we have noted, "ripeness can be characterized as standing on a timeline." *Id.* at 1138. In either event, what a party must show is that there is a true "'case or controversy,'" that is, "that the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Id.* at 1139; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). Moreover, ripeness doctrine does focus on timing and directs us to consider whether the claim a plaintiff is making keys on an alleged injury that is speculative because it "'rests upon

---

**[8]** U.S. Const. art. II, § 3.

contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010); *see also Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S. Ct. 1717, 1724–25, 109 L. Ed. 2d 135 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact." (internal quotation marks omitted)). Moreover, while there are times when a "law is aimed directly at plaintiffs"[9] and there is reason to believe that it will be enforced against them,[10] that is not the case here. The Executive Order itself is not directed toward the Counties at all; it is directed to Federal government officials only. If they obey its dictates, they will not overstep legal or constitutional boundaries. Nor have they threatened that they will knowingly do so.

The parties do not dispute that in order to assess whether action will be taken against the Counties a three-part test should be applied to ripeness in this case. That is: "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged [law]." *Thomas*, 220 F.3d at 1139. Application of the test demonstrates that this case is not ripe.

First: As already noted, the Executive Order is not directed at the Counties. It is directed to the Attorney

---

[9] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392, 108 S. Ct. 636, 642, 98 L. Ed. 2d 782 (1988).

[10] *Id.* at 393, 108 S. Ct. at 643.

General and the Secretary. Moreover, while it does direct those officials to "ensure" that a law—§ 1373—is complied with, it also tells them that whatever they do in that regard must be "consistent with law." And neither the Attorney General nor the Secretary has threatened to take actions that do not adhere to that admonition. That is quite different from executive orders that direct the executive's subordinates to take certain actions, but do not caution that those actions must be taken within the confines of existing law. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583, 587, 72 S. Ct. 863, 865, 867, 96 L. Ed. 1153 (1952); *Washington v. Trump*, 847 F.3d 1151, 1156–57 (9th Cir.) (per curiam), *cert. denied*, __ U.S. __, 138 S. Ct. 448, 199 L. Ed. 2d 331 (2017). The district court suggested that the admonition would render the Executive Order legally meaningless, but that is a disingenuous reading of it. It is not meaningless to announce to executive officers and, indeed, the nation, that a statute—here § 1373—will be enforced even if enforcement has been somewhat lax in the past. And the Counties certainly do not assert that they have violated or intend to violate § 1373.

In short, the Counties have not met the concrete-plan element.

Second: The terms of the Executive Order itself and the Formal Memorandum show that there is no threat to enforce the Executive Order in a manner that takes away (or denies) funding to the Counties in the improper manner that the Counties seem to fear. That is, neither the Executive Order itself, nor any actions taken under it, by creation of regulations or otherwise, have subtended that threat. Rather, whatever the President, or others, might wish for in order to achieve what they deem to be a more perfect polity, the

Executive Order recognizes their limits in achieving that. Nothing they have said or done threatens the possible illegal horrors conjured up by the Counties. *See Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 774 (9th Cir. 2006). And, after all, it is the Executive Order itself that is under attack here. It does not direct that any illegal conduct be undertaken. This factor does not support ripeness.

Third: There is no enforcement history regarding the Executive Order. San Francisco suggests that the factor is, therefore, neutral. Quite the contrary. What it does demonstrate is that the Counties' rush to litigate caused them to bring this facial attack on the Executive Order before the timeline allowed their case to reach the ripeness stage.

Therefore, in my view this matter is not ripe and the district court should have eschewed jurisdiction, as should we.

(2) While I am of the opinion that we should not opine on the merits at this point, because the majority does, I must say a few words. To a large extent, the defect in the district court's issuance of an injunction was caused by its failure to accord the Executive Order a fair enough reading. That resulted in its abusing its discretion when it issued the injunction. *See LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001); *see also United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

There can be no doubt that the President had the authority and the duty to see that duly adopted laws were faithfully executed, and to direct his subordinates to that end. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492–93, 130 S. Ct. 3138, 3151–52, 177 L. Ed. 2d 706

(2010); *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50, 102 S. Ct. 2690, 2701, 73 L. Ed. 2d 349 (1982); *Myers v. United States*, 272 U.S. 52, 117, 133–35, 47 S. Ct. 21, 25, 31, 71 L. Ed. 160 (1926). One way a president does that is through executive orders. *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32–33 (D.C. Cir. 2002). That is what the President did here. The courts do not treat executive orders with disdain, but read and construe them in much the same way as statutes should be treated,[11] and the courts do not properly construe executive orders based upon the courts' own policy preferences.[12] Among other things, that means that: "'when the [order's] language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030, 157 L. Ed. 2d 1024 (2004). And it is not the role of the courts "to rewrite the Executive Order." *Washington*, 847 F.3d at 1167. Unfortunately, the district court did not follow those rules.

What the Counties argued for and what the district court did was to shunt aside short but clear and extraordinarily important wording in the Executive Order. The introductory sentence of section 9 of the Executive Order merely stated that it was executive branch policy that § 1373 be followed "to the fullest extent of the law," and lest that be seen as too expansive, the body of section 9(a) directed that any actions

---

[11] *See Utley v. Varian Assocs., Inc.*, 811 F.2d 1279, 1284–85 (9th Cir. 1987); *see also Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005).

[12] *See Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1174 (9th Cir. 2017), *cert. granted*, __ U.S. __, 138 S. Ct. 1165, 200 L. Ed. 2d 313 (2018).

taken by the Attorney General or the Secretary were to be taken "to the extent consistent with law" and not otherwise. To brush those words aside as implausible, or boilerplate, or even as words that would render the Executive Order meaningless was just to say that the plain language of the Executive Order should be ignored in favor of comments made dehors the order itself, none of which have resulted in the taking of any illegal action pursuant to the order.[13] That is not the proper way to deal with plain language—it is, instead, an attempt to rewrite the Executive Order itself and then to enjoin use of the newly written version.[14] And if there is ambiguity in certain parts of the Executive Order, it is not at all ambiguous in its use of the restrictive language. Nor is it proper to enjoin enforcement of the Executive Order on the unsupported speculation that it will be implemented in an unconstitutional manner. *See Arizona v. United States*, 567 U.S. 387, 415, 132 S. Ct. 2492, 2510, 183 L. Ed. 2d 351 (2012); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 454, 128 S. Ct. 1184, 1193, 170 L. Ed. 2d 151

---

[13] As to the dismissive attitude evidenced by those characterizations, the answer is well set forth in *Allbaugh*, 295 F.3d at 33, where the court, referring to *Youngstown*, 343 U.S. 579, 72 S. Ct. 863, said: "Indeed, had President Truman merely instructed the Secretary of Commerce to secure the Government's access to steel '[t]o the extent permitted by law,' *Youngstown* would have been a rather mundane dispute over whether the Secretary had statutory authority to act as he did."

[14] *See Trump v. Hawaii*, ___ U.S. ___, ___, 138 S. Ct. 2392, 2416–23, ___ L. Ed. 2d ___ (2018) (rejecting attack on an executive order based on statements made by the President in his election campaign and some of his other general statements).

Case 3:17-cv-00574-WHA Document 108-1, Filed 08/07/18, Page 47 of 47

(2008).  Certainly, it was not a proper basis for deciding that the Executive Order was facially unconstitutional.[15]

In fine, while the Counties may be convinced that the Executive Order loosed a fearsome chimera upon them, that does not mean that the courts should take up arms to vanquish the imagined beast by slaying the Executive Order itself.[16]

Thus, I respectfully dissent.

---

[15] If an executive agency should misstep at some point, that will be the time to so state and rule accordingly.  *See Allbaugh*, 295 F.3d at 33.  I note that *City of Chicago v. Sessions*, 888 F.3d 272, 278 (7th Cir. 2018), *reh'g en banc granted on other grounds*, No. 17-2991 (7th Cir. June 4, 2018) is not apposite.  It discusses conditions which were not imposed as a result of the Executive Order and does not consider issues regarding enforcement of § 1373 itself.

[16] While it goes without saying that I would vacate the injunction in its entirety, even if it were otherwise proper, the district court erred when it granted a nationwide injunction.  It could have granted relief to the Counties without so doing.  In fact, the whole concept of issuing nationwide injunctions is somewhat dubious.  *See Trump*, ___ U.S. at ___, 138 S. Ct. at 2425–29 (Thomas, J., concurring); *cf. id.* at ___, 138 S. Ct. at 2423 (majority opinion) (declining to decide "propriety of the nationwide scope of the injunction").  They should at the very least be used with a great deal of caution.  In general, a court should not stretch to impose its will further than is necessary to grant relief to those before it.  *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); *see also Califano v. Yamasaki*, 442 U.S. 682, 701–03, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979).